# EXHIBIT A

Lane Koroly Deposition Transcript
(Filed Under Seal)

                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
                            SHERMAN DIVISION

    THOMAS ROY HARRIS, JR.,            )
    d/b/a SPORTING ARMS COMPANY,       )
         Petitioner,                   )
                                       )
    VS.                                )
                                       )
    KRISSY Y. CARLSON, in her          )    CASE NO.
    official capacity as               )    4:24-cv-00737-SDJ
    Director of Industry               )
    Operations, Dallas Field           )
    Division, Bureau of Alcohol,       )
    Tobacco, Firearms and              )
    Explosives,                        )
         Respondent.                   )

            ----------------------------------------
               ORAL AND VIDEOTAPED DEPOSITION OF
                          LANE KOROLY
                           VOLUME 1
                        April 13, 2026
            ----------------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF LANE KOROLY,

produced as a witness at the instance of the Petitioner,

was taken in the above-styled and numbered cause on

April 13, 2026, from 9:01 a.m. to 4:08 p.m., before

Jamie K. Israelow, Certified Shorthand Reporter in and

for the State of Texas, Registered Merit Reporter and

Certified Realtime Reporter, reported by machine

shorthand, at the offices of Bradley Arant Bould

Cummings LLP, 1445 Ross Avenue, Dallas, Texas, and the

provisions stated on the record or attached hereto; that

the deposition shall be read and signed before any

notary public.

APPEARANCES

FOR THE PETITIONER:
     William Chadwick Lamar, Jr.
     BRADLEY ARANT BOULT CUMMINGS, LLP
     One Federal Place
     1819 Fifth Avenue North
     Birmingham, Alabama  35203
     205.521.8533
     clamar@bradley.com


FOR THE RESPONDENT:
     Daniel Gaffney
     U.S. DEPARTMENT OF JUSTICE
     EASTERN DISTRICT OF TEXAS
     101 East Park Blvd., Suite 500
     Plano, Texas  75074
     daniel.gaffney2@usdoj.gov
     - and -
     Ashley V. Ayers
     U.S. DEPARTMENT OF JUSTICE
     BUREAU OF ALCOHOL, TOBACCO,
     FIREARMS AND EXPLOSIVES
     DALLAS FIELD DIVISION
     2501 South State Highway 121 Business
     Suite 300A
     Lewisville, Texas  75067
     469.451.4716
     ashley.ayers@aft.gov


FOR THE WITNESS:
     Jason L. Hornsby
     CORNERSTONE ADVOCATES, PLLC
     1500 Marilla Street
     Dallas, Texas  75201-6318
     817.998.1190
     jason.hornsby@cornerstoneadvocatespllc.com


ALSO PRESENT:

     Jack Franklin, Videographer
     Thomas Roy Harris, Jr.
     Jacqueline Harris

                            INDEX
                                                    PAGE
Appearances                                          2

LANE KOROLY

    EXAMINATION BY MR. LAMAR                         5
    EXAMINATION BY MR. GAFFNEY                      211
    FURTHER EXAMINATION BY MR. LAMAR               238


  Corrections and Signature                        248
  Reporter's Certificate                           250


                           EXHIBITS

NO.                    DESCRIPTION                 PAGE

Exhibit 1      Notice of Subpoena for Videotaped    8
               Deposition
Exhibit 2      Factual Basis                       118
Exhibit 3      Statutory Declaration               132
Exhibit 4      November 18, 2023, letter by Corey  142
               Staub
Exhibit 5      Report of Investigation             152
Exhibit 6      Letter titled:  Customers Please    155
               Note

P R O C E E D I N G S

(On the record at 9:01 a.m.)

THE VIDEOGRAPHER:  We are now on the record at 9:01 a.m. on April 13th, 2026.  Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.  This is the video-recorded proceeding of Lane Koroly, taken by counsel for Thomas Roy Harris, Jr., in the matter of Thomas Roy Harris, Jr. v. Krissy Carlson, filed in the United States District Court for the Eastern District of Texas, Sherman Division.

This proceeding is being held at Bradley Arant Boult & Cummings, located at 1445 Ross Avenue, Suite 3600, Dallas, Texas, 75202.

My name is Jack Franklin, and I am the videographer on behalf of U.S. Legal Support, located at 16825 Northchase Drive, Suite 900, Houston, Texas 77060.  I am not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Jamie Israelow on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will enter

the statement for remote proceedings into the record and swear in the witness.

MR. LAMAR:  Chadwick Lamar on behalf of Thomas Roy Harris.

MR. HORNSBY:  Jason Hornsby on behalf of Lane Koroly.

MR. GAFFNEY:  Danny Gaffney on behalf of the ATF.

MS. AYERS:  Ashley Ayers on behalf of ATF.

LANE KOROLY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LAMAR:

Q.   Good morning, Mr. Koroly.  My name is Chadwick Lamar, and I represent Tom Harris doing business as Sporting Arms Company in a civil case called Harris v. Carlson pending in the Eastern District of Texas.

Could you please state your full name, place of residence and place of employment for the record?

A.   Lane Alan Koroly, Fort Worth, Texas, Westland Hospitality Group.

Q.   Could you repeat the place of employment?

A.   Westland Hospitality Group.

Q.   Have you ever provided testimony in a

deposition before?

    A.    No.

    Q.    Have you ever provided testimony in a court?

    A.    Can you clarify?

    Q.    Have you ever given testimony under oath in a courtroom?

    A.    Like I've been to court -- I don't -- like as a witness?  I'm sorry.  I don't understand what you're saying.

    Q.    As a witness, yes.

    A.    No.  I pled guilty in court.

    Q.    I'm going to go over a few ground rules this morning that will help us make a clear record.

          It is my job to ask the questions.  Your job is to answer them based on your best recollection.  To do that, I would ask that you give me time to fully ask my question, and I will give you time to fully answer.  I will try not to interrupt you.

          If for any reason you don't understand my question, please let me know, and I will try my best to rephrase it.

          We have a court reporter this morning transcribing this deposition, so I'd ask that you give verbal answers.  Please do not nod your head or give an "uh-huh" or "huh-uh."

If you need a break for any reason, please let me know.  We will try to take a break around once per hour.  My only request is that if I've already asked a question, that you would answer it before requesting a break.

Do you understand these ground rules?

A.   Yes.

Q.   Are you represented by an attorney today?

A.   Yes.

Q.   Who is your attorney?

A.   Jason Hornsby.

Q.   Do you understand that you have been placed under oath this morning?

A.   Yes.

Q.   Do you understand that this is the same oath that you would be administered in a court of law?

A.   Yes.

Q.   Do you understand that your testimony this morning is subject to the penalty of perjury?

A.   Yes.

Q.   Is there any reason, such as medication, alcohol, or a health condition, that would impair your ability to understand my questions?

A.   No.

Q.   Is there any reason that would under- -- that

would impair your ability to give accurate responses today?

A.    No.

Q.    Is there any other reason that you feel that you cannot testify fully, accurately and truthfully today?

A.    No.

Q.    I'm handing you a document I will mark as Exhibit 1 to the deposition.

(Exhibit 1 was marked.)

Q.    (By Mr. Lamar)  Do you recognize the document in front of you?

A.    Yes.

Q.    Do you agree that it is a subpoena packet?

A.    Yes.

Q.    Were you served with a copy of the same subpoena packet?

A.    Yes.

Q.    Are you appearing today because you were served with a subpoena?

A.    Yes.

Q.    What is your date of birth?

A.    March 28th, 1996.

Q.    Where do you currently live?

A.    Fort Worth, Texas.

Q.    How long have you lived in Fort Worth?

A.    About four years.

Q.    Where did you live before moving to Fort Worth four years ago?

A.    Denton, Texas.

Q.    Are you married?

A.    Yes.

Q.    How long have you been married?

A.    Just under a year.

Q.    What is your spouse's occupation?

A.    Executive chef at the same company I'm at.

Q.    Do you and your wife have any children?

A.    No.

Q.    Do you and your wife have any plans to move in the next year?

A.    Can you clarify?  Move where?

Q.    Do you and your wife have plans to move to any different address in the next year?

A.    Yes.

Q.    Do you have plans to move to a different city?

A.    No.

Q.    Do you already know the address where you plan to move?

A.    No.

Q.    Where did you attend high school?

A.    Denton High School.

Q.    Do you have any post-high school education?

A.    Yes.

Q.    What post-high school education do you have?

A.    Two associate's degrees.

Q.    Where did you earn these associate's degrees?

A.    Texas State Technical College.

Q.    What are these associate's degrees in?

A.    Off-highway diesel and on-highway diesel.  That might not be exactly, but -- they're associate's of applied sciences, so -- it's about diesel mechanics.

Q.    Other than your associate's degrees, do you have any other technical training?

A.    Can you clarify?

Q.    Have you attended and graduated from any technical training school?

A.    No, apart from that one.

Q.    Other than your current job, what other jobs have you held in the last four years?

A.    I was a 1099 contractor for the same company I'm -- I'm an employee of now for probably 18 months, give or take.  And prior to that, I worked for the City of Fort Worth.  Prior to that, when I first moved to Fort Worth, it was Weinstein Properties.

Q.    Do you recall what job you had in the year

2021?

A.    Can you clarify?

Q.    What formal positions of employment did you hold in the year 2021?

A.    I guess none.

Q.    In the year 2021, would you have earned most of your revenue from selling firearms?

A.    Yes.

Q.    In the year 2022, would you have earned most of your revenue from selling firearms?

A.    No.

Q.    What cell phone do you have?

A.    iPhone.

Q.    Who is your cell phone provider?

A.    Mint.

Q.    What is your cell phone number?

A.    737.398.9270.

Q.    Have you used any other cell phone number in the past five years?

A.    Yes.

Q.    Was that with a different provider?

A.    I don't know.  I don't remember.  It would have been -- I'm pretty sure it was Mint.

Q.    Do you recall what your cell phone number was in the year 2021?

A.    Yes.

Q.    Would you tell me?

A.    940.367.9383.

Q.    Do you tend to delete text messages?

A.    Can you clarify?

Q.    Do you have a regular practice of deleting text messages?

A.    I'm not sure if you're familiar.  iPhone will do it for you however the default settings are.  It's not storing for, you know, decades, if that's what you're asking.

Q.    In addition to your phone regularly deleting text messages, do you have a practice of going through text messages and deleting them?

A.    No.

Q.    Have you ever been convicted of a crime?

A.    Yes.

Q.    What crime was that?

A.    Engaging in a business without a license.

Q.    Were you convicted of that crime in 2023?

A.    I pled guilty in 2023.  I was not sentenced until 2024.

Q.    Have you ever been convicted of any other crime?

A.    No.

Q.   Have you ever been charged with any other crime?

A.   No.

Q.   Have you ever been arrested on suspicion of any other crime?

            MR. HORNSBY:  Objection as to form.

A.   No.

Q.   (By Mr. Lamar)  Do you have an understanding of why you were served a subpoena to testify in this case?

A.   No.

Q.   Do you have any knowledge of what this lawsuit is about?

A.   Apart from what's in this and the suit, no.

Q.   Do you know Tom Harris?

A.   Yes.

Q.   Do you recognize him in this courtroom?

A.   Yes.

Q.   Strike that.

            Do you recognize him in this conference room?

A.   Yes.

Q.   Are you familiar with his business called Sporting Arms Company?

A.   Yes.

Q.   Prior to receiving the dep- -- the subpoena

Lane Koroly Vol 1
April 13, 2026                                                14

packet in this case, were you aware that the Bureau of

Alcohol, Tobacco, Firearms and Explosives revoked his

federal firearms license?

A.   No.

Q.   Sitting here today, do you know why ATF revoked

Mr. Harris' federal firearms license?

A.   According to the suit, it was willful

violation, I believe is what it was saying at the end.

Q.   On what basis do you know that fact?

A.   From reading the suit.

Q.   When you say you read the suit, what does that

mean specifically?

A.   The Petition for De Novo Judicial Review.  I

don't remember exactly, but -- I guess the -- it's got

all of the stuff y'all said followed by the -- I guess,

the ATF's report.

Q.   Is fair to say that in preparing for this

deposition, you read materials concerning this lawsuit?

A.   Yes.

Q.   How did you obtain those materials?

A.   They are from PACER.

Q.   Did you find them yourself?

A.   No.

Q.   Were they given to you by your attorney?

A.   No.

Q.   How did you access them, then?

A.   I used Grok to research it.

Q.   In preparing for this deposition, did you meet with an attorney?

A.   Yes.

Q.   Did you meet in person?

A.   No.

Q.   Did you meet on Zoom?

A.   No.

Q.   Did you meet on any other video/teleconference platform?

A.   Facetime.

Q.   Without divulging the substance of your conversation with counsel, how long was your meeting with your attorney?

A.   Maybe three hours.

Q.   Is that the only occasion on which you met to discussion this deposition?

A.   No.

Q.   On what other occasion did you meet with your attorney?

A.   We had phone calls.

Q.   Did you hire your attorney specifically for this deposition?

A.   Yes.

Lane Koroly Vol 1
April 13, 2026
16

Q.    In preparing for this deposition, have you discussed this case with anybody with the federal government?

A.    No.

Q.    Has your attorney discussed this case with anybody for the federal government?

MR. HORNSBY:  Objection, attorney-client privilege.

MR. LAMAR:  Are you instructing your witness not to answer?

MR. HORNSBY:  I'm instructing my witness not to answer.

Q.    (By Mr. Lamar)  Other than your attorney, have you discussed this lawsuit with anybody else?

A.    My wife.

Q.    Have you discussed this lawsuit with Chris Remley?

A.    I'm invoking my Fifth Amendment right to remain silent.

Q.    On what basis are you invoking your Fifth Amendment right to remain silent?

A.    On the basis of my Fifth Amendment right to remain silent.

Q.    When is the last time you spoke to Chris Remley?

A.    I'm invoking my Fifth Amendment right to remain silent.

Q.    Have you spoken to Chris Remley in the last week?

MR. HORNSBY:  Objection as to form.

A.    I'm invoking my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Do you have plans to speak with Chris Remley this week?

A.    I am invoking my Fifth Amendment right to remain silent.

Q.    In the last month, have you discussed with Chris Remley a need to have a straight story in this deposition?

A.    I am invoking my Fifth Amendment right to remain silent.

Q.    Other than your wife and Mr. Remley, have you spoken to anybody else about this deposition?

MR. HORNSBY:  Objection, asked -- asked and answered.

A.    I am invoking my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  In preparing for this deposition, did you review any documents related to your underlying federal criminal proceedings?

Lane Koroly Vol 1
April 13, 2026                                                    18

A.   Can you clarify?

Q.   In preparing for this deposition, did you review any documents provided to you by the federal government in relation to your prosecution for the unlawful selling of firearms?

A.   Yes.

Q.   What documents were those?

A.   The plea agreement and the Memorandum for Sentencing.

Q.   Did you review any other documents related to your underlying criminal proceeding in preparing for this deposition?

          MR. HORNSBY:  Objection, asked and answered.

A.   No.

Q.   (By Mr. Lamar)  When is the last time you spoke with anyone other than your attorney about Tom Harris?

          MR. HORNSBY:  Objection, asked and answered.

A.   I am invoking my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  How do you know Chris Remley?

A.   I am invoking my Fifth Amendment right to remain silent.

Q.   Mr. Koroly, are you aware that the Fifth

Amendment no longer protects you from crimes which you have already been convicted and punished?

A.    Yes.

Q.    And yet you are continuing to invoke your Fifth Amendment right to remain silent?

A.    You can ask me again, if you'd like, the question.

Q.    How do you know Chris Remley?

A.    From seventh grade, middle school.

Q.    Are you and Mr. Remley family friends?

A.    How would you define "family friend"?

Q.    Have you known Mr. Remley since childhood because your parents are friends?

A.    No.

Q.    How did you meet Mr. Remley?

A.    Seventh grade, middle school.

Q.    Did you remain friends with Mr. Remley through high school?

MR. HORNSBY:  Objection, relevance.

A.    Yes.

Q.    (By Mr. Lamar)  Were you friends with Mr. Remley between graduation from high school and the year 2021?

MR. HORNSBY:  Objection, relevance.

A.    Off and on, because I moved to Waco for about a

two-year period.

Q.    (By Mr. Lamar)  Would you consider Mr. Remley your friend today?

MR. HORNSBY:  Objection, relevance.

A.    No.

Q.    (By Mr. Lamar)  Why are you no longer friends with Mr. Remley?

MR. HORNSBY:  Objection, relevance.

A.    Because of this.

Q.    (By Mr. Lamar)  What is "this"?

A.    This entire legal issue for the last five years.

Q.    Do you believe that Mr. Remley got into your, quote, legal trouble?

MR. HORNSBY:  Objection --

A.    No.

MR. HORNSBY:  -- speculation.

Q.    (By Mr. Lamar)  Would you describe Mr. Remley as an honest person?

MR. HORNSBY:  Objection, relevance.

A.    I can't answer his mindset.  I don't know.

Q.    (By Mr. Lamar)  In your personal opinion, is Mr. Remley an honest person?

A.    I think he's a straightforward man, yes.

Q.    Is it fair to describe Mr. Remley as the kind

Lane Koroly Vol 1
April 13, 2026                                          21

of person who would take advantage of other people to meet his own needs?

A.   No.

Q.   Did Mr. Remley get you into selling firearms for profit?

A.   No.

Q.   Isn't it true that Mr. Remley approached you in spring 2021 and asked you to help him sell ammunition?

MR. GAFFNEY:  Objection, form.

A.   I wanted to make extra money, so I agreed to work the gun shows.

Q.   (By Mr. Lamar)  Do you understand that an agreement implies participation of two people?

A.   Yes.

Q.   Who did you agree with to sell firearms at gun shows?

A.   Can you clarify?

Q.   Did Mr. Remley approach you and ask you to help him sell firearms at gun shows?

MR. HORNSBY:  Objection, asked and answered.

A.   No.

Q.   (By Mr. Lamar)  Then with whom did you agree to attend gun shows and sell ammunition?

A.   With Freedom Seeds.

Q.    What's Freedom Seeds?

A.    It's the -- it's the name of that.

Q.    Is Freedom Seeds an ammunition business?

A.    Yes.

Q.    Who owns Freedom Seeds?

A.    I do not know.

Q.    Is it your testimony that you agreed to work with Freedom Seeds, yet you do not know who owns it?

        MR. HORNSBY:  Objection, form.

A.    That was on the business cards that were on the table, so I don't know the official -- like, what they officially called it.

Q.    (By Mr. Lamar)  Who managed the business affairs of Freedom Seeds?

A.    I don't think anyone --

        MR. HORNSBY:  Objection, speculation.

A.    -- specifically managed it.

Q.    (By Mr. Lamar)  Who is John Anderson?

A.    He was selling ammo from Academy, and that's how he and Chris met, as far as I understand.

Q.    Is John Anderson involved in Freedom Seeds?

A.    Yes.

Q.    In what way is John Anderson involved in Freedom Seeds?

A.    He and Chris met in line for Academy.  They

decided to basically team up, from what I understand. It was -- it was prior to my involvement.  They were -- knew each other.

Q.    When you say that Chris Remley and John Anderson teamed up, are you testifying that they teamed up for the purpose of running Freedom Seeds?

          MR. HORNSBY:  Objection as to form.

    A.    Yes.

    Q.    (By Mr. Lamar)  And at some point, Mr. Remley approached you about helping them in their Freedom Seeds business affairs?

          MR. GAFFNEY:  Objection, form.

    A.    Yes.

    Q.    (By Mr. Lamar)  When did you begin your involvement with Freedom Seeds?

    A.    Spring of 2021, early summer, maybe.

    Q.    When did you cease your involvement with Freedom Seeds?

    A.    When I left in -- I guess it was when I stopped talking completely.

    Q.    Mr. Koroly, I'm trying to understand your answer to the previous question.

          Is it your testimony that you ceased involvement with Freedom Seeds when you stopped talking completely with Mr. Remley?

A.   I'll clarify.  It was the spring of '22, I guess, when I moved, and I had an attorney who told me not to talk to him -- them.

Q.   Was your attorney at the time Brian Poe?

A.   Yes.

Q.   And Brian Poe instructed you to stop talking to Chris Remley?

MR. HORNSBY:  Objection, attorney-client privilege.

A.   To --

MR. HORNSBY:  I advise my client not to answer that question.

MR. LAMAR:  Mr. Hornsby, your client just spoke about the substance of the very communication that I am asking him about now.  Is it still your view that that conversation is privileged?

MR. HORNSBY:  Yes.

MR. LAMAR:  Are you instructing your client not to answer?

MR. HORNSBY:  Yes.

Q.   (By Mr. Lamar)  At the time you stopped talking to Chris Remley, were you under investigation by the ATF?

A.   I do not know when the investigation began specifically, or, I guess, when it started.  I was made

aware prior to them showing up to my house.

Q.   When did ATF show up to your house?

A.   Maybe -- I want to say, like, September 14th, '21, I think.  I don't remember exactly, but it was September/October, somewhere in there.

Q.   How were you introduced to Tom Harris?

A.   Through Chris and John.

Q.   What did you know about Tom Harris before you met him?

A.   He is an FFL they bought their ammo from -- or most of their ammo from, I guess.

Q.   Did Mr. Remley or Mr. Anderson tell you that Mr. Harris had issues with his health or vision?

MR. GAFFNEY:  Objection, form.

A.   I don't remember.

Q.   (By Mr. Lamar)  At the time that you met Mr. Harris, did you have any understanding of his reputation as a federal firearms licensee?

A.   His reputation?  I knew he had an FFL.  I don't -- I guess I don't -- I don't understand what you're asking me.

Q.   Prior to meeting Mr. Harris, had anyone told you that Mr. Harris was a strict federal firearms licensee?

A.   No.  The only thing I knew is he had an Asian

wife over there.  That's the only thing they specifically mentioned.

Q.    Do you recall when you learned that Mr. Harris had issues with his vision?

MR. HORNSBY:  Objection, asked and answered; and objection as to form.

A.    I don't remember.

Q.    (By Mr. Lamar)  Would it be fair to describe Mr. Harris as a strict federal firearms dealer?

MR. HORNSBY:  Objection as to form.

A.    I would say no, considering we're here.

Q.    (By Mr. Lamar)  Who is Nick Albin?

A.    He is someone I knew from, I guess, elementary school.

Q.    Did you attend high school with Mr. Albin?

A.    No.  He went to -- it's like a charter school, I think.  I don't remember exactly.

Q.    Is Larry or Buddy Albin Nick's father?

A.    Yes.

MR. HORNSBY:  Objection, relevance.

A.    Yes, I think.

Q.    (By Mr. Lamar)  Does Buddy Albin have a federal firearms license?

MR. HORNSBY:  Objection relevance.

A.    Last I knew, they got one, yeah.

Q.    (By Mr. Lamar)  Do you recall when the Albins obtained a federal firearms license?

A.    I don't know.

Q.    Did the Albins have a federal firearms license at the time you were selling firearms for profit?

MR. HORNSBY:  Objection as to form.

A.    I think they got it after I had already stopped.  I don't remember exactly when they got it, but it was in that same kind of time period as all this, like, 2021, 2022, somewhere in there.

Q.    (By Mr. Lamar)  Even before obtaining their federal firearms license, did the Albins sell ammunition?

MR. HORNSBY:  Objection as to form; and objection, relevance.

A.    I think so.

Q.    (By Mr. Lamar)  Prior to obtaining their federal firearms license, did the Albins sell firearms?

MR. HORNSBY:  Objection, relevance; objection as to form.

A.    I'm not sure.

Q.    (By Mr. Lamar)  Have you ever worked for the Albins?

A.    No.

Q.    Have you attended gun shows with the Albins?

MR. HORNSBY:  Objection as to form and relevance.

A.   I never went with them, but I knew they were there.  I don't remember when I knew they were there.

Q.   (By Mr. Lamar)  Have you ever sold ammunition on behalf of the Albins?

MR. HORNSBY:  Objection, relevance.

A.   No.

Q.   (By Mr. Lamar)  Do you recall when you first became interested in firearms?

A.   When I was young, I guess.

Q.   Is it fair to say that in high school you were interested in firearms?

A.   Sure.

Q.   Were you ever a hunter?

A.   No.

MR. HORNSBY:  Objection, relevance.

Q.   (By Mr. Lamar)  Do you recall when you first owned your own firearm?

MR. HORNSBY:  Objection, relevance.

A.   18, I guess.

Q.   (By Mr. Lamar)  Do you enjoin tinkering with firearms?

A.   I'm not allowed to own firearms.

Q.   Prior to your federal criminal proceedings, did

Lane Koroly Vol 1
April 13, 2026                                    29

you enjoy tinkering with firearms?

MR. HORNSBY:  Objection, relevance.

A.    I guess.

Q.    (By Mr. Lamar)  Prior to your federal criminal proceedings, did you enjoy customizing firearms?

MR. HORNSBY:  Objection, asked and answered.

A.    I guess.

Q.    (By Mr. Lamar)  Prior to your federal criminal proceedings, did you enjoy modifying firearms?

MR. HORNSBY:  Objection, relevance.

A.    Can you explain what you mean, "modifying"?

Q.    (By Mr. Lamar)  Have you ever converted a semiautomatic rifle into an automatic rifle?

A.    No.

Q.    Isn't it true that you have some experience with 3D printing?

A.    I had a 3D printer five years ago.

Q.    Did you 3D print any firearms?

MR. HORNSBY:  Objection, relevance.

A.    I am invoking my Fifth Amendment right to stay silent.

Q.    (By Mr. Lamar)  Did you ever sell a firearm that you had 3D-printed?

A.    No.

Lane Koroly Vol 1
April 13, 2026

30

Q.   Have you ever 3D-printed a Glock switch?

A.   No.

Q.   Have you ever 3D-printed an AR conversion part?

A.   What is that?

Q.   Have you ever 3D-printed a component that would convert a semiautomatic rifle into an automatic rifle?

MR. HORNSBY:  Objection, relevance; asked and answered.

A.   I'm invoking my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Do you recall when you first sold a firearm?

A.   Yes.

Q.   In what year did you first sell a firearm?

A.   2018.

Q.   When you sold a firearm in 2018, did you do so for profit?

MR. HORNSBY:  Objection, attorney-client privilege.

I advise my client not to answer that question.

Q.   (By Mr. Lamar)  You sold firearms at gun shows, right?

A.   I was convicted of that, yes.

Q.   Do you recall the year that you first sold a

firearm at a gun show?

A.   Yes.

Q.   What year was that?

A.   2021.

Q.   Isn't it true that you claimed to be a collector of firearms?

MR. GAFFNEY:  Objection, form.

A.   I was coached to make sure I did not say I sold firearms.

Q.   (By Mr. Lamar)  Isn't it true that you claimed to be a collector of firearms?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection, asked and answered; form.

A.   I was coached not to say I sold firearms.

Q.   (By Mr. Lamar)  It's a yes-or-no question.

A.   Can you repeat the question?

Q.   Isn't it true that you claimed to be a collector of firearms?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection as to form.

A.   I have claimed that, yes.

Q.   (By Mr. Lamar)  Was that ever true?

MR. HORNSBY:  Objection as to form.

A.   I guess.

Q.   (By Mr. Lamar)  Is it your testimony that you were a bona fide collector of firearms?

MR. HORNSBY:  Objection as to form; asked and answered.

A.   I bought firearms to sell, not to collect, necessarily, for the most part.

Q.   (By Mr. Lamar)  Who got you into selling firearms?

A.   Myself.

Q.   Did Chris Remley contribute to your beginning to sell firearms?

A.   I don't understand.

MR. HORNSBY:  Objection, relevance.

A.   Can you clarify?

Q.   (By Mr. Lamar)  Is the reason you began to sell firearms because Chris Remley asked you to sell firearms?

A.   No.

Q.   Did Chris Remley ever pressure you to sell firearms?

A.   No.

Q.   Did Chris Remley ever tell you that he needed your help selling firearms?

A.   No, because I was profiting.  I was buying them and selling them, so I don't really understand what

you're saying.

Q.    Is it your testimony that you began selling firearms through your own accord?

A.    Yes.

Q.    Isn't it true that at some point, you and Mr. Remley began to partner together in the selling of firearms?

MR. HORNSBY:  Objection as to form.

A.    I was selling at their table at the shows, because they have a table, if that's what you're asking.

Q.    (By Mr. Lamar)  When you use the word "they," who are you referring to?

A.    Chris, and sometimes Slade had a table, like, right next to it, too.

Q.    When you use the word "table," are you referring to a table at a gun show?

A.    Yes.

Q.    Am I correct that you began to attend these gun shows for the purpose of selling ammunition?

A.    Yes.

Q.    Am I correct that at some point, you decided to begin selling firearms as well?

A.    I sold my personal gun that I didn't want anymore and realized it was quite easy, and that's what basically started it.

Q.    Was that in spring 2021?

A.    Spring, summer, like I don't remember exactly when.  But I bought that gun prior to any shows.  I think I got it in, like, December or something from Academy.  And then I had it a little bit, decided it was not really that great.  So I said:  Well, if I sell it, I can go and just get something different.

Q.    Am I correct that you sold the personal firearm you were just describing before you ever met Tom Harris?

A.    No, I'm not sure -- yes.

Q.    To be clear, you sold your personal firearm that you didn't want anymore before meeting Mr. Harris?

A.    I sold that gun.

        MR. HORNSBY:  Objection, relevance.

A.    I sold that gun.  And then within that week or maybe two, I bought two firearms from Tom, to sell one and I figured I would keep the other one, then ended up selling both of those.

Q.    (By Mr. Lamar)  Is it your testimony that from your very first transaction with Tom Harris, you bought a firearm with intentions of reselling it?

A.    Yes.

        MR. HORNSBY:  Objection, attorney-client privilege.  I advise my client not to answer that question.

MR. LAMAR:  Are you instructing your client not to answer that question on the basis of attorney-client privilege, even though I'm not asking him to divulge the contents of any communication with an attorney?

MR. HORNSBY:  Yes.

MR. LAMAR:  Can you explain the basis for that objection?

MR. HORNSBY:  It goes into consultation with the -- with his previous attorney in regards to that -- that plea agreement that they entered into.

MR. LAMAR:  And you're instructing him not to answer on that basis?

MR. HORNSBY:  Yes.

Q.   (By Mr. Lamar)  Is it your testimony, Mr. Koroly, that you and Chris Remley were never partners in a conspiracy to sell firearms together?

MR. HORNSBY:  Objection as to form.

A.   We were friends.  Okay?  They were already selling ammo at the shows, because in 2021, the prices on everything were high.  I was helping them out, so I could make extra money selling on the weekends or whatever.  I sold the first gun because I thought it was pretty easy, which opened the door to me like:  Oh, why don't I just keep doing this?

As time went on, he knew Joe and, like, other people I didn't know.

Q.   (By Mr. Lamar)  Are you saying that Chris Remley knew someone named Joe?

A.   I don't know if that's his real name, but that's how I also met Joe.

Q.   Are you testifying that your introduction to Joe contributed to you systematically selling firearms for profit?

MR. HORNSBY:  Objection.

A.   No.  I systematically sold firearms for profit because it was easy and lucrative.

Q.   (By Mr. Lamar)  Did and you Mr. Remley have any business arrangement between the two of you?

A.   During my offense, it was:  Hey, we're friends and we're making money.  This is cool.

And then as time went on, I said -- well, we started, like, talking, thinking:  We should probably FFL, because Slade was telling us that he got in trouble for private selling.  And then he got his FFL, and that's what we ought do.

So it was December '21/maybe January of '22 that the application went in, and that got denied. Then, like, 2023 or 2024, I want to say, well after I'd already pled guilty.

Q.   Did you and Mr. Remley agree to share profits from your firearm sales?

MR. HORNSBY:  Objection, relevance.

A.   On some.

Q.   (By Mr. Lamar)  What do you mean by testifying that you had an agreement to share profits on some?

MR. HORNSBY:  Objection, relevance.

A.   It was not like a written agreement, if that's what you mean by "agreement," but it was just like:  I'm using the table, so I will contribute to table costs because I'm benefiting selling the guns.

Does that make sense?

Q.   (By Mr. Lamar)  If you sold a firearm that you acquired from a private transaction, would you share the profits from that sale with Mr. Remley?

MR. HORNSBY:  Objection, asked and answered.

A.   If it was at the show on their table, I would contribute to table costs.

Q.   (By Mr. Lamar)  Would you contribute to table costs through money you acquired by illegally selling firearms?

MR. HORNSBY:  Objection, relevance.

A.   Yes.

Q.   (By Mr. Lamar)  Did you ever sell firearms that

Mr. Remley acquired?

MR. HORNSBY:  Objection, relevance.

A.   I don't think so, because I had stopped in '21 -- sorry -- September, and that was when they visited me.  So, basically, the idea was just not to, like, touch guns, because obviously they told me to stop doing it, so --

Q.   (By Mr. Lamar)  But you and Mr. Remley were both selling firearms at the same gun shows from June to September 2021, correct?

A.   I don't think Chris bought any guns until, like, the fall of '21.

Q.   Is it your testimony that Chris Remley did not unlawfully sell any firearms until September 2021?

A.   I don't know when he sold guns.  I don't -- I mean, that's a different person, so, if, like, I'm not there to see it, I don't know what's happening.

Q.   Is it fair to say that you're not intimately familiar with Chris Remley's involvement in the unlawful selling of firearms?

A.   I guess I'm familiar with what I was there for, and, like, what I knew.

Q.   Other than contributing to table costs at gun shows, did you ever share profit from selling firearms with anybody else?

Lane Koroly Vol 1
April 13, 2026                                    39

MR. HORNSBY:  Objection, relevance.

A.    The straw purchasers all make some, I think.  I don't remember, because it was, like, five years ago now.

Q.    (By Mr. Lamar)  When you employed a straw purchaser, did you pay them on the front end?

A.    I don't remember.

Q.    Did you and Mr. Remley discuss any strategic plan for systematically acquiring firearms?

A.    I don't remember.

Q.    You don't recall whether you and Mr. Remley were following any plan with respect to how you would get your hands on firearms that you could sell?

A.    I bought the guns, like, through the summer and stuff.  Then I stopped in, like, September.  And I think I switched to shotguns because they wouldn't flag multiple purchase reports, unlike handguns.

Q.    Did you say that you switched to shotguns?

A.    No.  I stopped in September.  I don't think I really sold a shotgun.  I don't remember exactly.  It was mostly handguns.

Q.    At the time that you were selling firearms for profit, were you aware that it was a federal crime to repetitively buy and sell firearms for profit?

A.    Yes.

Q.   How did you know that it was illegal?

A.   I guess because, like, stuff like that was in the news, like all the laws changing -- or not changing, I guess, but, like -- it was, like, more in the news than it is now, so it was, I guess, more common to be known.

Q.   But you knew that your activities risked federal prosecution, correct?

A.   Yes.

Q.   How did you keep your activities a secret?

A.   I didn't really --

MR. GAFFNEY:  Objection, form.

A.   I didn't keep it a secret, necessarily.  It's hard to be secret when you're in public doing something, you know.

Q.   (By Mr. Lamar)  Did you undertake any effort to prevent the ATF from discovering that you were unlawfully selling firearms?

MR. HORNSBY:  Objection as to form.

A.   Yes.

Q.   (By Mr. Lamar)  What efforts did you undertake to prevent ATF from discovering that you were unlawfully selling firearms?

A.   When they pulled all the 4473s, I guess Tom called me right after and coached me to just not use the

word "sell" and to tell the agents that I was a collector or I traded for them, stuff like that.

Q. At the time that you were selling firearms, did you undertake any efforts to conceal from ATF that you were unlawfully selling firearms?

A. I don't think so.

Q. When you were acquiring firearms that you intended to sell, how did you go about obtaining those firearms?

A. Buying them.

Q. Did you buy firearms in private transactions?

A. A handful of times, I'm sure. I don't remember exactly.

Q. Did you ever make your own firearms that you intended to resell?

MR. HORNSBY: Objection, relevance.

A. No. We sold the lowers.

Q. (By Mr. Lamar) What is a lower?

A. It's, like, the frame or whatever.

Q. Are you referring to the -- the frame or receiver of an AR-15?

A. Yes. I think I ordered, like, 15 or something.

Q. From whom did you order those frames or receivers?

A. It was -- I don't remember. But we delivered

Lane Koroly Vol 1
April 13, 2026                                          42

them through Tom, so I guess -- it was -- it was online searching, but I don't remember who it was.

Q.   Is it fair to say that you ordered frames or receivers from firearms dealers outside of Texas?

MR. HORNSBY:  Objection, relevance.

A.   I don't know.

Q.   (By Mr. Lamar)  When you ordered frames or receivers that you intended to resell, you had to have them transferred through a Texas FFL, correct?

A.   You have to transfer any gun you buy online through an FFL, yes.

Q.   From which FFLs in Texas did you acquire firearms that you intended to resell?

A.   Sporting Arms, Academy, Slade's FFL.  There, was, like a -- one across from the table at the show I think I bought two from.  I don't remember who they were.  It was, like, a husband and wife.  I don't remember all.  It was, like, five years ago, so --

I think that's it.  I mean, I -- the ones I transferred online, I don't remember who I got those from.  I don't remember everyone, but those are the ones I can remember.

Q.   In 2021, were you interested in buying any firearms that you could get your hands on?

A.   Not any.

Q.    What firearms in 2021 were you principally interested in obtaining?

A.    Handguns.

Q.    Did you have any strategy for first approaching an FFL for an initial transaction?

A.    What do you mean?

Q.    You didn't walk up to an FFL from whom you'd never bought a handgun and said, quote:  Hi.  I'd like to buy 15 pistols that I can resell.  Correct?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection, form.

A.    I don't think I ever have said those words.

Q.    (By Mr. Lamar)  Did you test the dealer in any way?

MR. HORNSBY:  Objection as to form.

A.    No.  I mean, I would buy multiples, so I don't know if that -- what do you mean by "test"?

Q.    (By Mr. Lamar)  Were you ever concerned that an FFL would report you to the ATF?

A.    No.  So, I guess, can you define "concerned," or how -- you know what I'm saying?  Like, expand on that.

Q.    Did you undertake any effort to test whether an FFL would be a reliable source of firearms for you before you began to systematically purchase firearms

from that dealer?

MR. HORNSBY:  Objection as to form; asked and answered as well.

A.  No.  I just figured, like, nothing bad would happen.

Q.  (By Mr. Lamar)  Is it fair to say that you weren't putting a lot of thought into what you were doing?

A.  I mean, running a business isn't super simple, so there's obviously a -- you have to think about stuff to run a business.

Q.  Were you in business with Mr. Remley?

A.  I mean business as, like --

MR. HORNSBY:  Objection, relevance.

A.  -- you need to make money, so you have to think about making money, you know.  Is this going to make enough money to make it worth it or not?  Stuff like that.

Q.  (By Mr. Lamar)  So it's fair to say that you put thought into how you would run your firearms business, correct?

MR. HORNSBY:  Objection --

A.  My illegal firearms business, yeah.

Q.  (By Mr. Lamar)  Did you put into any -- strike that.

Did you give any similar thought into avoiding being federally prosecuted for illegally selling firearms?

A.    Yes.

Q.    What thought did you put into it?

A.    Deliberately being deceptive when they came to ask me stuff at my house.

Q.    Is it your testimony that only when the ATF showed up at your house were you deceptive?

A.    I mean, I guess I was deceptive when I said that I was not going to sell the guns the whole time, but, I mean -- like, I don't know how to explain that, I guess.  But, yeah, obviously, I don't want to get -- like, I was just trying to, like, I guess, avoid incriminating myself.

So that's when Tom was saying:  Just, like, say you're a collector or that you traded.  That way, you don't, like, say you're selling guns, because they're not going to be very happy about that.

Q.    When you just testified that you were deceptive in how you said, quote:  I was not going to sell guns, end quote, what did you mean by that?

A.    What did I mean by saying:  I'm not going to sell guns?

Q.    Who did you say -- strike that.

Who did you tell, quote:  I'm not going to sell these guns?

A.   So I guess I never said the words:  I'm not going to sell these guns.

It's -- like on the forms, it says:  Are you the true purchaser, whatever?

You would say:  Yes, even though it's, like, obviously not -- it was -- that's what I meant.  I didn't say it -- it's like -- because it's on the forms.  You have to fill them out, so --

Q.   Is it your testimony that you're describing the effort to deceive the ATF?

A.   No.  Okay.  When you fill out the form to get guns, they ask you a bunch of questions, and you give, like, your name and all this other stuff.  You have to say, like:  Yes, I'm the true purchaser, even though I was not.

So that is, I guess, deception because it's not true.  But when they came, obviously, I was deceptive, then, too, because you don't want to, you know, admit to crimes.

Q.   You also deceived the people from whom you were acquiring firearms, correct?

MR. HORNSBY:  Objection as to form.

A.   I don't -- well, no, because I -- they wouldn't

ask me:  Am I selling these?  Stuff like that.  It was, like, just normal.

Q.    (By Mr. Lamar)  When you fill out a 4473, you give that form to the FFL from whom you are purchasing a firearm, correct?

A.    Yes.

Q.    And am I correct that you would mark on the Form 4473 that you were the true transferee, correct?

MR. HORNSBY:  Objection, form.

A.    Yes.

Q.    (By Mr. Lamar)  Isn't it true that by marking on the form that you were the true transferee, the FFL would believe that you were the true transferee?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection as to form.

A.    I fill out the paperwork and you give it to them.  They give you the guns.  That's how a 4473 works, pretty much.

Q.    (By Mr. Lamar)  But you never told the FFL that you intended to resell the firearm, correct?

A.    What FFL?

MR. HORNSBY:  Objection as to form.

A.    Because you're -- you're being very general.  It was multiple FFLs, obviously, we established I bought from, so I would like you to be more specific.

Lane Koroly Vol 1
April 13, 2026                                           48

Q.    (By Mr. Lamar)  Let's start with Academy.

A.    Okay.

Q.    When you purchased firearms from Academy, did you mark on the 4473 that you were the true transferee with the intent of deceiving Academy?

A.    No, because I did not intend to sell that when I bought that one.

Q.    When you bought your very first firearm from Tom Harris, did you mark on the Form 4473 that you were the actual transferee?

A.    I bought two from him the very first time, and, yes, I filled out the 4473.

Q.    On the Form 4473 that you filled out for the initial two pistols that you purchased from Mr. Harris, did you mark on the Form 4473 that you were the actual transferee?

A.    Yes, I marked I was the actual transferee.  I filled out the whole form.

Q.    Did you so mark the Form 4473 to deceive Mr. Harris into believing that you were not going to resell that firearm for profit?

        MR. HORNSBY:  Objection as to form.

A.    I filled out the 4473 because you have to fill out the 4473 to buy a firearm from an FFL.

Q.    (By Mr. Lamar)  When you first purchased

Lane Koroly Vol 1
April 13, 2026                                        49

firearms from Mr. Harris, did you tell him that you intended to resell those firearms for profit?

A.   When I first -- the first time I purchased guns, did I tell him I was going to sell guns?  Is that your question?

Q.   That is my question.

A.   The first time I bought guns, I did not tell him I going to sell guns.  No, the first time, I did not.

Q.   So, Mr. Koroly, by filling out the Form 4473 for your first two purchases from Mr. Harris, did you intend to deceive Tom Harris into believing that you were the actual transferee?

MR. HORNSBY:  Objection as to form.

A.   I did not fill it out to deceive him; I filled it out to acquire the firearms.

Q.   (By Mr. Lamar)  Do you agree that Mr. Harris would not have been able to transfer you the firearms if you had marked that you were a straw purchaser?

A.   I agree that no one could transfer firearms if you marked you were a straw purchaser.

Q.   So in order to acquire those first two firearms from Mr. Harris, you had to deceive him into believing that you were the actual transferee, correct?

MR. HORNSBY:  Objection as to form.

A.   To acquire the firearms, I had to fill out the 4473, yes.

MR. LAMAR:  Would you like to take a 10-minute break?

MR. HORNSBY:  Sure.

MR. GAFFNEY:  Yeah, that's fine.

THE VIDEOGRAPHER:  We are going off the record at 10:05 a.m.

(A recess was taken from 10:05 a.m. to 10:17 a.m.)

THE VIDEOGRAPHER:  We are back on the record at 10:17 a.m.

Q.   (By Mr. Lamar)  Mr. Koroly, when you were engaged in the unlawful selling of firearms for profit, who did you sell firearms to?

MR. HORNSBY:  Objection, relevance.

A.   Multiple people.

Q.   (By Mr. Lamar)  Would you please provide a few examples of the people you sold firearms to without a license?

A.   People at the shows, Joe, J.J., the -- the guy at the Burleson show who didn't want the box.  I remember that specifically, and then -- like, mostly people at shows, and then it kind of transferred more towards Joe.  But J.J. was an early customer as well.

Lane Koroly Vol 1
April 13, 2026                              51

Q.   Isn't it true that ATF recovered firearms that you had sold at the Mexican border?

A.   I thought it was the Canadian border, so --

Q.   Is it true that firearms you sold were recovered at the Canadian border?

A.   If they recovered them there, then yes, yeah. In Canada -- I just remember Canada being kind of weird so --

Q.   Did you ever sell firearms to an individual you knew was associated with a cartel?

MR. HORNSBY:  Objection, relevance.

A.   Yeah, I didn't know anyone associated with a cartel.  But, I mean, they're Mexican, if that's what you're asking.

Q.   (By Mr. Lamar)  Did you sell a firearm to anyone knowing that they were associated with a gang organization?

MR. HORNSBY:  Objection, relevance.

A.   I don't really know any gang members.

Q.   (By Mr. Lamar)  Was this Joe that you have described in this deposition associated with any gangs in Dallas?

MR. HORNSBY:  Objection, relevance.

A.   I don't know.  I never asked people if they're in a gang, so --

Q.    (By Mr. Lamar)  At any point in 2021 or 2022, were you concerned that you could be in trouble for international arms trafficking?

MR. HORNSBY:  Objection, relevance.

A.   I did not know about anything international until after I'd already stopped selling.  So at the time, I didn't know anything about international arms trafficking.

Q.    (By Mr. Lamar)  When did you become aware that your firearms were associated with international arms trafficking?

MR. HORNSBY:  Objection, relevance.

A.   I think Tom said they were recovered in Canada, like, after he met with the agents in 2021, I think, or 2022.  It was after I'd already stopped, so it was after, I guess, September of '21.

Q.    (By Mr. Lamar)  At any point prior to pleading guilty to selling firearms without a license, were you personally concerned that you were going to be charged with a crime related to international arms trafficking?

MR. HORNSBY:  Objection as to form.

A.   I figured it would just be unlicensed dealing, I guess.  When they came and gave me the paper that said, that's basically what I was doing.

Q.    (By Mr. Lamar)  Did the papers given to you by

ATF, as you are describing, make any reference to international arms trafficking?

MR. HORNSBY:  Objection, relevance.

A.    I don't remember specifically.  It was just, like, what -- it's, like, unlicensed dealing and, I think, the penalties and warning to, like, stop.  I didn't end up signing those.  I think that was the second visit they had brought the papers, because we were in the truck, and it was raining, so --

Q.    (By Mr. Lamar)  Did ATF or any representative of ATF ever tell you that firearms you had sold were found at the border to another country?

MR. HORNSBY:  Objection, relevance; asked and answered.

A.    I don't remember if the ATF told me about borders and other countries.

Q.    (By Mr. Lamar)  Do you recall an ATF agent approaching you at Academy Sports and telling you that your guns were found at the Canadian border?

MR. HORNSBY:  Objection, relevance.

A.    The only interaction I had was, they came to my house the first time and were asking me about a SCCY that got seized at, like, a casino -- or not -- it was, like, an underground gambling thing.  And then they left.

Like, we talked, obviously.  That was when -- then they came with the paperwork that just was, like, a warning to stop.  And then I didn't hear anything till when I hired Brian, whom I had to proffer in, like, 2022, in the fall, maybe.

Those are the three interactions I'm pretty sure I had with the ATF.

Q.   (By Mr. Lamar)  Is it your testimony that you were never approached by an ATF agent at Academy Sports?

A.   I don't think I ever was approached by an ATF agent at Academy Sports.

Q.   Is it your testimony that you don't think you were or that you were not approached by an ATF agent?

A.   I remember three times I interacted with the federal government.  And that was when they came to the house the first time and the second time, and then with my attorney.

Oh, I'm sorry.  I think he called me to set up a meeting.  It was Agent Yost.  He didn't come and talk to me.  Yeah, he called me again to meet, and that's when I had Brian -- or when I got Brian.  He didn't show up at Academy, because I remember that now.

So I'm pretty sure he had called me and asked me -- yeah.  Yeah, he called me and asked me about, like, a gold Glock or something, I think, or I

said it was a gold Glock or something, but I don't remember if that was before or after they came.  But he wasn't in person.  It was a phone call.  That's what the confusion, I guess, was.

Q.   At the time that you were contacted by Agent Yost, were you at Academy Sports?

A.   I think so, yeah.

Q.   When Agent Yost contacted while you were at Academy Sports, did Agent Yost tell you that your firearms were associated with trafficking into Canada?

MR. HORNSBY:  Objection, relevance; asked and answered.

A.   I think he -- I think that's when -- I don't know if he said Canada specifically, but just, like, he asked me about specific guns, if I recall.  I don't remember if he said Canada specifically.  I just remember, like, Canada -- learning later on after everything -- after I'd already stopped is when the Canada stuff came, so not, like, during.  I don't remember exactly when it was.

But I do remember, yeah, he called me and asked me about two different Glocks I had sold Joe.  And like -- I think one was gold, I think, but that was at Academy.  But I don't remember when that was, besides after September, but before I pled guilty.

Q.   (By Mr. Lamar)  Even if Agent Yost did not say the word "Canada" by name, did Agent Yost mention international arms trafficking in any form?

MR. HORNSBY:  Objection, relevance.

A.   I don't remember.  I just remember he had two specific guns, or three -- I think it was two, though -- that he had asked me about.

The main things I remember is when they're actually, like, at my house, because that's obviously kind of a big deal.

Q.   (By Mr. Lamar)  Is it true that you became aware of the Canadian arms trafficking issue before you pleaded guilty?

A.   Yes.

Q.   Were you aware of the Canadian arms trafficking issue before you participated in a proffer interview?

MR. HORNSBY:  Objection, relevance.

A.   I think so, yes.

Q.   (By Mr. Lamar)  International arms trafficking would carry pretty serious prison time, wouldn't it?

MR. GAFFNEY:  Objection --

MR. HORNSBY:  Objection, requires legal -- requires a legal conclusion.

A.   Yeah, I'm not an attorney.  I don't know.

Q.   (By Mr. Lamar)  Were you ever personally

worried that you were going to go to federal prison?

A.   When you plead guilty to a federal crime, yes, that is a concern.

Q.   You didn't go to federal prison, did you?

MR. HORNSBY:  Objection, relevance.

A.   No.  I am on probation.

Q.   (By Mr. Lamar)  Am I correct that you and Mr. Remley decided to apply for a federal firearms license in fall of 2021?

A.   I think the application went in in, like, December, maybe, or January.

Q.   Do you recall when you and Mr. Remley decided to pursue a federal firearms license?

A.   I guess it was in the fall of '21.  It was after I got in trouble, I think, we started all the stuff for that.

Q.   Whose idea was it to apply for a federal firearms license?

A.   I suppose it was mutual.

Q.   Do you recall who first said something along the lines of:  We should apply for a federal firearms license?

A.   No, I don't remember who said that first.

Q.   Why did you decide to apply for a federal firearms license?

A.   I guess there's many reasons.  The big one is to sell guns and make money.

Q.   Did you personally want to own a legitimate firearms business?

MR. HORNSBY:  Objection as to form.

A.   I wanted an FFL to be legally protected and continue to sell firearms.

Q.   (By Mr. Lamar)  Did you and Mr. Remley initially want a Type 7 federal firearms license?

A.   What is that?

Q.   Are you familiar -- strike that.

Are you aware that there are different kinds of federal firearms licenses?

A.   Yes.

Q.   Are you aware that a Type 7 firearms license -- federal firearms license would permit you to manufacture firearms?

A.   I did not know that.

Q.   Are you familiar with a Type 1 federal firearms license?

A.   No.

Q.   Did you and Mr. Remley want to manufacture your own firearms?

MR. HORNSBY:  Objection, lack of foundation.

A.   If that would have made more money than, like, the regular one, I guess, whatever you're talking about, then I guess, yeah, it would be something to pursue, because the goal was to make money -- or, I guess, make higher profit.

Q.   (By Mr. Lamar)  Are you familiar with the process of Cerakoting firearms?

MR. HORNSBY:  Objection, relevance.

A.   I know what it is, but I don't know how it's done.

Q.   (By Mr. Lamar)  Did you ever see a firearm that Mr. Remley had Cerakoted?

MR. HORNSBY:  Objection, relevance.

A.   That he Cerakoted?  Is that what you're saying?

Q.   (By Mr. Lamar)  Correct.

A.   I don't think so.  I don't -- I mean, Cerakoted guns, I guess, are, like, common because they're just colored guns, but I don't think he ever Cerakoted guns himself.

Q.   Did you and Mr. Remley have any business plan for your FFL?

A.   To sell guns and make money.

Q.   How did you and Mr. Remley plan to get your FFL business off the ground?

A.   By selling guns.

Q.    Do you agree that starting a business requires capital?

MR. GAFFNEY:  Objection, form.

A.    I guess it depends what kind of business.

Q.    (By Mr. Lamar)  Is it your testimony that you and Chris Remley had no strategy for funding your FFL business once it became licensed?

MR. HORNSBY:  Objection as to form.

A.    We were going to fund the FFL with illegal firearms sales prior to getting the FFL.

Q.    (By Mr. Lamar)  Did you have any financial investors in your FFL?

MR. HORNSBY:  Objection, relevance.

A.    Are you saying, did people give me money for the FFL?

Q.    (By Mr. Lamar)  Did anyone promise to give you money for the FFL in return for a stake in the business?

MR. HORNSBY:  Objection, relevance.

A.    I don't remember, because most of it, we could have boot-strapped off of the previous sales.  I don't remember if anyone promised to give me money in exchange of a stake of a potential business.  Like, you have to get approved before you could do any sort of, like, business with the FFL.  So I don't remember if anyone promised to give me money for a stake of a potential

business in the future.

Q.   (By Mr. Lamar)  Is it your testimony that you did not have a financial investor named Ty?

A.   Ty?  I think Ty helped Chris with money.  I never met Ty.  Or maybe it was somebody John knew, but I don't really know who that is.  I recognize the name, now that you mention it.  But it's, like, I never met Ty.  It was, like, a -- I think it was maybe somebody John knew.  I'm not sure.

Q.   What's Ty's last name?

A.   I don't know.

Q.   Was this Ty aware that Chris Remley had been selling firearms without a license?

A.   I don't know.

MR. HORNSBY:  Objection, speculation.

Q.   (By Mr. Lamar)  When is the last time you heard reference to Ty before this deposition?

MR. HORNSBY:  Objection, relevance.

A.   Probably like five years ago, like 2021.

Q.   (By Mr. Lamar)  Was John Anderson involved in your FFL plans in any way?

MR. HORNSBY:  Objection, relevance.

A.   Are you saying, like, was he going to be on the license?

Q.   (By Mr. Lamar)  Did John Anderson informally

advise you and Chris Remley concerning your FFL application?

A.   I don't remember if he formally advised us on applying for an FFL.  No, I don't remember.

Q.   Did you speak with John Anderson about your plans of applying for an FFL?

MR. HORNSBY:  Objection, relevance.

A.   Yes.  John knew we applied for an FFL.

Q.   (By Mr. Lamar)  Did you discuss your plan to apply for an FFL with Tom Harris?

A.   Yes.

Q.   Did you seek advice from Tom Harris as to how to submit a compliant FFL application?

A.   Probably.

Q.   Do you recall ever meeting with Tom Harris for the purpose of discussing your FFL application?

A.   Yes.

Q.   Did you and Chris Remley ever form an LLC for your FFL?

A.   Yes.

Q.   What was the name of the LLC?

A.   Elevated Firearms.

Q.   Am I correct that you filed a form with Denton County to establish the business name Elevated Firearms?

A.   Yes.  Yeah.

Q.   Isn't it true that to be qualified for an FFL, you have to set up a licensed business premises?

MR. HORNSBY:  Objection, relevance.

A.   Yeah, I don't know specifically.  I haven't really looked into FFLs too much in the last couple of years, obviously.

Q.   (By Mr. Lamar)  Isn't it true that you rented space in Tom Harris' licensed premises for the purpose of running your FFL?

A.   Yeah.  He cooked up a rental agreement to use the other half of his office, yes.

Q.   When you use the phrase "cooked up," do you mean drafted?

A.   Yeah.  He found, like, a template online or something, I guess.

Q.   Do you recall signing a lease agreement with Mr. Harris?

A.   Yeah.  We did that before we put the application in, but it was already after I'd already gotten in trouble for private selling firearms.  So that was -- came after all the crime -- of my crime, I guess.

Q.   When you say "I had already gotten in trouble," you mean that you had been approached by the ATF, correct?

A.   Yes.

Q.   At the time you submitted your FFL application, no federal criminal charges had been filed against you, correct?

A.   No, I don't think.

Q.   And isn't it correct that you were legitimately pursuing an FFL?

A.   The plan with the FFL was, we could continue basically doing what we're doing, and Joe would be able to have people buy from our FFL, so we could continue to make money the way we were doing, but it wouldn't be private sales.  So it would be, like, through the FFL, so we'd be, kind of, covered.

Q.   Didn't you say that you had stopped selling firearms before you started the FFL application process?

A.   Yeah.  I did not buy any firearms after September 2021 to resell.

Q.   So is it fair to say that you wanted an FFL to resume selling firearms, which you had previously ceased?

A.   Chris was still selling guns at that time.

Q.   Do you recall running into any trouble getting your application ready to submit?

A.   I don't remember.

Q.   What ultimately happened with your FFL application?

A.   They denied it in 2023, I think; 2024, maybe. Because it was -- it was after I'd already pled guilty, so it was a couple of years after we submitted it, a year or two.

Q.   Between submitting your FFL application and learning that it had been denied, did ATF discuss your FFL application at any point with you?

A.   They scheduled a meeting, I think, and then they canceled it, or they kept, like, postponing it.  I don't think we had, like, the official meeting, I don't think, because it was -- it was -- we put the application in, and then they are supposed to, like, tour it or something, but then he, I think, canceled it.

And then I don't really -- I don't remember what happened between, like -- we were supposed to have the meeting, but I'm pretty sure the meeting did not happen.  And then, like, I didn't really hear anything until, like, 2023, I want to say.

Q.   Do you recall when you first visited Tom's licensed premises?

A.   In 2021.

Q.   Do you recall what month in 2021 you first visited Tom's licensed premises?

A.   June, maybe; May.  I don't remember exactly. It was, like, beginning of summer, I guess.

Lane Koroly Vol 1
April 13, 2026

66

Q.   Did you first visit Tom Harris' licensed premises for the purpose of acquiring firearms to resell?

A.   Yes.

Q.   Before meeting Tom Harris, were you already intending to target Tom Harris as a source of additional firearms?

MR. HORNSBY:  Objection, mischaracterization.

A.   He is an FFL who sells guns, and you go to an FFL to buy guns.

Q.   (By Mr. Lamar)  Why did you believe that Tom Harris would be a reliable source of firearms prior to meeting him?

A.   Because he's an FFL, I guess.

Q.   Why did you go to Tom Harris' FFL instead of Dick's Sporting Goods?

A.   Because Chris and John were going to get ammo, so I just rode with them.

Q.   Did Chris and John indicate that Tom Harris would be a good source of firearms to resell?

A.   I don't think so.  Can you give me a little more specific, I guess?

Q.   Is it your testimony that your initial meeting with Tom Harris was entirely random?

Lane Koroly Vol 1
April 13, 2026                                          67

A.   No, it was not entirely --

            MR. HORNSBY:  Objection, mis- -- improper characterization.

Q.   (By Mr. Lamar)  Am I correct that your answer was that it was not random?

A.   No.  I --

            MR. HORNSBY:  Objection, improper characterization.

A.   I rode with Chris and John.  They were getting ammo, and I bought guns while we were there.

Q.   (By Mr. Lamar)  Is it your testimony that the very first time you met Tom Harris, you bought guns from him?

A.   I think that was the first time we met, yeah.

Q.   Are you sure that it was the very first time?

A.   I'm not positive.  It was five years ago at this point, but I'm pretty sure it was the first time. If it -- if it wasn't the first time, it was, like, the second time, but I'm pretty sure it was the first time. You're asking about stuff, like, from five years ago I haven't really thought about since 2021.  So it's hard to remember the very first date I met Tom.

Q.   Is your memory pretty foggy on the precise details on your experience with Tom Harris?

A.   I would not say it's foggy.  I'm saying, like,

I don't remember the exact date of something that happened five years ago.

Q.   Do you recall the brand of the two firearms that you initially purchased from Mr. Harris?

A.   I think it was Smith & Wesson.  I don't remember if both were Smith & Wesson.  I just remember one was, like, a -- the bodyguard, I think -- or not the bodyguard -- the EZ, maybe.  I don't remember.  It was one or the other.

Q.   You didn't tell Mr. Harris when you bought your first two firearms that you were going to sell them for profit, right?

A.   No.

Q.   Did you, in fact, sell either of those two initial firearms for profit?

A.   Yes.

Q.   Did you sell both of those two firearms for profit?

A.   Yes.  Not at the same time.

Q.   So isn't it true that, at least for the first two firearms you purchased from Tom Harris, you deceived him into believing that you were the actual transferee?

MR. HORNSBY:  Objection, mischaracterization.

A.   When you fill out a 4473, you have to fill the

Lane Koroly Vol 1
April 13, 2026                                    69

whole thing out correctly for it to be approved.

Q.   (By Mr. Lamar)  Were you aware at the time you first purchased firearms from Chris -- strike that.

Were you aware, at the time you first purchased firearms from Tom Harris, that if you marked on the 4473 that you were not the actual transferee, the form would not be approved by the FFL?

A.   Yeah.  There's multiple questions that you have to answer to do that.

Q.   When did Tom become aware that the firearms you were purchasing from him were being resold for profit?

A.   Whenever he would tell me what guns sold good.

Q.   Would you please provide details on the conversation you just referenced?

A.   Like he recommended a SCCY because they were cheap and easy to sell.  It was, like, a 380, 1911, I think he said would be a good seller.  I don't remember when that was exactly, but --

And, like, he would order the same guns over and over, tell us his cost and stuff like that.

Q.   How did Mr. Harris become aware that you were reselling firearms you acquired from him?

A.   I don't remember, but I was buying the same thing over and over and, like, ordering stuff that he would not normally order, and just, like -- I don't

Lane Koroly Vol 1
April 13, 2026
70

remember exactly when it was.  But the fact he was, like, real concerned whenever they pulled the paperwork, he knew I was selling them, and told me not to say I was selling them; say I traded for them and that I was a collector when agents came.

Q.    Is it fair to say that you just assumed that Mr. Harris knew that you were selling guns?

MR. HORNSBY:  Objection, speculation.

A.    I won't say it's fair to assume when someone is coaching me on how to answer investigators' questions, you know.

Q.    (By Mr. Lamar)  In the month of August 2021, before you had ever been approached by ATF, did Tom Harris know that you were selling firearms for profit?

A.    I think so, yeah.

Q.    How he would have known?

A.    Repeatedly buying the same guns over and over, the same models.

Q.    Didn't you tell him that you were a collector?

A.    He was hard on the collector angle to protect me, because if I got in trouble, I'm sure he was afraid of getting in trouble as well.

Q.    In August 2021, did you tell Tom Harris that you were a firearms collector?

A.    I don't know if I told him I was a firearms

collector in August of 2021.

Q.   Do you recall ever telling Tom Harris that you were a firearms collector?

A.   I don't remember if I ever said those words specifically, but that was the, kind of, angle he wanted to go down, was that we were just collectors who collect, I guess, the exact same make and model.

Q.   Are you disputing that you approached Tom Harris and told him that you were a collector of firearms, particularly interested in Glocks?

MR. HORNSBY:  Objection as to form.

A.   I don't think I ever said I'm a collector who was particularly interested in Glocks.  I don't think I've ever -- I don't.  The Glocks were good because they sold good.

Q.   (By Mr. Lamar)  Is it your testimony, at some point which you cannot remember, Tom simply became aware that you were selling firearms for profit?

A.   I don't remember when he --

MR. HORNSBY:  Object -- objection, speculation.

A.   -- when specifically he knew, but his actions were of someone who would, like, obviously know, being very concerned about, like, the way I answered the questions when they came, stuff like that, and coaching

me on, like, what not to say.

Q.    (By Mr. Lamar)   Do you have any knowledge that Tom Harris was aware that you were selling firearms for profit prior to the ATF approaching you in September of 2021?

A.    Can you repeat that?

Q.    Prior to ATF approaching you in 2021, do you have any knowledge that Tom Harris was, in fact, aware that you were reselling firearms for profit?

A.    Yes, when he would order specific guns repeatedly.

Q.    Did ordering specific guns repeatedly necessarily imply the unlawful reselling of firearms?

A.    Does it imply the unlawful reselling of firearms?  Yes.

Q.    Why?

A.    Because, like, a regular collector is not going to get, like, 10 Glock 19s, you know.  And the fact that it was -- it was mostly Glocks, because those sold the easiest and best, and that's what Joe wanted.  There was other guns, too, but those were the main ones.

Q.    Do you agree that it also could be a legitimate business decision to restock firearms that sell well?

MR. HORNSBY:  Objection, speculation.

A.    He had minimal Glocks when I first met him, and

over time, that dominated his inventory.

Q.    (By Mr. Lamar)  Is it your testimony that because Tom restocked Glocks, he must have known that you were reselling firearms for profit?

MR. HORNSBY:  Objection, improper characterization.

A.    No.  It was the fact that I was constantly in there, like, every week buying multiple guns -- and so were other people over time -- that he obviously, like, had an understanding.

Q.    (By Mr. Lamar)  You're just assuming that he had an understanding, right?

MR. HORNSBY:  Objection, impair characterization.

A.    No, because he knew we were working the gun shows, selling guns and ammo.

Q.    (By Mr. Lamar)  How did he know that?

A.    Because we were talking about it.  It was, like, we're always, like, buying guns and ammo at the same time.  And he told me to, like, say I was buying ammo with the guns, even though I was not, to make it seem more organic, I guess, or legitimate.

Q.    When you used the phrase, quote "we were talking about it," what do you mean by that?

A.    Just -- just, like, small talk, I guess.

Q.   So is it your testimony that you entered Tom Harris' licensed premises and, in front of Tom Harris, said that you were reselling firearms for profit?

A.   I did not use specific words.  It's, like, he's been doing this since, like, 1994, so he would know when something was very weird and out of the ordinary, and his business goes up like crazy, and the same guys who were selling ammo are now, all of a sudden, buying a ton of guns and talking about gun shows and talking about the cost of guns, that a collector wouldn't really be too concerned about a profit margin on a gun or, you know, how good is it going to sell HOA or how popular is it?  That's --

When you're a collector, you're just, like once stuff.  You're not too concerned about, like, am I going to be able to sell this immediately?  Or you're not taking pictures of guns in the box at the store or taking pictures of the inventory at the store, stuff like that, if you're just a collector.  You're just looking for a specific gun.

Q.   Mr. Harris has very poor vision, does he not?

A.   I don't know.  I don't know what you consider poor vision.  I have poor vision.  I have contacts and glasses, so it's kind of hard to -- I'm not an eye doctor either, so it's, like, I don't know what the

cutoff for that would be.

Q.   If Mr. Harris had nearly blind vision, is it possible that he didn't see you taking pictures of firearms inside his store?

MR. HORNSBY:  Objection, speculation.

A.   His office is smaller than this room.  And the way he sits, the guns are, like, next to him, so --

And also, you wouldn't just, like, let somebody wander around a bunch of your inventory that is, like, controlled by the law unless you're just irresponsible, I guess.  But it's like -- especially like someone who you don't really know very well, you're not going to let them just kind of have free rein over your -- your domain, I guess.

And he had cameras, too.  So it's, like, he wouldn't necessarily need to be able to look all around the room when the cameras are, like, right there, you know.  You could see them on a screen.

Q.   (By Mr. Lamar)  Am I correct that you previously testified a few moments ago that Mr. Harris' business or sales volume increased after meeting you?

A.   Yes.  That's I believe what they said when they first met, is that he's selling more than normal during that period.

Q.   Are you saying that ATF told you that Tom

Harris' sales volume had increased?

A.   I believe that's what they said, yeah, because I -- he -- I was led to believe that he had already had a very successful, very busy business, you know, so it really wouldn't be a noticeable uptick.  And that was apparently not the case.

Q.   Who led you to believe that Mr. Harris had a very busy business?

A.   Mr. Harris.  He was talking about he was successful and stuff.

Q.   Well, if you didn't know until ATF told you that Mr. Harris' sales volume had increased, how could you have known prior to that that his sales volume increased in a way suggesting that he knew about your scheme?

MR. HORNSBY:  Objection as to form.

A.   Yeah.  Can you repeat that?

Q.   (By Mr. Lamar)  Do you agree with me that a few moments ago you testified that one reason you suspect that Mr. Harris knew you were reselling guns was that his business volume had increased?

A.   That would be, I guess, a reason.  I'm sorry. It's just confusing the way you're, like, wording it.

Q.   Did you testify a few minutes ago that one reason you believe Mr. Harris knew you were reselling

firearms was that his sales volume increased while you were buying firearms from him?

A.   That would be -- yes, that's what I said.

Q.   But that's not possible if you didn't learn until September 2021 that his sales volume had increased, correct?

A.   No.  Like I said earlier, is that he increased the amount of, like, Glocks he had significantly because that's what the primary purchase was.

Q.   To make sure we have a clear record, do you agree with me that Mr. Harris' sales volume in August 2021 did not indicate to you that he knew you were reselling firearms?

MR. HORNSBY:  Objection, speculation.

A.   I don't remember when he became aware that we were selling them, but it -- by the end, he had a ton of guns he couldn't sell otherwise if we weren't buying them.

Q.   (By Mr. Lamar)  So you just know that at some point he became aware that you were reselling firearms?

A.   It was his behavior:  Having us turn our phones off, turn my watch off, stuff like that, that, like, you wouldn't do that if -- you know, just a couple of dudes, like -- just, like, collecting guns, you wouldn't take precautions like that.

Q.    Can you agree with me that you have nothing more than various circumstantial facts that, in your mind, led you to believe that Tom Harris knew you were reselling firearms?

MR. HORNSBY:  Objection as to form.

A.    He had us meet in his living room in, like, May and to come up with a scheme to repeat what he told the agents, that -- I don't remember exactly what it was. But I was there.  Chris was there.  He had us turn all our stuff off.  And he was very concerned about just people talking to the agents about what was going on.

Q.    (By Mr. Lamar)  When you say "May," are you referring to May 2022?

A.    Yeah, it would -- it would have been 2022.

Q.    What does a conversation in May 2022 have to do with Tom Harris' knowledge in August 2021?

A.    Because if he had no idea, he wouldn't be meeting with us to get a story straight to tell the agents.

Q.    Were you aware that the ATF had talked to Tom Harris about you and your firearms selling between August 2021 and May 2022?

A.    Yes.  He told us when we met him.

Q.    So do you agree with the me that the mere fact that you had a conversation with Tom Harris in May 2022

does not mean that he knew you were selling firearms for profit in August 2021?

MR. GAFFNEY:  Objection, form.

A.   I know he knew because he called me when they pulled all the 4473s and told me that, like:  Yeah, they're going to come visit you.  Just say, like, you traded for them and that you're a collector.

And he gave me a Glock shirt, and I ended up wearing that at the meeting -- or sorry -- not the meeting, but when Agent Yost and the other guy was, like -- I think he had tattoos -- when they came to the house.  So I put it on when I answered the door the second time to try to seem, like, more convincing that I just really liked Glocks, and I really liked the same models over and over.

Q.   (By Mr. Lamar)  When did that conversation occur?

A.   The conversation when he called me?

Q.   Correct.

A.   Prior to them coming.  It was -- it was whenever they pulled all the paperwork from his, like, office, I guess.

Q.   Isn't it possible that Tom became aware that you were selling firearms for profit when the ATF showed up at his door demanding records concerning your

purchases?

A.    No.  Because if he didn't think I was selling, he wouldn't tell me that:  Hey, they're going to come see you, and don't say you're selling them.  Tell them you're a collector.  Tell them you traded for them or whatever.  You wouldn't tell someone that who is just collecting, because they could say:  Oh, they're all right here.  But obviously they're not because they're all sold.

Q.    Is it your testimony that, looking back, you believe Tom Harris knew that you were selling firearms for profit?

A.    Yeah, he knew we were selling guns for profit.  And it was not just me.  It was the straw purchasers and stuff, I found out later on.

Q.    When you were buying firearms from Tom Harris to resell, did you know that Tom Harris knew you were selling them?

MR. HORNSBY:  Objection, asked and answered.

A.    Yes, I guess.  I don't -- it's kind of confusing.  Can you repeat it?

Q.    (By Mr. Lamar)  At the time you were buying firearms from Tom Harris with intent to resell them, were you aware that Tom Harris had full knowledge of

your intent to resell?

MR. HORNSBY:  Objection, asked and answered.

A.    Yes.  Buying, like, the same guns over and over is, like, obviously a pretty big red flag for someone who is selling guns.  And if you just ignore it, then it's, like, you would have to also know.

Even if you don't come out and say:  Hey, I'm going to go do some crimes -- like, no one is going to do that, but you would know just from experience and, like, all the laws.  You have to know the FFL, like, when to stop selling someone guns, because it's, like, you're not supposed to, like, facilitate stuff like that and, like, allow it to happen.

Q.    (By Mr. Lamar)  If Tom Harris knew that you were reselling firearms for profit, why did you send straw purchasers into his premises for purchases?

A.    I did not send -- oh, sorry.  To continue to get guns for Joe.

Q.    Is it your belief that had you not sent straw purchasers into Tom Harris' licensed business premises, that you would not have been able to obtain firearms to give to Joe?

A.    No, I could have kept buying, but that was -- because I stopped buying guns, so I was not going to

purchase them after September 2021.  It was, like, people Joe knew that were going in there and ordering specific guns and all the specifics, but --

Q.    Didn't you testify that you stopped selling firearms for profit in September 2021?

A.    Yes.  I stopped purchased guns to resell in September of 2021.

Q.    When did you stop selling guns for profit?

MR. HORNSBY:  Objection, asked and answered.

A.    I don't remember exactly when, but it was -- I sold guns I had collected, but they weren't purchased to, like, resell.

Q.    (By Mr. Lamar)  So after September 2021, you kept selling firearms for profit, correct?

MR. HORNSBY:  Objection, asked and answered.

A.    No, I did not sell any guns at the shows after I got the letter.

Q.    (By Mr. Lamar)  Did you facilitate the transfer of firearms from FFLs to this Joe after September 2021?

MR. HORNSBY:  Objection, asked and answered.

A.    I never met Joe by myself.  I think it was mostly through Chris, but -- because they met on

Facebook.  I don't have Facebook, so I was never, like, the primary point of contact.

Q.   (By Mr. Lamar)  For purposes of establishing a timeline, do you agree that between July 2021 and September 2021, you personally bought firearms and resold them for profit?

MR. HORNSBY:  Objection, relevance.

A.   Yes, I bought and sold firearms in 2021 that I pled guilty to.

Q.   (By Mr. Lamar)  After you stopped personally buying firearms to resell them, is it true that you then started sending straw purchasers in to continue acquiring firearms that would go to this Joe?

MR. HORNSBY:  Objection, asked and answered.

A.   Joe had, like, his own people.  My friend Sam bought stuff.  I don't remember exactly when that was. But the -- the people Joe had were, like, his people, as far as I understood.

Q.   (By Mr. Lamar)  Did you play a role in Joe having his people go buy firearms from Tom Harris?

A.   No.  I think Chris was there during that.

Q.   When you told the ATF that you had bought and resold firearms for profit, did you include firearms that were bought from straw purchasers in that number?

MR. HORNSBY: Objection, relevance.

A. I didn't -- like, I didn't deal with Joe primarily, so I don't know specifics on who did what. I just know that that was happening.

Q. (By Mr. Lamar) Do you recall specifics on conversations that you would have had with Tom Harris in 2021?

MR. HORNSBY: Objection, asked and answered.

A. Do I recall specifics of conversations from five years ago?

Q. (By Mr. Lamar) Correct.

A. I guess it would -- you'd have to ask me. I don't remember. Like, it was five years ago at this point so. So it's, like, I pled guilty to buying and selling guns five years ago, and so it's -- like, it's not really been on the forefront of my mind, stuff that happened five years ago, because I figured it was pretty much done for. But I remember, I guess, the broad strokes, because even the -- the meetings were four years ago, so it's -- I have other stuff going on in my life. I don't really reminisce about the time I ruined my life, so --

Q. Am I correct that you bought more than a dozen firearms from Tom Harris in August 2021?

A.    I don't remember how many I bought in August, no, but it was multiple at a time, so --

Q.    Are you aware that when you buy multiple pistols, the FFL is required to submit to the ATF a Report of Multiple Sale?

A.    Yes.

Q.    If you purchased multiple firearms -- strike that.

If you purchased multiple pistols from Tom Harris in August 2021, would Tom Harris have been required to submit Reports of Multiple Sale to the ATF?

MR. GAFFNEY:  Objection, form.

A.    Yes.  You have to submit those.

Q.    (By Mr. Lamar)  Do you have any reason to dispute that Tom Harris submitted Reports of Multiple Sale to the ATF in August 2021 concerning pistols that you bought from him?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection, form.

A.    Can you repeat that?

Q.    (By Mr. Lamar)  Do you have any reason to dispute that Tom Harris submitted Reports of Multiple Sale to the ATF in August 2021 concerning pistols that you bought from Tom Harris?

MR. HORNSBY:  Objection as to form.

A.    I don't dispute that.  I don't remember how many I bought in August, though.  But if I did, then, yeah, I guess he would have submitted it.

Q.    (By Mr. Lamar)  Do you recall Tom Harris in August 2021 telling you that by buying many pistols, the ATF was probably going to call you?

A.    I don't remember if he told me that in August of 2021.  I remember when he called me -- when they pulled the 4473s.  I don't remember if he told me prior to that or when it was.

Q.    Do you recall, in response to Tom Harris telling you in August 2021 that the ATF was probably going to call you, that you said, quote:  I'm not worried about it.  I'm not doing anything wrong?

A.    No, because I knew I was doing wrong.  That's why he told me to make sure I don't say I sold them; to say I traded for them or that I'm just a collector, just to not use the word "sell."

Q.    Are you testifying that the conversation I just summarized never happened?

A.    I don't remember if it happened or not.  I just remember specifically not to use the word "sell" when he told me, like:  They're probably going to come visit you.

Q.    So the conversation that I just recalled could

have happened; you just don't remember whether it happened?

A.   Yeah, I don't remember if I said those exact words to him five years ago.

Q.   If Tom Harris testified that he warned you that the ATF was probably going to call you, and you responded:  I'm not worried about it.  I'm not doing anything wrong.  You wouldn't be able to dispute that, would you?

MR. HORNSBY:  Objection as to form.

A.   I can't remember the exact words exchanged on a phone call from five years ago, no.  I remember the -- the gist and then what happens.

Q.   (By Mr. Lamar)  Did you and Mr. Remley target Tom Harris in your firearms-selling scheme because he had poor vision?

A.   No.

MR. HORNSBY:  Objection, improper characterization.

Q.   (By Mr. Lamar)  Did you say that your answer was:  No?

A.   That's correct.

MR. HORNSBY:  Objection, improper characterization.

A.   I said:  No.

Q.    (By Mr. Lamar)  Did you think in 2021 that Tom Harris made an easy target for you to acquire firearms to resell?

MR. HORNSBY:  Objection, improper characterization.

A.    I don't think he made an easy target.  I think he was more than happy to allow it to happen, though, because he was making money, same as us, and that was the point of the business.

It's not -- it's like -- it doesn't matter if someone is old or not.  Like, your brain works, so you know when you're doing, like, something you shouldn't do because you've been doing it for, like, 20-something years, like '94.  So it's -- being, like, old does not really keep you from doing a job.

Q.    (By Mr. Lamar)  So because his brain works, he should have known what you were up to?

A.    No, that's not what I'm saying.  I'm saying trying to lean on the disabled angle is just not really the case of anything.  It's, like, that wasn't like: Hey, I'm disabled, guys, stuff like that.  That wasn't, like, an announcement he was making to people.

████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

Q.    (By Mr. Lamar)  If Chris Remley, in fact, said that, would you agree that Chris Remley targeted Tom Harris because of his vision?

MR. HORNSBY:  Objection, speculation and improper characterization.

A.    I think Slade is trying to protect himself also by saying stuff like that.

Q.    (By Mr. Lamar)  You testified earlier that firearms prices were inflated in 2020 and 2021, correct?

A.    Everything was inflated, yeah.  But they were, I guess, in higher demand than previously.

Q.    Isn't it true that in the Dallas area, there were people lined up outside of FFLs trying to get in and buy firearms?

A.    I don't know if people were lined up outside of FFLs to try to buy firearms.  I think it was ammo people were --

MR. HORNSBY:  Objection, speculation.

A.    -- yeah, more into.

Q.    (By Mr. Lamar)  Isn't it true that compared to other federal firearms licensees, Tom had firearms to

sell at competitive prices?

MR. HORNSBY:  Objection, relevance.

A.    There's other places that are cheaper.

Q.    (By Mr. Lamar)  Compared against the market average, were Tom Harris' prices cheaper?

A.    They were on par with, like, online sellers.

Q.    Aren't online sellers usually cheap?

MR. HORNSBY:  Objection, speculation.

A.    Yeah.  I don't know if online sellers are considered cheap.

Q.    (By Mr. Lamar)  Did you buy firearms from Tom Harris because he offered them for sale at an affordable price point?

A.    I bought them because they were already buying ammo, so there was an established relationship, I guess.

Q.    Is it your testimony that you didn't care what Tom Harris' prices were?

A.    No.

Q.    So, in part, did you buy firearms from Tom Harris because they were offered at an affordable price?

MR. HORNSBY:  Objection, asked and answered.

A.    Over time, he reduced his prices.

Q.    (By Mr. Lamar)  Isn't it true that Tom Harris' firearms were listed at a price that you found

affordable?

MR. HORNSBY:  Objection, asked and answered.

A.   He wasn't significantly cheaper than other FFLs.  It wasn't, like, highway robbery either.

Q.   (By Mr. Lamar)  Is it fair to say that Tom's prices met your needs, even when Tom marked the firearms up and charged you sales tax?

A.   Can you repeat that?

Q.   You paid sales tax for firearms you bought from Tom Harris, correct?

MR. HORNSBY:  Objection, relevance.

A.   Yes.

Q.   (By Mr. Lamar)  Did you also pay for Tom's markup on firearms?

MR. HORNSBY:  Objection, relevance.

A.   Yes.

Q.   (By Mr. Lamar)  Do you have any knowledge of what Tom was paying his distributors for the firearms you were buying?

MR. HORNSBY:  Objection, speculation.

A.   Not at first.

Q.   (By Mr. Lamar)  When did you become aware of the prices Tom was paying for his firearms?

A.   I don't remember exactly, but it was a little

bit in.

Q.   Sitting here today, can you tell me what Tom's profit margin was on firearms that you bought from him?

MR. HORNSBY:  Objection, speculation.

A.   No.

Q.   (By Mr. Lamar)  Were you aware of Tom's inventory in the year 2020?

A.   No.

Q.   When you were buying firearms from Tom Harris, did Tom have any problem with his inventory?

A.   What do you mean, "problem"?

Q.   When you were buying firearms from Tom Harris, did you ever believe that Tom Harris had too much inventory that he needed to liquidate?

MR. HORNSBY:  Objection, speculation.

A.   Yeah, I don't know.

Q.   (By Mr. Lamar)  Sitting here today, you cannot tell me that Tom Harris had too many firearms and needed to get rid of them as quickly as he could, correct?

MR. HORNSBY:  Objection, improper characterization.

A.   Yeah, I don't remember.



Q.   Do you recall Chris or Tom ever telling you that Tom had too many firearms and needed to get rid of them?

A.   I don't remember.

Q.   Do you recall ever telling Tom that his prices were too low?

Lane Koroly Vol 1
April 13, 2026                                          94

A.   I don't remember.

Q.   Do you recall Tom asking you:  Well, what are firearms going for?

A.   I don't remember.

Q.   Didn't you testify earlier in this deposition that you distinctly remember Tom Harris asking you how much you were selling firearms for?

A.   I remember we talked about profit margins.  I just remember, like, my proffer notes.  So I don't remember all the way back five years ago; I just had the notes from everything I wrote down.

Q.   Is it fair to say, you remember the things that you told ATF during your proffer interview?

A.   I took notes of everything I could remember prior to the meeting.

Q.   Did you use those notes to refresh your recollection for purposes of this deposition?

A.   Along with my plea agreement and the memo for sentencing, yes, I reviewed things from my case.

Q.   You're not able to deny that you asked Tom Harris, quote -- strike that.

You're not able to deny telling Tom Harris that his prices were too low, correct?

A.   I don't remember saying specific words five years ago.

Lane Koroly Vol 1
April 13, 2026                                        95

Q.   You're not able to deny that Tom Harris asked you in response:  What are firearms going for?  Correct?

MR. HORNSBY:  Objection, asked and answered.

A.   I don't remember a conversation from five years ago.

Q.   (By Mr. Lamar)  What did you know about Tom's profit margin?

MR. HORNSBY:  Objection, asked and answered.

A.   What I did know about his profit margin?  I guess near the end, he would tell us what he would, like, order them for and what he would want for them, I guess.

Q.   (By Mr. Lamar)  When you use the phrase "near the end," what does that mean?

A.   I guess, like, towards the end of 2021, like, whenever I -- like, the end of summer.  Like, when I was doing it, the relationship built between the three of us to where, like, the end, he was more trusting of, like, talking about, like, prices and stuff like that.  So we could kind of scheme up like what would be worth, like, getting for -- to, like, make a worthwhile profit, like, per item.

Q.   Are you testifying that you and Chris Remley

schemed up what firearms to buy for the purpose of

reselling --

    A.    Okay.  So I used the word --

              MR. GAFFNEY:  Objection, form.

    A.    Sorry.  "Schemed up" is not the right word.

              But it's -- when you're sitting and, like,

talking to someone about, like, business, like, stuff

like that will come up.  So it's, like, as time goes on,

it was just more -- he was more open with his, like,

price that he was paying, so he could accommodate what

we think they would be, like, worth.

    Q.    (By Mr. Lamar)  Isn't it fair to say that

business owners ordinarily are concerned with making

money on the products they're selling?

    A.    Yes.

    Q.    Do you agree that a business owner typically

would want to sell an item for more money than it costs

that owner to get it?

    A.    Yes.

    Q.    Do you agree with me that Tom sharing his

profit margins could be consistent with legitimate

business activities?

              MR. GAFFNEY:  Objection, form.

    A.    Yeah, it could be consistent.  But it's -- the

issue arises, I feel, when it's the same thing over and

over and over again, like the same make and models, is where the issue is; that someone is not a collector buying, like, the same thing over and over, over like, you know, a couple months' span.

Q.   (By Mr. Lamar)  So you were buying the same gun over and over, so Tom should have known that you were selling firearms for profit?

A.   I bought identical models of the same guns throughout the span of that time, in 2021 until whenever -- September till -- what's it called? -- March.

Q.   Do you recall how many different models of firearms you purchased from Tom Harris?

A.   No, I don't recall how many models I purchased.

Q.   It is not your testimony that you only ever purchased Glocks from Tom Harris, right?

A.   I purchased multiple brands, but those were the primary brand.

MR. LAMAR:  Would y'all like to take another --

MR. GAFFNEY:  No, no, no, no.  I'm sorry. I tapped -- tapped the table.  I'm totally fine.  I can't speak for everybody else, though.

MR. HORNSBY:  Yeah, a brief -- a brief break.

Lane Koroly Vol 1
April 13, 2026                                    98

                    MR. LAMAR:  You want to take 10 minutes?

                    MR. GAFFNEY:  Ten works for me.

                    MR. HORNSBY:  Yeah.

                    THE VIDEOGRAPHER:  We're going off the

record at 11:24 a.m.

                    (A recess was taken from

                    11:24 a.m. to 11:38 a.m.)

                    THE VIDEOGRAPHER:  We are back on the

record at 11:38 a.m.

     Q.   (By Mr. Lamar)  Mr. Koroly, what was your plan

for the business space that you leased in Tom's licensed

premises?

     A.   To have a place for the FFL application.

     Q.   Did you plan to continue using that space once

your FFL application became approved?

     A.   Yeah.  Until we, like, moved eventually.

     Q.   Did you have plans to eventually open your own

brick-and-mortar shop?

     A.   Like, we looked at other places, but decided

the best way was to just keep doing shows and focus on,

like, online sales to keep a low overhead.

     Q.   Isn't it true that in the meantime, you planned

to keep records in this leased space?

     A.   What do you mean, "keep records"?

     Q.   Did you and Mr. Remley plan to store 4473s in

the office space leased at Tom's licensed premises?

A.    Yeah.  I think you have to have them where the FFL is, like, at, I think.

Q.    Did you plan to store are FFL's firearms inventory in this space?

A.    I think the inventory has to be where the FFL is, like, at.

Q.    Isn't it true that until your FFL license were approved, you couldn't store firearms at Tom's licensed premises, correct?

A.    I'm not sure.

Q.    Do you recall Mr. Remley asking Tom to allow y'all to store firearms in his licensed premises before you obtained your FFL?

MR. HORNSBY:  Objection, relevance.

A.    Yeah, I don't recall.

Q.    (By Mr. Lamar)  Do you recall what prompted the ATF to begin investigating you?

A.    I think they said it was the SCCY that they found at the gambling den.  They mentioned that specifically.  I think that's what they said it was. But, like, they asked me about that one in particular earlier.

Q.    When ATF showed up at your door in September 2021, did they tell you that ATF believed you were

selling firearms without a license?

A.    I don't remember if they said that specifically.

Q.    Did they hand you any documents when they visited you in 2021?

A.    They second time, they had the -- I guess a warning, I guess.  I think it's a regular thing to give people for that.

Q.    Isn't it true that after ATF's first visit in September 2021, you stopped buying firearms that you intended to resell?

A.    I stopped prior to them coming.  I don't remember exactly when it was.

Q.    Why did you stop?

A.    I just felt that it was getting to be a bit much.

Q.    Were you trying to get out of the illegal scheme?

MR. HORNSBY:  Objection, improper characterization.

A.    No.  I just figured that you can't really do that forever, so --

Q.    (By Mr. Lamar)  At the time you decided to stop acquiring firearms to resell without a license, were you and Mr. Remley beginning to pursue your FFL?

A.   I don't remember exactly when we started it.  I just remember, like, we were at the show, and Slade was telling us he got a warning also for private sales, and he got his FFL.  And so that's kind of, I guess, when it started.  I don't remember when that was.  But I don't remember exactly when we started the FFL process either.

Q.   When did you become aware that you were going to face criminal prosecution?

MR. HORNSBY:  Objection, relevance.

A.   I guess when Brian Poe told me.

Q.   (By Mr. Lamar)  Did you hire Brian Poe when ATF asked you to come for a proffer interview?

A.   No.  It was before that.

Q.   What prompted you to hire Brian Poe?

MR. HORNSBY:  Objection, attorney-client confidentiality -- or privilege.

I'm instructing my client not to answer that question.

Q.   (By Mr. Lamar)  Am I correct that in 2022 you agreed to a deal with the ATF?

A.   No.

Q.   Did Chris Remley agree to a deal with the ATF?

MR. GAFFNEY:  Objection, form.

A.   Yeah, I don't know.

Q.   (By Mr. Lamar)  Were you talking to Chris

Remley during the ATF's investigation into you?

A.   I don't know when it started, so I could have been.

Q.   When you learned that the ATF was investigating you, did you tell Chris Remley?

A.   Yeah.  It was a pretty stressful event.

Q.   Do you recall the month and year when you hired Mr. Poe?

A.   No.

Q.   Do you recall doing a proffer interview with ATF in October of 2023 [sic]?

A.   That sounds correct.

Q.   In your own words, what is a proffer interview?

A.   It's basically tell them everything you know.

Q.   What prompted you to participate in a proffer interview with ATF?

A.   Brian said I should.  Like it's part of it, I guess.

Q.   Why did Brian tell you that you should?

          MR. HORNSBY:  Objection, attorney-client privilege.

          Instructing my client not to answer that question.

          MR. LAMAR:  Do you agree with me that he just divulged the contents of a confidential

communication with his attorney?

MR. HORNSBY:  He did not actually address what was said.

MR. LAMAR:  Do you agree that he addressed --

MR. HORNSBY:  He said there was a communication, but he did not divulge, you know, what was said and the communication.

MR. LAMAR:  Do you agree that he said:  My client told me I should do it?

MR. HORNSBY:  Yes, I agree with that.

MR. LAMAR:  Do you agree that that waives privilege as to his attorney's advice to participate in the proffer interview?

MR. HORNSBY:  I don't believe that opened the door to the discussion of why he told him to do what he did.  That goes into legal strategy between the attorney and the client.

MR. LAMAR:  I'm going to reserve the right to keep this deposition open on the basis of a subject matter waiver under Federal Rule of Evidence 502.

Are you still instructing him not to answer why his attorney advised him to participate in the proffer interview?

MR. HORNSBY:  Yes.

Q.    (By Mr. Lamar)  Are you going to answer?

A.    He said not to, no.

Q.    When you were being investigated by the ATF, did you have any knowledge that Chris Remley was also being investigated?

MR. HORNSBY:  Objection, relevance.

A.    I guess I could infer that they probably would investigate everything going on.

Q.    (By Mr. Lamar)  Did you and Chris Remley ever discuss the fact that ATF was investigating both of you?

MR. HORNSBY:  Objection, asked and answered.

A.    I don't remember specifically.

Q.    (By Mr. Lamar)  Did you and Chris Remley discuss the need to have a consistent story with the ATF?

A.    No.  That was mostly Tom's idea.

Q.    Is it your testimony that you and Chris Remley never discussed the need to have a consistent story with the ATF?

MR. HORNSBY:  Objection, asked and answered.

A.    When I talked to them, they just wanted to know about the guns I bought.  When the proffer came, they wanted to know everything I knew.  So there was no,

like, corroboration of stories, because it was, like, two separate things going.

Q.   (By Mr. Lamar)  You did a proffer interview with ATF in October '23, correct?

A.   Yes.

Q.   Were you aware that Chris Remley did a proffer interview within 10 days of your proffer interview?

A.   No.  I thought I was the last person they talked to.

Q.   If you were to learn you were the first person they talked to, would that be news to you?

A.   That would be surprising to me, yes.

Q.   At the time that ATF was investigating you, did you owe Tom Harris money?

A.   I don't think so.

Q.   Isn't it true that Freedom Seeds owed Tom Harris money for ammunition purchases?

MR. HORNSBY:  Objection, relevance.

A.   Yeah, I don't know.

Q.   (By Mr. Lamar)  Didn't you testify earlier that you were involved with Freedom Seeds?

A.   Not on a money-controlling level.

Q.   Were you Mr. Remley's business partner in Freedom Seeds?

A.   No.  That was more John.

Q.   So if Mr. Remley said that he and his, quote,
business partner owed Tom a lot of money for ammunition,
would that have been a reference to Mr. Anderson?

MR. HORNSBY:  Objection, speculation.

A.   Yeah, I'm not sure.

Q.   (By Mr. Lamar)  Were you aware that Freedom
Seeds owed to Tom Harris money for ammunition?

A.   No.

Q.   Did you only do a single proffer interview with
ATF?

A.   Yes.

Q.   Do you recall the substance of your proffer
interview testimony?

A.   Yes.

Q.   Do you recall signing a proffer agreement with
the ATF as part of this proffer interview?

A.   Yes.

Q.   What were the terms of that agreement?

A.   Basically, you just tell them everything you
know.

Q.   Am I correct that you agreed to tell ATF
everything you knew?

A.   Yeah.  I just -- we talked for, like, two
hours, probably.

Q.   What did ATF agree to do?

A.   Listen, I guess.

Q.   Did they promise you any sort of immunity from prosecution based on the contents of your interview testimony?

A.   I don't -- could you expand on that, I guess? Sorry.

Q.   In exchange for your participation in a proffer interview, did ATF promise not to use your testimony against you in criminal proceedings?

MR. HORNSBY:  Objection, relevance.

A.   So you're saying they said not -- not to prosecute me for doing the proffer?

Q.   (By Mr. Lamar)  My question is:  In exchange for your testimony in the proffer interview, did ATF promise not to use that testimony against you in a criminal proceeding?

MR. HORNSBY:  Objection, relevance.

A.   Yes.

Q.   (By Mr. Lamar)  Do you have a paper copy of this proffer agreement?

A.   I don't think so.

Q.   Did ATF tell you that they were going to use your proffer interview testimony against Tom Harris?

MR. HORNSBY:  Objection, relevance.

A.   I don't think so.

Q.    (By Mr. Lamar)  At the time you participated in this proffer interview, were you already aware that you were going to face criminal prosecution?

A.    No.  I -- it was an expected risk, I guess.

Q.    Did ATF promise you that, in exchange for your participation in the proffer interview, you would receive a lighter sentence?

A.    Can you repeat that?

Q.    Did ATF promise you that if you participated in the proffer interview, that you would receive a lighter sentence?

A.    No.

MR. HORNSBY:  Objection, relevance.

Q.    (By Mr. Lamar)  They just promised you immunity based on the testimony that you were giving?

MR. HORNSBY:  Objection, relevance.

A.    Yeah.  I think they used the term -- not they, but I remember, like, "Queen for a Day" is like the way it was described.  Like, you -- like, maybe that's not the right term.

Basically, we met, and I just talked with them.  But I don't remember, like, what exactly the form said because they didn't -- like, they ended up charging me, so I didn't have, like, immunity for doing that. Maybe I just don't understand, like, what you're saying.

Q.   (By Mr. Lamar)  They promised you some sort of immunity in exchange for your participation in the proffer agreement -- proffer interview, correct?

MR. HORNSBY:  Objection, asked and answered.

A.   I think so, yes.

Q.   (By Mr. Lamar)  But you don't recall any additional details as to what the terms of that immunity were?

MR. HORNSBY:  Objection, asked and answered.

A.   No.

Q.   (By Mr. Lamar)  Mr. Poe was present at the proffer interview, correct?

A.   Yes.

Q.   Were any representatives of the United States Attorney's Office present at your proffer interview?

A.   I'm not sure.  I know there were, like, two agents there, I think.  I don't know if they were attorneys or not.  I'm pretty sure it was the agents. And there was, like, another person there, but I don't know who he was.

Q.   You don't recall any information about the third person in attendance at the proffer interview?

A.   I don't remember who he was.  He had, like, a

computer, though.

Q.   Am I correct that ATF contacted you and asked you to come in for the proffer interview?

A.   No.  We did it at Brian's office.

Q.   Was the proffer interview ATF's idea?

A.   I'm not sure.

Q.   Do you know whether the proffer interview was your attorney's idea?

A.   I'm not sure.

            MR. HORNSBY:  Objection, attorney-client privilege.

            I instruct my client not to answer that question.

            MR. LAMAR:  Do you agree that he just answered the question?

            MR. HORNSBY:  He did.

Q.   (By Mr. Lamar)  Am I correct that you had no idea that Chris Remley was also doing a proffer interview within a few days of yours?

            MR. HORNSBY:  Objection, asked and answered.

A.   I was under the impression I was, like, the last person they talked to.

Q.   (By Mr. Lamar)  It's a yes-or-no question.

            Were you aware that Chris Remley was also

participating in a proffer interview within 10 days of your proffer interview?

A.   When I did the proffer?

MR. HORNSBY:  Objection, asked and answered.

A.   When -- are you asking me if, at my proffer, I knew he was doing one in 10 days?

Q.   (By Mr. Lamar)  At some point, you became aware that Chris Remley also participated in a proffer interview, correct?

A.   Yes.

Q.   At any point leading up to your proffer interview, did you discuss the substance of your testimony with Chris Remley?

A.   No.

MR. HORNSBY:  Objection, asked and answered.

Q.   (By Mr. Lamar)  Did your attorney meet with Chris Remley's attorney?

A.   I'm not sure.

Q.   Am I correct that the U.S. Attorney's Office eventually brought federal criminal charges against you?

A.   Yes.

Q.   Am I correct that they charged you with one count of selling firearms without a license?

A.    Yes.

Q.    Did you ever consider pleading not guilty to those charges?

A.    No.

Q.    Is the reason you didn't consider pleading not guilty because you had already worked out a plea agreement with the United States?

A.    No.  I pled guilty because I did it.

Q.    You eventually reached a plea agreement with the United States, correct?

A.    Yes.

Q.    Did you reach that plea agreement before federal criminal charges were filed against you?

A.    I -- I don't know.

Q.    Do you recall receiving anything from the United States in exchange for entering your guilty plea?

        MR. HORNSBY:  Objection, asked and answered.

A.    Can you explain what you mean, I guess?

Q.    (By Mr. Lamar)  Did your cooperation against Tom Harris have any impact on your sentencing?

        MR. HORNSBY:  Objection, asked and answered.

A.    Yeah, I don't think so.  I did not get a cooperation agreement.

Q.    (By Mr. Lamar)  Is it your testimony that the plea agreement you've testified to signing makes no mention of cooperation with the federal government?

A.    No, it does.

MR. HORNSBY:  Objection, relevance.

Q.    (By Mr. Lamar)  Am I correct that you just testified that your plea agreement expressly discusses cooperation --

MR. HORNSBY:  Objection.

Q.    (By Mr. Lamar)  -- against Tom Harris?

MR. HORNSBY:  Objection, relevance.

A.    I don't think it mentions Tom Harris specifically, but I didn't get the 5K1 thing.  So I don't really know what you're asking, I guess.

Q.    (By Mr. Lamar)  Is it your testimony that your testimony against Tom Harris played no role in your federal criminal prosecution?

A.    I'm not sure.

Q.    Did you receive a lighter sentence because you agreed to accuse Tom Harris of misconduct?

MR. HORNSBY:  Objection, improper characterization.

A.    No.

Q.    (By Mr. Lamar)  Did the ATF -- strike that.

Did the United States decline to bring

more severe criminal charges against you in exchange for your accusations against Tom Harris?

MR. HORNSBY:  Objection, improper characterization; asked and answered.

A.    Can you repeat that?

Q.    (By Mr. Lamar)  Did the United States agree not to bring more severe criminal charges against you in exchange for your accusations against Tom Harris?

MR. HORNSBY:  Objection, improper characterization; and asked and answered.

A.    I don't think so, because I -- the thing they gave me was engaging in a business, so I didn't see, like, any other different, like, charges.

Q.    (By Mr. Lamar)  Did the United States agree not to bring any additional charges against you in exchange for your accusations against Tom Harris?

A.    I don't --

MR. HORNSBY:  Objection, improper characterization; relevance.

A.    I don't think so.

Q.    (By Mr. Lamar)  Is your testimony that you don't remember the terms of your plea agreement?

A.    That's not what I'm saying.

Q.    Do you agree with me that when I asked you if you received favorable treatment by the United States in

exchange for your testimony against Tom Harris, you said, quote:  I don't think so?

A.    I think I got the result because of my attorney.

Q.    Did your attorney facilitate accusations against Tom Harris in exchange for any favorable treatment from the United States?

MR. HORNSBY:  Objection, attorney-client privilege.

I'm instructing my client not to answer that question.

MR. LAMAR:  Could you please give me the basis of that objection?

MR. HORNSBY:  The basis of the objection, any discussions of legal strategy between the client and his attorney and getting the result that they got, that's not to be disclosed.  Whatever is in the plea agreement should speak for itself.

MR. LAMAR:  Are you aware that the plea agreement is not public?

MR. HORNSBY:  No.

MR. LAMAR:  Are you giving me an objection under Federal Rule 502?

MR. HORNSBY:  Yes.

MR. LAMAR:  So attorney-client privilege?

MR. HORNSBY:  Yes.

MR. LAMAR:  Is it your position that your client's attorney's discussions with the United States are privileged?

MR. HORNSBY:  Whatever -- whatever they discussed, I'm arguing that it is privileged.  It's not -- whatever they -- the terms of the agreement, as far as the legal strategy between the client and his attorney -- you know, I'm focusing on whatever the client told the attorney.  I'm not focusing on the US Attorney's Office.  I understand that under the US Attorney's Office, the plea agreement, you know, that is waived as the Fifth Amendment.  But the discussions between the client and his attorney as far as strategizing to get the result, those are -- that that privilege is now waived.

Q.   (By Mr. Lamar)  Without divulging the contents of any conversation you had with your attorney, did you attorney facilitate accusations against Tom Harris in exchange for favorable treatment?

MR. HORNSBY:  Objection, improper characterization.

A.   I do not think so.

Q.   (By Mr. Lamar)  Do you know whether the answer to that question is "yes" or "no"?

A.   No.

Q.   As in, you are unaware of whether your attorney facilitated favorable treatment by the United States in exchange for you cooperating against Tom Harris?

MR. HORNSBY:  Objection, asked and answered.

A.   I did the proffer, which was our second one. We didn't.  And then we got the plea, like, later. Like, it wasn't a whole lot of, like, back-and-forth. Brian's -- like, he would just contact me when something would happen.

Q.   (By Mr. Lamar)  Is it your testimony that one day, your attorney called you and said, essentially:  I have a plea agreement for you?

A.   Yes.

Q.   Is it your testimony that you don't really know what the terms of that plea agreement were?

A.   No, I understand the terms of my plea agreement.

Q.   Was one term of that plea agreement your cooperation against Tom Harris?

MR. HORNSBY:  Objection, asked and answered.

A.   Part of it was to cooperate with the government.

Q.    (By Mr. Lamar)  When you say that you agreed to cooperate with the government, do you mean that you agreed to cooperate with the government against whoever the government told you to testify against?

MR. HORNSBY:  Objection, improper characterization.

A.    I never testified against anybody.  I just, like, went to court and had the proffer.

Q.    (By Mr. Lamar)  I'm going to hand what I will mark as Exhibit 2 to the deposition.

(Exhibit 2 was marked.)

MR. LAMAR:  Are we ready?

Q.    (By Mr. Lamar)  Mr. Koroly, do you recognize the document that I just handed you?

A.    Yes.

Q.    Do you agree that it purports to be a Factual Basis?

A.    Yes.

Q.    Do you agree that the title -- strike that.

Do you agree that the case that this Factual Basis concerns is the United States of America versus Lane Koroly?

A.    Yes.

Q.    Could you flip to Page 2, and tell me when you're there.

A.    Yes.

Q.    Do you see the section labeled Defendant's Signature and Acknowledgement?

A.    Yes.

Q.    Did you sign this document?

A.    Yes.

Q.    Do you remember signing this document?

A.    Yes.

Q.    Would you flip back to Page 1, and tell me when you're there.

A.    Yes.

Q.    Do you agree that this Factual Basis was filed with the Court as part of your guilty plea proceedings?

A.    Yes.

Q.    Do you agree that in the opening sentence of the Factual Basis, you stipulated and agreed that certain facts were true?

A.    It says:  The following facts were true.  Yes.

Q.    Do you agree that the facts discussed in Paragraph 1 discuss your conduct?

A.    Yes.

Q.    Do you agree that the facts discussed in Paragraph 2 discuss your conduct?

A.    Yes.

Q.    Do you agree that the facts discussed in

Paragraph 3 discuss your conduct?

A.    Yes.

Q.    Do you agree that the facts in Paragraph 4 discuss your conduct?

A.    Yes.

Q.    Do you agree that the facts in Paragraph 5 discuss Tom Harris?

A.    Yes, he is mentioned in Paragraph 5.

Q.    Did you write the language that appears in Paragraph 5?

A.    I don't -- I did not write the plea agreement, no.

Q.    Were you aware, prior to pleading guilty, that you would be signing a document that contains the substance of Paragraph 5?

A.    Can you repeat that?

Q.    How did you become aware that you would be submitting a Factual Basis that included accusations that Tom Harris sold you firearms with full knowledge that you intended to resell them?

A.    How did I become aware of the plea agreement? When they sent it, I guess.

Q.    Who is "they"?

A.    The government, I guess.  I don't -- I don't know how a plea gets decided.  But Brian said:  Hey, we

have a plea.  Let's come, like, look at it.

That's how I was made aware of it.

Q.   Why did you go out of your way in your Factual Basis to talk about Tom Harris?

MR. HORNSBY:  Objection, improper characterization.

A.   Because I admitted to, like, everything that was happening.

Q.   (By Mr. Lamar)  Was your signing a Factual Basis that accused Tom of misconduct made in exchange for anything received from the United States?

MR. HORNSBY:  Objection, asked and answered.

A.   Are you asking me if my plea got me something? I guess I don't understand what, like, you're saying. I'm sorry.

Q.   (By Mr. Lamar)  Did you receive anything from the United States in exchange for signing a document that included the substance of Paragraph 5?

MR. HORNSBY:  Objection, asked and answered.

A.   A guilty plea, I guess.

Q.   (By Mr. Lamar)  Did they agree to make a particular recommendation concerning your sentence in exchange for signing this document?

MR. HORNSBY:  Objection, asked and answered.

A.    No.  They recommended, like, 47 months, I think.

Q.    (By Mr. Lamar)  Is it your testimony that you signed this Factual Basis because the government asked you to?

MR. HORNSBY:  Objection, asked and answered and improper characterization.

A.    No.  I signed it myself.

Q.    (By Mr. Lamar)  When the ATF asked you questions during the proffer interview, did their questions concern any persons other than Tom Harris?

A.    Yes.

Q.    Did your testimony in the proffer interview implicate any persons other than Tom Harris in criminal activity?

A.    Yes.

MR. HORNSBY:  Objection, relevance.

Q.    (By Mr. Lamar)  Do you know why those other persons were not included in this Factual Basis?

MR. HORNSBY:  Objection, relevance.

A.    Yeah, I'm not sure.

MR. GAFFNEY:  Objection, form.

Q.    (By Mr. Lamar)  Could you repeat your answer,

Mr. Koroly?

A.    I am not sure.

Q.    Did your attorney tell you to sign this Factual Basis?

MR. HORNSBY:  Objection, attorney-client privilege.

I'm instructing my client not to answer that question.

Q.    (By Mr. Lamar)  How did you know that Tom Harris had, quote, full knowledge that you were reselling guns that you bought from him?

A.    His behavior and the fact he's, like, been doing it forever and knew, like, specific stuff.

Q.    Is it your testimony that you knew without a single doubt in your mind that Tom Harris knew what you were doing with the firearms you bought from him?

MR. HORNSBY:  Objection, improper characterization.

A.    Without a doubt, yes.

Q.    (By Mr. Lamar)  And that's based on Mr. Harris' conduct while you were visiting his licensed premises?

A.    His conduct, I guess, during and after.

Q.    And are you referring to the conduct that we've already discussed in this deposition?

A.    Yeah, I think we've pretty much covered that

now.

Q.    Are we missing any reason why Tom Harris would have known that you were reselling firearms for a profit?

MR. HORNSBY:  Objection, speculation.

A.    Are you asking me to describe all the things that happened?

Q.    (By Mr. Lamar)  I'm asking you whether we've already covered all such reasons in this deposition.

MR. HORNSBY:  Objection, speculation.

A.    Yeah.  I guess the coaching was, like, the biggest thing.

Q.    (By Mr. Lamar)  Do you agree with me that the alleged coaching from Tom Harris came after you had already bought your very last firearm from Tom Harris?

MR. HORNSBY:  Objection, asked and answered in a previous line of questioning.

A.    Sorry.  Can you repeat that?

Q.    (By Mr. Lamar)  Do you agree with me that the alleged coaching from Tom Harris came after you had already purchased your last firearm from Mr. Harris?

A.    Yes.  It came when --

MR. HORNSBY:  Objection, speculation and asked and answered.

A.    -- when they called him.  Then he called me.

Q.    (By Mr. Lamar)  So it's based on after-the-fact conversations you had with Tom Harris?

A.    Well, it goes back to just the repeated same thing over and over, the same make and models.  It's -- like, he knew how to try to sidestep what they would do, I guess, to protect himself, because if I got in trouble, I think he was afraid of being in trouble.  And that was, I guess, like the idea behind that.

Q.    Did ATF ever tell you that they thought Tom Harris was in on your scheme of unlawfully selling firearms?

MR. HORNSBY:  Objection, improper characterization.

A.    I don't remember.

Q.    (By Mr. Lamar)  Did the ATF pressure you in any way to discuss Tom Harris?

A.    No.

During the proffer, they were mostly more concerned about customers.

Q.    I want to make sure I understand your testimony.

A.    Okay.

Q.    At any point in the investigative and prosecutorial processes we're discussing, did ATF ever pressure you to discuss Tom Harris?

A.    No.

Q.    Did Chris Remley ever pressure you to implicate Tom Harris?

A.    No.

Q.    Am I correct that the sentencing guideline range for your offense was around three to four years of imprisonment?

A.    Yeah.

Q.    Am I correct that you received a sentence of 60 months' probation?

A.    Yes.

Q.    How did you get such a light sentence?

MR. HORNSBY:  Objection, speculation.

A.    I'm not sure.

Q.    (By Mr. Lamar)  Is it your testimony that your receiving probation instead of prison time had nothing to do with your accusations against Tom Harris?

A.    I think my attorney was very good, and that plays a pretty big role overall, I guess.

Q.    Was he very good in helping get a deal to accuse Tom Harris of misconduct?

MR. HORNSBY:  Objection --

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  -- improper characterization.

A.    No.   Like, when Brian died, Dan Hagood took over, and that was his, like, mentor.  So he was already -- like, was good, and I was like -- his mentor was, like, also very good.  I think they -- my character letters helped and stuff like that.

Q.    (By Mr. Lamar)  Am I correct that before this deposition, you reviewed the sentencing memorandum submitted by your attorney in the criminal case?

A.    More the plea.

Q.    Did you review the sentencing memorandum?

A.    I did not read the entire thing, no.

Q.    To the best of your knowledge, does the sentencing memorandum submitted by your attorney mention Tom Harris at all?

A.    I don't remember.

Q.    Do you have a copy of the sentencing memorandum with you today?

A.    I don't have a copy, no.

Q.    And you're unwilling -- strike that.

You're unable to confirm or deny whether that memorandum mentions the name "Tom Harris" at all?

MR. HORNSBY:  Objection, relevance.

A.    Yeah, I don't remember.  It's, like, 30 pages, I think.  It was mostly the plea we went over.

Q.    (By Mr. Lamar)  Did you ever personally think

Lane Koroly Vol 1
April 13, 2026                                    128

that if you accused Tom Harris of misconduct, you might

receive favorable treatment by the United States?

    A.    No.

    Q.    Why did you make public accusations by Tom

Harris?

    A.    Because they asked me to tell them the truth

of, like, everything that happened.

    Q.    When you say "they," are you referring to the

ATF?

    A.    Sorry.  Like --

              MR. GAFFNEY:  Form.

    A.    You just -- like you can't, like, lie in, like,

court, so I included everything that happened, I guess.

              Does that make sense?

    Q.    (By Mr. Lamar)  Was including language about

Tom Harris in your Factual Basis necessary in any way to

your federal criminal proceedings reaching the end that

they reached?

              MR. HORNSBY:  Objection, speculation.

    A.    I don't think so.  I'm not an attorney.

    Q.    (By Mr. Lamar)  Do you know whether an attorney

for the United States drafted Paragraph 5?

              MR. GAFFNEY:  Objection, form.

    A.    I'm not sure.

    Q.    (By Mr. Lamar)  Do you have any knowledge of

why that paragraph was included in your Factual Basis?

MR. HORNSBY:  Objection, asked and answered.

A.    Because, like, part of the crime.

Q.    (By Mr. Lamar)  Isn't it true that you signed this Factual Basis because the United States asked you to sign the Factual Basis?

MR. GAFFNEY:  Objection, improper characterization; asked and answered.

A.    I don't think the United States asked me to sign it.

Q.    (By Mr. Lamar)  Was it your idea to submit Paragraph 5?

A.    I'm not familiar with the inner workings of how they write plea agreements, so, no, it was not my idea to write this plea agreement.

Q.    Are you aware that Chris Remley also pleaded guilty to one count of selling firearms without a license?

A.    Yes.

Q.    Are you aware that Chris Remley also submitted a Factual Basis in his guilty plea proceedings?

MR. GAFFNEY:  Objection, form.

A.    No.

Did you say I'm aware or unaware?

Q.    (By Mr. Lamar)  Were you aware that Chris Remley also signed a Factual Basis?

A.    No.

MR. HORNSBY:  Objection, form.

THE WITNESS:  I'm, sorry.

Q.    (By Mr. Lamar)  Did you discuss your Factual Basis with Chris Remley at any point?

A.    No.

Q.    You're still on probation right now, correct?

A.    Yes.

Q.    Are you worried that your testimony today could get you into additional trouble?

A.    No, because I'm telling the truth.  But, like, trying to trick me makes me nervous.  Like asking me specific stuff about, like, legal stuff that I don't know about is, like, not fair, I feel like, but --

Q.    Are you worried that if the ATF were to believe that you were lying to them in 2021, that you would go to prison?

A.    I didn't lie.

MR. HORNSBY:  Objection, speculation.

Q.    (By Mr. Lamar)  Could you repeat your answer?

A.    I did not lie.

MR. HORNSBY:  Objection, speculation.

Q.    (By Mr. Lamar)  You've testified today about

Slade Turner, correct?

A.    Yes.

Q.    Who is Slade Turner?

A.    He's another FFL.

Q.    How did you come to know Slade Turner?

A.    Through Chris and John, I guess.

Q.    Do you have any reason to believe that Slade Turner is a dishonest person?

A.    I don't think he's dishonest.  I don't know if I would fully trust him, though.  Just, like, he's kind of weird sometimes.

Q.    Your testimony is that you don't trust him because he's kind of weird?

MR. GAFFNEY:  Objection.  That's a mischaracterization of what he said.

A.    Like, I was never, like, friends with him or anything.  Like, I guess I don't know how to describe what I'm trying to say.  Like, he was also doing sales to me to resell also, so I don't know if that makes him, like, dishonest.

Q.    (By Mr. Lamar)  I'm correct that Slade Turner sold firearms at the same shows that you attended, right?

A.    Yes.

Q.    Am I correct that he was at a table nearby your

table?

          MR. HORNSBY:  Objection, relevance.

     A.   The only time I can remember specifically is at, like, the Burleson show, because he private sold a 1911 there, and I remember that from my notes.  But I don't know how often he was, like, right next to us besides that.

     Q.   (By Mr. Lamar)  I'm going to show you a document that I'll mark as Exhibit 3.













MR. LAMAR:  Would y'all like to take a lunch break?

MR. GAFFNEY:  Whatever is good for everybody else.

MR. HORNSBY:  Yeah, whatever -- whatever works for you.

MR. LAMAR:  How long do you think y'all will need?

MR. GAFFNEY:  I only need, like, 30 minutes.

MR. HORNSBY:  Sure.

MR. GAFFNEY:  I don't want -- I don't want to step on anyone's toes.

MR. LAMAR:  30 minutes?

THE WITNESS:  I'm not really hungry, but, yeah, that's fine.

THE REPORTER:  That's fine.

MS. AYERS:  Little bit more for the restaurant.

MR. LAMAR:  45?

MR. HORNSBY:  45.

MR. LAMAR:  It is 12:33, so let's say 1:18.

MR. HORNSBY:  Okay.

THE VIDEOGRAPHER:  We are going off the record at 12:32 p.m.

(A recess was taken from 12:32 p.m. to 1:15 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 1:15 p.m.

Q.   (By Mr. Lamar)  Mr. Koroly, did you meet with your attorney during the lunch break?

A.   Yes.

Q.   Did you discuss the substance of your deposition testimony?

A.   Yes.

Q.   What did you discuss?

A.   Just, like, what was talked about and then --

MR. HORNSBY:  Objection, attorney-client privilege.

And I instruct my client not to answer.

MR. LAMAR:  Is it your basis that the attorney-client privilege attaches during the time that he's under oath?

MR. HORNSBY:  Yes.

MR. LAMAR:  And you're instructing him not to answer?

MR. HORNSBY:  Yes.

MR. LAMAR:  I'm going to again reserve my right to keep the deposition open for purposes of challenging that objection.

MR. HORNSBY:  Okay.

MR. LAMAR:  Understood?

Q.    (By Mr. Lamar)  Who is Corey Staub?

A.    He -- I don't really know who he is -- or I know who he is, but I don't know his, like, history.

Does that make sense?

Q.    Is it fair to describe Corey Staub as a professional acquaintance?

A.    I think I only met him, like, twice, maybe three times.

Q.    Have you ever had a conversation with Corey Staub?

A.    Yeah.

Q.    Would you sell products at the same gun shows as Corey Staub?

MR. HORNSBY:  Objection, relevance.

A.    Yes.

Q.    (By Mr. Lamar)  Would Corey Staub have witnessed you selling firearms at gun shows?

MR. HORNSBY:  Objection, relevance.

A.    I'm not sure.  I think it was at Canton, so it would have been, like, after I stopped, I think, when I met Corey Staub.

Q.    (By Mr. Lamar)  Isn't it true that Corey Staub approached you and told you to stop selling firearms without a license?

A.    I don't think so.  He was bragging about building, like, M16s and stuff.  That's why I thought he was kind of, like, a corny, like, weird kind of, like, guy.  I don't know.  Like a -- like a loudmouth kind of guy, if that makes sense.  So I -- I didn't really like him very much, personally.

Q.    I want to make sure I understand your testimony.

Are you denying that Corey Staub approached you and told you to stop selling firearms without a license?

A.    Yeah.  I don't remember him talking about firearm law and stuff.

Q.    Is Chris Remley the kind of person who would

boast and laugh?

MR. HORNSBY:  Objection, relevance.

A.   He's kind of brash, I guess, yeah.

Q.   (By Mr. Lamar)  I'm going to show you a document that I will mark as Exhibit 4.



















MR. HORNSBY:  Objection, relevance.

A.   I think most of those were sold at the shows, so I'm not sure if he ended up selling one separate or not.

Q.   (By Mr. Lamar)  Mr. Remley was your business partner, correct?

MR. HORNSBY:  Objection, asked and answered.

A.   I don't know business partner, because we had worked together, but it was also kind of, like, independent, too.  I could have done stuff myself.

Q.   (By Mr. Lamar)  Is it your testimony that you and Mr. Remley were acting alongside each other but not in concert with one another?

MR. HORNSBY:  Objection, asked and answered.

A.   Yes.  We -- we had teamwork, I guess you would say.

Q.   (By Mr. Lamar)  You were team members for purposes of acquiring firearms from Mr. Harris?

MR. HORNSBY:  Objection, asked and answered.

A.   I guess team members as in we're friends, and we both wanted to make money selling guns.

Q.   (By Mr. Lamar)  Is the answer "yes"?

A.   I guess.

Q.   If Mr. Remley targeted Mr. Harris because of Mr. Harris' visual impairment, would that strategy also have applied to your purchases from Mr. Harris?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection, speculation.

A.   No.  I was buying them from Tom because they already knew Tom, so it was, like, an easy introduction.

Q.   (By Mr. Lamar)  Do you agree with me that your story is somewhat inconsistent with Mr. Staub's and Mr. Turner's?

A.   Yes.  I think they have motive to try to protect Tom.

Q.   Do you have motive to try to protect the story that you gave ATF in the process of your investigation?

MR. HORNSBY:  Objection, improper

characterization.

A.    No, because it's the truth.

Q.    (By Mr. Lamar)  I'm going to show you another document.  I'm marking this document as Exhibit 5 to this deposition.





Lane Koroly Vol 1
April 13, 2026





Q.   I'm going to mark this as Exhibit Number 6.





Q.   You testified that you were familiar with Form 4473, right?

A.   Yes.  I know what they are.

Q.   Based on the questions in the Form 4473, you

were aware that it would be unlawful to buy a firearm if you were not the actual transferee, correct?

A.    Yes.

Q.    Were you given those forms by Mr. Harris when you bought firearms from Mr. Harris?

A.    Was I given 4473s by Mr. Harris when I bought from Mr. Harris?

Q.    Correct.

A.    I think so.

Or are you saying was there, like, a pile of them or something?

Q.    When you purchased firearms from Mr. Harris, you completed a Form 4473, right?

A.    Yes.

Q.    And in the process of filling out a Form 4473, you had to fill out whether you were the actual transferee, correct?

A.    Yes.

Q.    Didn't you testify earlier in this deposition that if your answer to that question was "no," then the FFL was prohibited from selling you the firearm, correct?

A.    Among other questions, yeah.  But that is also a question that will, like, not let it go through.

Q.    You agree with me that to the extent Mr. Harris

Lane Koroly Vol 1
April 13, 2026                          159

had you fill out 4473s, he informed you that you could
not sell firearms that you were purchasing from him?

    A.    Are you saying because I filled out 4473s, that
meant he was telling me I couldn't sell guns?

    Q.    My question is:  Through the 4473 process that
you undertook with Mr. Harris, did Mr. Harris make you
aware of the fact that you had to be the actual
transferee to legally buy a gun?

    A.    No, he never explained 4473s.  I just filled
them out.

    Q.    Were you aware that it is illegal for an FFL to
coach a person filling out a Form 4473?

    A.    I think so.  I don't remember talking about
stuff like that, but it sounds correct.













Q.   So Mr. Harris would just let Chris Remley take a bunch of firearms from his business premises to see what he could sell?

A.   I'm sure they kept some sort of list of what was out, like, and the cost of them.  But I don't know that -- like, that was more of him and Chris.  I just

remember, like, being there, like, at Canton and stuff and, like, understanding, like, how it was working out. But I -- I don't know the intricate, like, details of their arrangement besides, like, just the shotguns were, like, the way to do it for right then.

Q.   Did you ever witness Mr. Korol- -- strike that.

Did you ever witness Mr. Remley and Mr. Harris filling out a 4473 after Remley had already sold the firearm?

A.   I don't recall.

Q.   Is the extent of your knowledge concerning this strategy based on what Mr. Remley has told you?

A.   I guess --

MR. HORNSBY:  Objection, improper characterization.

A.   -- just more being around, I guess, because you can kind of, like, understand stuff by, like, being there, if that makes sense.  But it's not like he's laying out the whole entire game plan to me and telling me every detail, because I was already real anxious about this.  I didn't want to be, like, knee deep into it, you know.

Q.   (By Mr. Lamar)  Was it easier to buy and sell long guns than it was to buy and sell handguns because of the Report of Multiple Sale form?

A.    No.    There's way less demand for shotguns than there is for -- for, like, handguns, and Glocks specifically.  I guess because of the name recognition.

Q.    Are you saying that it was easier to sell handguns?

A.    There's, like, a bigger market for them.

Q.    Is it easier to obtain long guns without drawing ATF scrutiny?

A.    Yeah, I suppose, yeah, or, I guess, like, shotguns --

        MR. HORNSBY:  Objection, speculation.

A.    -- specifically, because they're, like, not as, like, popular, or, like, I don't know how to describe it.  They're like -- like, they don't seem as important, I guess, if that makes sense.

Q.    (By Mr. Lamar)  Do you have to -- strike that.

        Does the FFL have to submit a Report of Multiple Sale for multiple purchases of rifles?

        MR. GAFFNEY:  Objection, form.

A.    Yeah.  I think for, like, the border, for, like, ARs.

Q.    (By Mr. Lamar)  Are you confident that you have to submit a Report of Multiple Sale for the transfer of rifles?

A.    I think it's, like, ARs in, like, border

states.  Because it's a different, like -- for, like, ARs compared to, like, hunting rifles, because it's, like -- I don't know why, but, like, I just remember like that being, like, a -- like whenever I was, like, Googling it myself, that was, like, the -- the difference, I guess because they're semi-auto, I think, over, like, bolt action, like, hunting rifles.

Q.    Why did the Report of Multiple Sale process make acquisition of handguns riskier than acquisition of shotguns?

A.    I don't know if it made it riskier, but it definitely made it easier to -- like, for the government to, like, know about.

Q.    Isn't it true that the Report of Multiple Sale has to be submitted to ATF at the time of disposition?

A.    What was that?  The last words.  Sorry.

Q.    Isn't it true that the FFL is required to send the Report of Multiple Sale to ATF at the time the firearm is transferred?

MR. GAFFNEY:  Objection, form.

A.    I'm not sure when they -- I just know they have to, like, do it within a week or something.

Q.    (By Mr. Lamar)  Isn't it true that the ATF can find those reports suspicious?

MR. GAFFNEY:  Objection, form.

A.    Yeah.  I would figure that that could be suspicious, yeah.

Q.    (By Mr. Lamar)  Isn't it true that Mr. Harris warned you that your purchases of multiple pistols was going to be suspicious to the ATF?

MR. GAFFNEY:  Objection, form.

A.    I think he told me that, like, whenever they already pulled stuff, that, like:  Yeah, they're going to visit you.

But I don't think he ever -- he never, like, mentioned NPRs until, like, after they had, like, pulled his 4473s.  It wasn't during -- because I didn't know about NPRs until after I had, like, stopped, and I think maybe the agents said that they had a record of everything.  I don't know who told me what NPRs were. But at some point, like, I found out what they were, and I Googled it, obviously, to, like, see.  And that's how I knew, like, what it is, basically.

Q.    (By Mr. Lamar)  Sitting here today, do you agree with me that the ATF can see Reports of Multiple Sale and find them suspicious?

MR. GAFFNEY:  Objection, form.

A.    Yeah.  I figured that could be suspicious, yeah.

Q.    (By Mr. Lamar)  Were you aware that Tom Harris

had submitted several Reports of Multiple Sale concerning your purchases?

MR. GAFFNEY:  Objection, form.

A.    Not till, like, after.

Q.    (By Mr. Lamar)  Are you aware today that Mr. Harris submitted Reports of Multiple Sale concerning your purchases?

MR. HORNSBY:  Objection, form.

A.    Today, I'm aware, yes.

Q.    (By Mr. Lamar)  Are you aware that he submitted multiple such reports in the month of August 2021 alone?

MR. HORNSBY:  Objection, form.

A.    I am aware that you're telling me now.

Q.    (By Mr. Lamar)  You testified earlier that Mr. Harris has had his federal firearms license since 1994, correct?

A.    Yes.

Q.    Tom Harris is knowledgeable about the ATF investigative capabilities, correct?

MR. GAFFNEY:  Objection, form.

A.    I'm not sure what he knows about that.

Q.    (By Mr. Lamar)  If Reports of Multiple Sale were, in fact, something that the ATF finds suspicious, Mr. -- Tom would know that, wouldn't he?

A.    Yeah.  I figured he would know that, yeah.

Q.    In completing 4473s after the fact with Mr. Remley, did Mr. Harris sign 4473s on Mr. Remley's behalf?

A.    I don't know about that.  In my notes, he was bragging, like, his wife could, like, copy anybody's signature, and she would, like, I guess, proofread them for him, just, like, helping out and stuff, like catch errors before it's, like, too late and have to call somebody back, something like that.

Q.    Do you believe that Tom Harris knew that he had to submit Reports of Multiple Sale, knew that the ATF could find them suspicious, and yet just decided to sell you firearms and sent those reports because he wanted to make extra money?

MR. HORNSBY:  Objection, form.

A.    I think it was mutually beneficial because we both made money, and it was a risk at the time I was willing to take, because I didn't think it was such a big deal.  I figured that the government had, you know, bigger priorities, and I guess I was really quite ignorant of how the world actually works and was -- I was just foolish then.  Like, it's not something I would obviously do now.  It's, like, I was willing to take the risk then because it didn't seem like it was, like, going to be a big deal, if that makes sense.

Q.   (By Mr. Lamar)  And you're testifying that Mr. Harris, despite his 27 years of experience as an FFL, decided to engage with similar foolishness?

A.   I think he did it because it was mutually beneficial.  He was making money; I was making money.  And if the FFL would have got approved, he would have continued to make money, so -- and the whole thing would have helped him also.  It's not like he was losing money, you know.  It was like a -- not like a legitimate business.  It's not the right word.  But it's a -- like you're doing business, so it's, like, both people, like, win.  Maybe I don't know how to say that right, but, like --

Q.   And Mr. Harris decided to take the risk?

A.   I guess so.  Maybe he didn't think it was, like, a big deal either or that they had bigger fish to fry, because that was, like -- 2021 was kind of, like, a more chaotic year, I feel like.  Like, there was a lot of stuff, like, going on.  So maybe, like, this would just kind of be, like, just -- they would do something else or something.  I don't know.

Q.   Sitting here today, are you 100 percent certain that Tom knew you were selling firearms for a profit?

A.   Yes.

Q.   Based on the conduct that we've already

discussed?

A.   Yeah.  And, I mean, you said he's been doing it for 27 years, so it's, like -- I'm sure they have, like, training to spot, like, suspicious patterns, like -- like banks, you know.  And it's like you have, like, a duty to, like -- like, do the right thing, I guess, and to not let it happen, but you could also not do that and just, like, facilitate.

Q.   Do you agree that submitting multiple Reports of Multiple Sale is one such thing that is suspicious?

A.   Do I think submitting the reports is suspicious?

Q.   Correct.

A.   I don't think submitting the reports is suspicious, or maybe I don't understand, like, what you're saying.

Q.   Didn't you agree with me earlier that when the ATF receives Reports of Multiple Sale, they can find those reports to be suspicious that someone is buying and selling fire- -- firearms for profit?

A.   Sorry.  Maybe I didn't answer good.  The reports themselves, I guess, not suspicious, but, like, the activity that caused the reports --

Q.   Do you agree --

A.   -- if that makes sense.

Lane Koroly Vol 1
April 13, 2026                                        174

Q.    Do you agree that in the month of August, Tom Harris had to send ATF several reports indicating that you were buying multiple pistols from him?

A.    I think he would have had to do that from the very first time I bought guns from him.

Q.    And your testimony is that he just ignored the risk that the ATF was going to find that suspicious?

A.    That's -- yeah.  It's -- it's hard to, like, analyze risk when you're doing something, but, like, after you've had five years to kind of look at everything, then you realize:  Wow, maybe I should not have done any of this.  It's a lot easier to come to that conclusion versus at the time, it's, like -- it's not a very, like -- it doesn't feel like a big deal, like, when you're in the moment, you know, if that makes sense.  But, like, looking back and seeing, like, the cumulative, like, effect it's had on everyone is -- I think it's a bigger deal than it seemed like when it was happening, if that makes sense.

Q.    Other than Chris Remley, would anyone else be able to corroborate your accusation that Tom knew you were selling firearms for profit in August 2021?

            MR. HORNSBY:  Objection, speculation.

A.    In August of 2021, like, specifically?  I guess John, maybe, because he would have been, like, there

sometimes, too, as well.

Q.   (By Mr. Lamar)  When's the last time you spoke with John?

A.   Oh, I don't know.  It was before I moved, so, like, four years ago.

Q.   Are Tom -- strike that.

Are John and Chris Remley still acquainted in any way?

A.   I don't know.

MR. LAMAR:  Y'all want to do one more break?  And then I think I can finish up.

MR. GAFFNEY:  Sure.

MR. HORNSBY:  Yeah, sure.

MR. LAMAR:  Does that work?

MR. GAFFNEY:  You read my mind.

THE VIDEOGRAPHER:  We are going off the record at 2:05 p.m.

(A recess was taken from 2:05 p.m. to 2:12 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 2:12 p.m.

Q.   (By Mr. Lamar)  Mr. Koroly, do you recall Mr. Remley purchasing a Henry Repeating mare's leg from Tom Harris?

A.   Can you describe, like, what it would look

like?

Q.  A rifle with the stock essentially cut off, shiny.

MR. HORNSBY:  Objection, relevance.

A.  I think so.  I think.  I don't remember when that was, though.

Q.  (By Mr. Lamar)  You don't have any knowledge of Mr. Remley selling that firearm to a customer, do you?

A.  I don't think I remember that, no.

Q.  Who is Chris Remley's now wife?

MR. HORNSBY:  Objection, relevance.

A.  Maggie something or Maddie, one or the other.

Q.  (By Mr. Lamar)  In 2021, was Mr. Remley romantically involved with a woman named Maggie?

MR. HORNSBY:  Objection, relevance.

A.  It's either Maggie or Maddie.

Q.  (By Mr. Lamar)  I'll represent to you that, from my understanding, it would be Maggie.

A.  Okay.  Yes.  Sorry, because they're so close, I don't -- yes.  Maggie, yes.

Q.  Do you recall Mr. Remley being romantically involved with someone named Maggie?

MR. HORNSBY:  Objection, relevance.

A.  Yes.

Q.  (By Mr. Lamar)  Do you recall Mr. Remley

bringing this Maggie to Sporting Arms Company with him?

MR. HORNSBY:  Objection, relevance.

A.    I don't remember if she's been there or not.

Q.    (By Mr. Lamar)  Do you have any recollection of Chris Remley taking Maggie to pick out a firearm from Tom Harris' business?

MR. HORNSBY:  Objection, relevance.

A.    I don't remember if she's been there or not.  I don't remember, like -- I'm not sure.

Q.    (By Mr. Lamar)  Do you have any knowledge of Mr. Remley using Maggie to help him acquire firearms that he intended to resell?

MR. HORNSBY:  Objection, relevance.

A.    I don't think that happened, or I would be unaware of that, I guess.

Q.    (By Mr. Lamar)  Did you or Mr. Remley acquire any firearms for the purpose of selling them once you obtained your federal firearms license?

A.    Did we -- just so I understand, did we buy guns privately to hold and wait till we had the FFL to then sell them?

Q.    Correct.

MR. HORNSBY:  Objection, relevance.

A.    I don't think so, because we would have just ordered stock to -- like, if we got the FFL.  So, like,

it -- kind of like putting the cart before the horse, so I don't think we did that.

Q.   (By Mr. Lamar)  You're not certain that you didn't do that, correct?

MR. HORNSBY:  Objection, relevance.

A.   I'm not positive, yeah.

Q.   (By Mr. Lamar)  Do you have any recollection of Mr. Remley asking Tom Harris to hold firearms for you at his house -- strike that.

Do you have any recollection of Mr. Remley asking Mr. Harris to hold firearms at Mr. Harris' licensed business premises on your behalf?

A.   On my behalf?

Q.   On your behalf or Mr. Remley's.

A.   I'm not sure.  I -- I'm confident I didn't have guns there that were, like, my own.  I don't know if Chris did or not.

Q.   Is it your testimony that you don't have recollection of whether Mr. Remley asked Mr. Harris to hold firearms?

A.   Correct.  Yeah, I don't.

Q.   When you purchased firearms from Mr. Harris, did you ever provide him a legitimate personal reason for your purchase?

A.   Did I, like, ever, a singular time, did I ever

do that?  Yeah, there's stuff that I bought for myself, but that was, like, maybe two guns, three guns, out of the 118.

Q.    Even when you intended to resell a firearm that you were purchasing from Mr. Harris, would you verbally provide Mr. Harris with a legitimate personal reason for the purchase?

A.    I did not feel the need to justify buying guns, no.

Q.    To the extent you provided a legitimate personal reason, would it have been reflected on the 4473?

A.    I don't think that's a question on there.

Q.    For every firearm that you purchased from Mr. Harris, you marked that you were the actual transferee, correct?

A.    Yes.  I filled out the form for every time -- I don't think I bought anything private sale from Tom.

Q.    When was the last time that you spoke with Mr. Harris before today?

A.    Like 2022.  It would have been before I moved, so before the summer of 2022.  I think he texted me, like, "Happy Birthday," but I didn't reply.

But I think maybe it was 2023, because I was living in Fort Worth.  I think he might have said

"Happy Birthday" in 2023.  But the last time we would have talked would have been, like, 2022.  Because after I moved to Fort Worth, I basically -- so it's not, like, a fresh start, but it's, like, I can just get away and, like, focus on, like, putting it behind me, I guess, even though it was obviously not behind me, but, like -- like, a new scenery to, like, to, like, distance myself from everything.  Does that makes sense?

Q.   Do you recall the last time that you were at Mr. Harris' licensed business premises?

A.   It would have been, like, early 2022, like spring, I guess, like, before I moved.  Because I never went back when I moved, I'm pretty sure, because it was -- it was -- the most recent I know is -- from my proffer notes, was that -- the May time, when we were in his, like, living room on the couch, and I think Chris was there also.

Q.   Do you recall the substance of that conversation?

A.   That was when he asked us to turn the phones off, and, like, he was talking about, like, he had to, like, meet with them.  And, like, they were, like, looking into Sam and, obviously, me and Chris and then, I guess, people that Joe knew, and that basically, like, they pretty much, like, knew everything, I guess, and so

to, like, not engage with them -- like to try to figure out how to, like, not stumble, but, like, how to, like, just not let it progress, if that makes sense.

Q.   Did Mr. Harris ever tell you that you should hire an attorney?

A.   I think.  Because, remember, he -- he got an attorney before anyone else because he had to, like, meet with the agents, like, early on.  But I think -- I think that was after they had visited me, I think, like, asking him stuff to see, like, what was going on.  I just remember, like, he had to spend, like, 10,000 on the first one.  And I was like:  Well, I don't have 10 grand, so I can't really get that.

But I don't remember when that was.  But I'm pretty sure that was before the May meeting -- or not meeting, but, like, when we were at his house.  If that makes -- I don't remember when he had an attorney, but it would have been after he already had one, like when people were talking about attorneys and stuff, if that makes sense.

Q.   Is it possible that Mr. Harris was trying to help you navigate this process in good faith rather than out of self-interest?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection, speculation.

A.    I think -- I don't think he was looking out for me more than he would look out for himself.  Like, by me not talking about anything, it would kind of shield, like, everyone involved.  Like, if no one talked, it would be like a dome over it, I think, is what the thought process was, so --

But it's like they could figure stuff out other ways, so it's like that wouldn't have really worked, I guess, but, like, I don't think it was like a selfless devotion to protecting me, no.

Q.    (By Mr. Lamar)  Do you recall visiting Tom Harris at any point after the May 2022 meeting that you're discussing?

A.    I don't think so.  I mean, that's like the most recent time I can definitely recall because I have, like, in my notes and stuff.  I think he met, like, Chris at, like, lunch or something one time, but I wasn't there.  I don't know if that was before or after the May date because -- like late May.  I'm pretty sure that was, like, the last time I saw him, or it was, like, the last time I definitely, like, know I saw him on.

Q.    Do you recall visiting Tom and sitting in Tom's den, just the two of you?

A.    I thought Chris was there, but it could have

been just the two of us.

Q.   Do you recall Tom praying for you?

A.   I don't recall that.  I -- my faith was not very strong then, so I might not have really, like, remembered that at the time.

Q.   Do you have any basis to dispute that you thanked Tom for praying for you?

A.   I mean, I would thank someone for praying for me, yeah, because it's, like, a good thing to do for people.

Q.   Do you dispute telling Tom, quote:  I love you?

A.   I don't remember saying:  I love you.  I don't really say that super often.  But maybe it was, like, a -- I don't remember the praying or the "I love you." But, like, saying "thank you" for a prayer is something I would do, like, regardless.  But I don't really, like, throw around "I love yous" to people.  Like, my parents and my wife, obviously, but, like, I feel like it's kind of like a strong word if it's used, to, like -- but being, like, overly liberal with it, it kind of, like, cheapens the, like, meaning for other people.

Q.   So you don't have any recollection of Tom consoling you in his den?

A.   I don't remember, like, consoling.  Like, obviously, I was anxious because this was, like, a -- a

stressful thing, but, like, it was not, like, a therapy session.  It was -- he was, like, telling me what was going on and stuff.  So it's, like, I -- I don't think there was any, like, consoling.

Q.    Did you ever go by the nickname "Quizzy Boy" in the process of your interactions with Mr. Harris?

A.    "Quizzy Boy"?

Q.    Yeah.

A.    No.

Q.    Did you ever go by the nickname "Izzy Boy"?

A.    Glizzy -- I don't -- I mean, I know what he's saying, like "glizzy" is, like, a slang term for Glock, but I wouldn't call myself that.  Like, I'm sure we said that like as, like, a light-hearted, like, thing, but it wasn't like:  This is what we're going to call ourself, if that makes sense.

It's not like:  Hey, I want people to call me this, because that would -- it sounds kind of, like, weird, like, hearing it out loud.  But if it's, like, used, in a conversation or something, I could see why that would maybe be thought to be, like, a nickname, but it wasn't something I would, like, call -- ask people to call me, if that makes sense.

Q.    Do you recall when you confessed to the ATF for the first time that you had been selling firearms for

profit?

A.    It was at the proffer.

Q.    Until your proffer, had you denied any allegations of unlawfully selling firearms?

A.    Yeah, because that was when -- I mean, to me, like, the interaction was -- when they came, I just made sure that I followed what he was saying:  Just make sure I don't say "sell"; just say "traded" or "collecting." I just like them.

And then he called me on the phone at Academy, which I had forgot until you mentioned.  But, yeah, he -- I didn't say anything about selling.  I think I said:  Oh, I must have traded it or something.

And then, like, what, time passed until when -- this was October, so probably, like, about a year, I guess.  And that's when, like, we had the proffer.

And I remember, like, feeling, like, a lot better after from, like, having to, like -- or to, like, be able to just talk about it without, like, having to, like, constantly try to think about, like, what I'm saying or, like, try to, like -- like, formulate, like, my words and stuff.  I was just able to, like, talk about it.

I just remember feeling, like, good after,

even though it kind of seems, like, counterintuitive to, like, feel good about, like, admitting to, like, a crime.  I just remember feeling, like, much better after, I guess, getting it off my chest.  So I was -- like, up until the proffer, I just kept, like, solid: Oh, I never sold any of those, and stuff like that.

Q.   Do you recall what prompted you to confess at the proffer?

A.   I don't think I was, like, prompted to confess. It was like -- at the proffer, like you just basically, like, get out all your cards to see, like, if they like that to, like, have, like, another one, I guess.  You just, like, tell them everything, and then they'll decide what they want to, is basically, like, how I understand it works still and how I, like, understood it at the time.

Q.   Prior to participation in proffers, had Chris Remley been maintaining his innocence?

A.   I'm not --

          MR. HORNSBY:  Objection, speculation.

A.   I'm not sure, because I remember he -- they had, like, a binder or something from, like, his Facebook, so I don't know what he told them then.

Q.   (By Mr. Lamar)  Did you know before the proffer interview that you were going to be asked questions

about Tom Harris?

A.    I don't think we really talked about what would happen at the proffer besides, like -- like, you just tell them, like, everything, if that makes sense.  It wasn't like we had, like, an agenda.  It was like I was just, like, constantly, like, talking, like -- and so it kind of just, like, not bounced around between stuff, but, like, I would start talking about something, and that would, like, remind me of something else.  So it was, like, kind of disjointed, I guess.  So there was no, like, agenda, if that makes sense.  It was just like we were just, like, sitting in a room and, like, just talking.

Q.    Had any representative of the ATF asked you about Tom Harris before the proffer interview?

A.    I don't remember.  I don't remember for sure.  I remember, like, when they came, they were just more concerned with, like -- to my house -- because, like, the main, like, interactions were when they, like -- they came to my house.  And then he had called me that time at Academy, but I didn't know if it was, like, he was trying to, like, trick me or something.  And then he called me again for an interview prior to this.  And that was whenever I definitely had an attorney, or got an attorney, was when he was, like:  Hey, come in, and

I've got questions for you, whatever it was.  That's when I had Brian.

But, like, prior to the proffer, it was mostly, I guess, centered around, like -- excuse me -- like:  What happened with this gun, or what happened with that gun?  Because it was, like, I guess, ones they, like, got, I guess.  So they wanted to know, like, who I sold it to or how it got, like, where it was, if that makes sense.

Q.   After your proffer interview, was the next time that you were expected to discuss Tom Harris at your guilty plea proceeding?

A.   I don't -- like at the guilty plea, like, they didn't, like -- I wasn't, like, talking about stuff, really.  It was just, like, we read it, and then I was, like, saying, like:  I'm guilty.

And then, like, they took my fingerprints and photo, and then I left.  So it was -- there wasn't, like -- it was only, like, 10 or 15 minutes, so it wasn't, like, the judge interviewing me or anything.  It wasn't, like, a formality, but it was, like, a -- I don't know how to, like, describe it -- like, a -- like, I went and then said, like:  Yes, I'm pleading guilty.  And, like, we read through it, and then, like, that was over.  And that's when, like, the marshal was there.

Lane Koroly Vol 1
April 13, 2026                                      189

So then you get fingerprinted and, like, picture taken.  And then that was, like, it.  And then later, you have to meet with the probation office to, like -- like, get one assigned, I think it was.  And that's, like, pretty much, like, how the guilty plea, like, went.  It was, like, not like a back-and-forth, I guess, if that makes sense.

Q.   Where were you when you signed the Factual Basis that included the language about Tom Harris' full knowledge?

A.   I think it was at Brian Poe's office, because, like, he emailed me, and I went over there.  So I'm pretty sure it was at his office, because the first time, I think, they had, like, sent the wrong one or something.  So then, like they, like, fixed it.  But, it was, like, the -- it was just, like --

I forget what it was -- the issue was with, like, the specific, like, number, I guess, of the offense.  And so when they fixed that, then we signed it, or I signed it and then he signed it.

Q.   Prior to showing up at your attorney's office that day, did you have any understanding that you would be signing a document implicating Mr. Harris?

A.   Prior to -- sorry.  Repeat that.

Q.   Prior to showing up in Mr. Poe's office to

review the Factual Basis that you signed, did -- were you aware that you would be signing a document implicating Mr. Harris in misconduct?

A.    We didn't go over it before I got there.  We went over it when I got there.

Q.    Was that the first time that you learned that you would be implicating Mr. Harris in misconduct?

A.    I guess that's not the first time I learned that, because, like, at the proffer, we talked about it, if that makes -- or maybe I guess, like, I'm not getting what you're saying, like, because, like, we talked about the proffer and, like, talked about everything, and like, nothing happened for, like, six months.  And that's -- then the plea, and then we signed that.  And then court happened after that, so I guess I -- it was, like, I don't really get -- like, are you saying, like, did I know the plea before I had it?

Q.    Was it surprising that the document concerning the facts underlying your guilty plea were discussing Tom Harris?

A.    Was it surpris- -- I don't think it was, like, surprising, because it was just, like, going through kind of like the -- not, like, high view, but it was, like, a simplified, I guess, like, summary.  Maybe I -- maybe I didn't say it like that, but, like -- like --

like, the plea is, like, what happened, but it's not, like, verbose.  You know, it's like, I guess -- I don't know if that's the right word.

Q.  Did you know that you would be cooperating against Tom Harris before you walked into Mr. Poe's office that day?

A.  The day that I signed the plea, did -- sorry.  Repeat.  Sorry.

Q.  Did you know that you would be cooperating against Mr. Harris before you walked into Brian Poe's office on that day?

A.  I knew I would cooperate prior to that because of the proffer, and so yes.

Q.  Had you already signed any plea agreement before you reviewed the Factual Basis discussing Mr. Harris?

A.  No, because I didn't know, like, what the Factual Basis was till we had the plea.  So, I guess, it's, like -- I guess I don't really know exactly how they come up with stuff, because it's like -- not like -- like, I don't know if they, like -- if, like -- how exactly it works.  It's just, like -- the plea is just, like:  Here's what I did and I did it.

Q.  And that was the document you were presented, and you signed it?

A.   I -- I signed the plea agreement.

Q.   Are you aware that the plea agreement and the Factual Basis are two different documents?

A.   I thought it was, like, together, so, no, I guess I was not aware they were separate, or maybe I just don't, like, get what you're saying, because, like, the Factual Basis is, like, on the plea, right?  Are you saying it's, like, separate from the plea?

Q.   Do you recall reviewing the Factual Basis with me earlier in this deposition?

A.   Yes.  But I thought that was the plea we were looking at.

Q.   Are you aware of any other documents concerning your plea agreement, excluding the one you and I reviewed?

A.   No.  Like, so from what I understand, this (indicating), the -- the one you gave me -- I don't remember what you said it was called -- this was the guilty plea or, like, a section of the guilty plea, I thought.  I didn't know it was, like, not the same thing as the guilty plea.

Q.   Is that the only document you signed in Brian Poe's office on that day?

A.   No.  I mean, like, I remember -- I thought this was a guilty plea, but obviously, it doesn't say, like:

This is a guilty plea.  So I thought this was a guilty plea, so I was mistaken.

When you were asking about the plea, I thought it was, like, this, because, like, the -- the plea had, like, this plus, like, other stuff.  So I just thought this was, like, a section of it, if that makes sense.

Q.   What other stuff was in the other document?

A.   No, it's like we were -- I don't have it.  But, like, the plea is like this, but just, like, longer.  I think it has, like, the other attorney's name, like, the government attorney.  And I don't remember what else.

Q.   Is there another document that says:  Lane Koroly agrees to plead guilty in exchange for certain counterpromises by the United States?

MR. HORNSBY:  Objection, asked and answered.

A.   No, because I didn't get a cooperation agreement.  So I didn't get, like, the 5K11 or 1.1 or -- just that.  Maybe the plea was, like, longer.  I just -- I thought this was the plea, like, when you were asking, but it's not, because, like, the plea -- I think that is -- yes.  The plea agreement, like, opens, like, the information and then the factual basis.  So I was getting them mixed because it was all, I felt like, one

document, if that makes sense.

Q.   (By Mr. Lamar)  Would you be willing to provide a copy of your plea agreement?

A.   I think it's right there (indicating).  It just says, like, the crime and then this, and then it's the attorneys.

Q.   Would you be willing to provide --

A.   Oh, yeah, you can look at it; yeah.

Q.   -- a copy of the plea agreement?

A.   Yes.

MR. LAMAR:  Is that what this purports to be?

MR. HORNSBY:  Yes.

(Mr. Lamar perusing document.)

Q.   (By Mr. Lamar)  Were you aware that the government, in exchange for your guilty plea, agreed to recommend a punishment at the bottom of the sentencing guidelines?

A.   I don't think that happened, because I didn't get that, like, part of it, because I didn't get the departure for it.  Like, it was in it, but I didn't get it.  That was -- because I was asking Brian -- I was, like:  Hey, why is this not on there?

And he was like:  Well, they just didn't do it --

Lane Koroly Vol 1
April 13, 2026                                                  195

Q.   Are you --

A.   -- or they don't have do it, I guess.

Q.   Are you certain that the government never requested that your sentence be at the bottom of the US sentencing guidelines range?

MR. HORNSBY:  Objection, asked and answered.

A.   Because at court, I think she said, like, 42 months, so I don't know where that is on the range. But, like, the -- the bottom would be, like, probation, I guess, because they never recommended that because, like, I didn't -- like, I didn't meet the threshold for, like, the -- what's, like, significant assistance, I guess they were saying, so they didn't give me the downward departure.  But it was, like, in there.  I just didn't -- like, it was there.  I guess they decided to do that.  But Brian was saying, like, they didn't.

Q.   (By Mr. Lamar)  Did you try to get a downward departure on the basis of cooperation?

MR. HORNSBY:  Objection, attorney-client privilege.  Whatever he discussed with his attorney that is not in the plea agreement, that's protected, as far as attorney strategy with the client.

So I'm going to advise my client not to answer that question.

Lane Koroly Vol 1
April 13, 2026                    196

MR. LAMAR:  Is it your view that his attorney's conversation with assistant United States attorneys is privileged from discovery.

MR. HORNSBY:  It's my view that his conversation with his attorney in regards to a strategy of a downward departure is not -- is -- is protected. That's what we're focusing on.

MR. LAMAR:  Do you agree that conversations that Mr. Koroly's attorney had with the United States Attorney's Office are not privileged?

MR. HORNSBY:  Yes.

Q.   (By Mr. Lamar)  Excluding any conversations that you had with your attorney, did your attorney ask the United States government to agree to a downward departure on the basis of cooperation?

MR. HORNSBY:  Objection, asked and answered.

A.   I think he asked, but I don't know.  I thought it was kind of, like, standard to ask for that, like, from what I understood.  They just don't, like, always agree that it -- to it.

Q.   (By Mr. Lamar)  Did your attorney try to use your accusations against Tom Harris in exchange for a downward variance on the basis of cooperation?

MR. HORNSBY:  Objection, asked and

answered.

A.   No.  It was because, like, we're -- like, doing the proffer, I guess, is like showing them you're willing to cooperate and be honest.  It's not like: Hey, if we do X, you'll do Y.  Like --

Q.   (By Mr. Lamar)  But you testified that the government agreed to make a recommendation of a sentence at the bottom of the guideline range; they just didn't follow through with it?

MR. HORNSBY:  Objection, mischaracterization; improper characterization.

A.   I'm saying, like, the cooperation part was in there, but it was up to, like, them to offer it or not, but they didn't offer it.

Q.   (By Mr. Lamar)  Are you testifying that the United States government breached their plea agreement with you?

A.   No.  No.  I'm saying, like, they don't have to give it to you.  But, like, you, like, ask for it, is what I understand.  But it's up to them to decide:  Does it meet the threshold?

Q.   When you say "them," are you referring to the United States Attorney's Office?

A.   I guess, like, whoever decides stuff like that.

Q.   Are you aware that it is the Court that makes

the ultimate decision on sentencing?

A.   No.   So I guess I thought that, like -- maybe I just was misunderstanding.  I thought, like, by, like, doing the proffer, you're showing, like:  Hey, I'm willing to cooperate and, like -- I'm willing to cooperate.  And it's up to the government, the other side, whatever you want to say, like, to decide, like, is it worth doing or not?

Like, I guess I don't know about the ins and outs of, like, everything, but that's, like, how I understood it.  And, like, they don't have to, like, recommend the departure or -- I don't know who decides, I guess, the departure.  But I just remember, like, it was not in, like, the sentencing thing, so I asked him.

And he was like:  Well, they didn't, like, meet it, or they -- it wasn't, like, substantial enough, so I didn't get the downward departure.

Because, like, I don't know, like, how, like, things, like, work because, like, I'm not, like, an attorney.  So I don't know, like, the specifics.  I'm trying to remember what -- what he was telling me, you know, like, three years ago.  So it's, like --

Q.   Are you testifying that the probation office who drafted a sentencing memorandum to the Court decided that you did not meet the criteria for a downward

variance on the basis of cooperation?

A.   I don't know who decided it.  I don't think it was, like, probation, though.  I think -- I don't know exactly how they do that.  I just -- I just remember, like, thinking I was getting it, because it was, like, in there.  But he was like:  No, it's, like, an opportunity.  It's not like:  Hey, it's in here, so it's definitely going to happen and stuff like -- it's like -- it's like -- I don't even know how to describe it.  Like --

Q.   Are you saying --

A.   He's, like, requesting to, like, say:  Hey, have we been, like, cooperative enough to justify that?  I guess is how it works.  I don't -- you know what I'm saying?  I don't know, like, lawyer, like, stuff.

Q.   Do you agree that you thought you were going to get a downward variance on the basis of your cooperation with ATF?

MR. HORNSBY:  Objection, requires a legal conclusion.

A.   I did not think I was going to get it.  It was just, like, it would be nice to get that because, obviously, you want to, like, get it.

Q.   (By Mr. Lamar)  Didn't you just testify, quote: I thought I was going to get it?

Lane Koroly Vol 1
April 13, 2026                                    200

A.    No.    I'm saying, like when I read it, right, I thought it was, like, part of it.    I didn't know it was, like, a -- an addendum or something.    You know what I'm saying?    Where it's, like, a request for it, I guess. Because, like, it's in there, so I was like:    Oh, it will be part of it.    But, like, I'm saying, like, as we talked about it, I realized it's not set in stone.

I guess I -- it's, like, I don't know specifically how that works, like, that mechanism works. I just -- like, I remember reading it and thinking -- like, it being in there.    I didn't know it was like a -- like a bar to meet, if that makes sense.    You know what I'm saying?    Like, it's not, like, my job, so I don't know all the way it works.

Q.    You subjectively wanted a downward variance on the basis of cooperation, correct?

MR. HORNSBY:    Objection, mis- -- mischaracterization; improper characterization.

A.    I think anyone would want a downward departure for a myriad of reasons, because there's more than just that, though.    There's a lot of, like, rules and stuff they have to set guidelines and stuff.

Q.    (By Mr. Lamar)    Is it fair to say that you were trying to do everything you could do to set yourself up for a downward variance?

Lane Koroly Vol 1
April 13, 2026                                    201

MR. HORNSBY:  Objection.  Objection to form.

A.    No.  I met and proffered, and that was pretty much the extent of my cooperation -- not "pretty much." That was the extent of my cooperation, because they never met with me again after.

Q.    (By Mr. Lamar)  You signed a Factual Basis separate and apart from your proffer agreement implicating Mr. Harris, did you not?

MR. GAFFNEY:  Objection, form.

A.    Yes.  I signed a Factual Basis after a proffer.

Q.    (By Mr. Lamar)  And at the time you signed the Factual Basis, did you hope that this would help get a downward variance on the basis of cooperation?

MR. HORNSBY:  Objection, asked and answered.

A.    From how I understand the Factual Basis, it's just you're saying like:  Yes, we both agreed this is what happened, not, like -- it's, like, a tool to maneuver.  It's just like -- like:  Okay.  Like, we can agree this is, like, the truth.  This is what happened.

Q.    (By Mr. Lamar)  And it's your testimony that your signing this Factual Basis had absolutely no relation to your efforts to get as light a sentence as possible?

MR. HORNSBY:  Objection, asked and answered.

A.   No, I did not sign a Factual Basis to get a light sentence.

Q.   (By Mr. Lamar)  Didn't you say that anyone would want a downward variance under these circumstances?

MR. HORNSBY:  Objection, improper characterization, and objection to form.

A.   The Factual Basis is not, like, an argument thing, as far as I know.  It's just, like:  You agree this is a factual basis of the actions taken, not, like, a way to, like, sneak stuff in.  It's not, like, a tricky thing, you know.

Q.   (By Mr. Lamar)  Was it an opportunity to demonstrate your cooperativeness?

MR. HORNSBY:  Objection, asked and answered.

A.   I don't -- I can't, like, answer stuff like that because I don't know, like, how they file stuff like that.

Q.   (By Mr. Lamar)  Do you --

A.   Like, I'm saying, like, it's part of the plea. Like, you're agreeing, like, you did what you said you did.

And the government is like:  Yes.

And you are like:  Yes.

And so it's, like, a summary of what happened.  It's not an argumentative thing.

Q.   Do you have a copy of your sentencing memorandum with you today?

A.   No.

Q.   You reviewed that document before showing up today, correct?

A.   What document?

Q.   The sentencing memorandum submitted on your behalf by your attorney asking the Court to issue a particular sentence.

A.   I don't think it -- I think they avoided saying a particular sentence.

Q.   Do you agree, at the beginning of this deposition, that I asked you what documents you read in preparing for this deposition?

A.   Yes.

Q.   Do you agree that, among other documents, you said that you reviewed your sentencing memorandum?

A.   Yes.  But I also said it was, like, 30 pages, so I don't remember case law that they cited and stuff, like -- because it's, like, all the stuff, like, they write, I guess.

Q.    Is that --

        MR. HORNSBY:  Objection, misleading question.  He's getting confused.

A.    Yeah.  Like, I don't -- like, you're, like -- sorry.  Could you repeat your question?

Q.    (By Mr. Lamar)  Do you have a copy of the documents submitted by your attorney requesting a downward variance with you today?

A.    No, I don't think so.

        And I don't think it, like, specifically talks about that stuff.  It's, like, character letters and stuff.  It's not, like, just asking for stuff.

Q.    Sitting here today, you don't know whether your attorney asked for a downward variance because of your cooperation against Tom Harris?

        MR. HORNSBY:  Objection, asked and answered.

A.    I don't remember if they did or not.

Q.    (By Mr. Lamar)  You got a downward variance, didn't you?

        MR. HORNSBY:  Objection, asked and answered.

A.    I am not sure.

Q.    (By Mr. Lamar)  Well, you're supposed to go to prison according to the guidelines, correct?

MR. HORNSBY:  Objection, asked and answered.

A.    Yes.

Q.    (By Mr. Lamar)  Did you go to prison?

MR. HORNSBY:  Objection as to form.

A.    No.

Q.    (By Mr. Lamar)  You received a sentence of probation, correct?

MR. GAFFNEY:  Objection, form.

A.    Yes.

Q.    (By Mr. Lamar)  Sitting here today, do you know whether your cooperation against Tom Harris played any role in you obtaining probation as opposed to a prison sentence?

MR. HORNSBY:  Objection, asked and answered.

A.    I'm not sure.

Q.    (By Mr. Lamar)  Have you spoken to Chris Remley in April of 2026?

A.    I'm advising -- I mean, I'm invoking my Fifth Amendment right to remain silent.

Q.    Do you have any basis for believing that my question implicates your Fifth Amendment rights?

A.    You're asking me, like, stuff outside the pleading.  It's, like, stuff that hasn't happened.

Q.    Have you met with Chris Remley?

MR. HORNSBY:  Objection --

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  -- form.

A.    I have lived in Fort Worth for, like, four years.

Q.    (By Mr. Lamar)  Have you met with Chris Remley in April 2026?

MR. HORNSBY:  Objection to form, and objection as to relevance.

A.    I have not seen Chris since I -- I moved, is what I'm telling you.

Q.    (By Mr. Lamar)  When's the last time you spoke to him on the phone?

A.    I don't know.

MR. HORNSBY:  Objection as to form and relevance.

Q.    (By Mr. Lamar)  Have you spoken to Chris Remley on the phone in April 2026?

MR. HORNSBY:  Objection, asked and answered; objection as to form; objection as to -- asked and answered.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Did you and Chris Remley

discuss in April 2026 the need to have a straight story during these depositions?

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  Objection as to form, and objection as to form.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Did you and Chris Remley discuss concern that your testimony during these depositions could open you up to additional criminal liability?

MR. HORNSBY:  Objection as to form.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Did Chris Remley pressure you during April 2026 to make sure that your deposition testimony was consistent with your testimony to the ATF?

MR. HORNSBY:  Objection, improper foundation.  There hasn't been any questions that have been elicited -- answers they have been elicited that go towards that.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Does Chris Remley plan to lie during his deposition testimony on Friday?

MR. HORNSBY:  Objection --

MR. GAFFNEY:  Objection, form.

MR. HORNSBY:  -- speculation.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Is Chris Remley still selling firearms for profit?

MR. HORNSBY:  Objection, relevance.

MR. GAFFNEY:  Object as to form as well.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Was Chris Remley lying when he told the ATF that Tom Harris knew he was selling firearms for profit?

MR. HORNSBY:  Objection, relevance.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Have you and Chris Remley texted about your deposition testimony this week?

MR. HORNSBY:  Objection, relevance.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Did Chris Remley and you agree that in offering deposition testimony this week, you would continue to testify that Tom Harris knew you were

Lane Koroly Vol 1
April 13, 2026                                  209

selling firearms without a license?

MR. HORNSBY:  Objection, relevance.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Did you and Chris Remley discuss in April 2026 that Tom Harris, in fact, did not know that you were selling firearms without a license?

MR. HORNSBY:  Objection, asked and answered.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Did Chris Remley tell you in April 2026 that he's concerned that this deposition could lead to him going to federal prison?

MR. HORNSBY:  Objection, relevance and speculation.

A.   I invoke my Fifth Amendment right to remain silent.

Q.   (By Mr. Lamar)  Did Chris Remley tell you in April 2026 that he lied to the ATF during his proffer interviews?

MR. HORNSBY:  Objection, relevance; and objection, speculation.

A.   I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Did Chris Remley tell you in April 2026 not to talk about his deal to implicate Tom Harris in exchange for leniency from the federal government?

MR. HORNSBY:  Objection as to form.

A.    I invoke my Fifth Amendment right to remain silent.

Q.    (By Mr. Lamar)  Do you have plans to speak with Chris Remley between now and Friday?

A.    I invoke my Fifth Amendment right to remain silent.

Q.    Are you going to leave here and meet with Chris Remley?

A.    I invoke my Fifth Amendment right to remain silent.

Q.    Are you going to leave here and call Chris Remley?

A.    I invoke my Fifth Amendment right to remain silent.

MR. LAMAR:  I do not have any further questions for you.

MR. GAFFNEY:  Take, like, 10?  Does that work?

MR. HORNSBY:  Sure.

THE VIDEOGRAPHER:  We are going off the

record at 3:05 p.m.

                    (A recess was taken from

                    3:05 p.m. to 3:23 p.m.)

                    THE VIDEOGRAPHER:  We are back on the

record at 3:23 p.m.

                              EXAMINATION

BY MR. GAFFNEY:

    Q.   Good afternoon, sir.  Can you hear me okay?

    A.   Yes.

    Q.   All right.  Are you nervous at all today?

    A.   Like, it's pretty stressful, like, dragging it
all back up.

    Q.   Does that stress impact your memory at all?

    A.   I don't think so.  It's just, like, it
happened, you know, five years ago, so I guess that's
what impacts my memory.

    Q.   Do you know Tom Harris?

    A.   Yes.

    Q.   When did you first meet him?

    A.   The, like, spring of 2021.

    Q.   And -- and how do you know him?

    A.   How do I know him?

    Q.   Yes.

    A.   Through John and Chris.

    Q.   Okay.  And -- and approximately when is the

first time you met him and spoke to him face to face?

A.   Like, May or June of 2021.  Whenever the first time I bought two guns is the first time I met him.

Q.   Bought two guns.

Where was that at?

A.   At his FFL, his house.

Q.   At his house.  Okay.

And is there another location for that FFL?

A.   No.

Q.   Okay.  So --

A.   Not that I know of.

Q.   Okay.  To your knowledge, the only location is at Mr. Harris' home?

A.   Yes.

Q.   Okay.  And you've been inside there?

A.   Yes.

Q.   How many times?

A.   Like, a lot.

Q.   Ballpark?

A.   Maybe 50 times.

Q.   50 times?

A.   Probably, yeah.

Q.   Okay.  And can you describe the layout of the business location?

A.   Yes.

Q.   So you walk in the door.  What do you see?

A.   It's, like, stairs on the left, and his office is, like, in a front office room, I guess.

Q.   Uh-huh.

A.   And then it's, like, the living room straight. I think it's, like, the kitchen over here (indicating). I don't know what's, like, upstairs or anything, though.

Q.   Are there firearms when you walk in?

MR. LAMAR:  Object to form.

A.   Not, like -- sorry.  When you walk into the house or the office?

Q.   (By Mr. Gaffney)  The house.

A.   I don't think so, really.  It's, like -- because it's in that room, I guess.

Q.   Okay.  And -- and by "that room," you mean office?

A.   Yeah.  Sorry.  Yeah.

Q.   Okay.  And when you go into the office, what do you see?

A.   It's, like -- I mean, it could have changed, but last I remember, it was, like, the door.  There was, like, a table on the wall next to the entry door that had, like, ammo.  And there was, like, racks, like, catty-corner to it with guns.  And then I think there

might have been, like, another shelf kind of, like,

L-shaped.  And then his desk that's also kind of, like,

L-shaped and, like, the things on the wall and, like,

the -- there's, like, a thing on the side, like a

bookshelf, maybe, or, like, another kind of desk thing.

Q.   And that room that you just testified to,

that's where the business took place?

A.   Yes.

Q.   Okay.  And -- and how big was that room?

A.   Not super big.  Like maybe half -- like from

the half table over, probably.  Like -- sorry -- from,

like, your left, where the table thing is, to here

(indicating), like, the wall.

Q.   So would it be fair to say approximately

15 feet by 15 feet?

A.   I suppose, yeah.

Q.   Okay.

A.   I'm sorry.  I'm not good at, like --

Q.   That's okay.

A.   -- space.

Q.   That's okay.

And when you went in there, were there

ever occasions where anyone else would accompany you?

A.   Yes.

Q.   Who?

A.   Chris; John; Sam, I think, once or twice.  I think, like, Chris' brother was there once.

Q.   So on some occasions, it would be you with other people?

A.   Yes.

Q.   Okay.  Was Mr. Harris always in the room with you while you were there?

A.   I don't think he really, like, left.  He was usually, like, there.  Maybe, like, to go to the bathroom or something, but I don't remember a time, like, we're alone --

Q.   Uh-huh.

A.   -- without anyone there.  Does that make sense?

Q.   Right.

So in that confined setting, did you have conversations with other individuals about what you were going to do with the firearms?

A.   Yes.  Like, we would, like, talk and, like, take pictures of items.

Q.   Did you talk quietly, or did you talk like in a normal conversational volume?

A.   I mean, like, relatively close, so it was not, like, hollering, but, like, not whispering either. Like, I guess, kind of, like, normal, like you would talk to someone, I guess.

Q.    Sure.

And when you had those conversations about what you were going to do with the firearms, where was Mr. Harris?

A.    Like, at his desk.

Q.    How far away?

A.    Like, less than 15, like -- because it's like you were saying, like, 15 feet was like -- it was, like, wall to wall.  But then you have the table, so that's, like, a couple feet.  And then his desk is away from the wall.  Like, the client desk is kind of, like, in the middle of the room.

Q.    Within earshot?

A.    Yeah.  It's, like, kind of a confined area, I guess.

Q.    Did he have headphones on?

A.    I don't think I've ever really seen him wear headphones.

Q.    Was he talking on the telephone?

A.    I think he's talked on the phone before, but it's not, like, sitting on the phone the whole time everyone is there, if that makes sense.

Q.    Do you think he could have heard the conversations that you had with other individuals while you were speaking about those matters within his office?

A.   I would have reason to believe, yeah, that people would, like, hear being in proximity like that.

Q.   Was there loud music playing in the room while you're there?

A.   No.

Q.   Relatively quiet?

A.   Yeah.  It's, like, in a residential neighborhood, so there's not, like, excess noise or, like -- I don't think the TV was, like, ever on.  It was, like, just a normal house.

Q.   Normal office space?

A.   Yeah.  I guess, yeah.

Q.   So on numerous occasions, you purchased firearms from Mr. Harris; is that correct?

A.   Yes.

Q.   Okay.  And that occurred in 2021, correct?

A.   Yes.

Q.   And more specifically, it occurred in the summer of 2021, correct?

A.   Yes.

Q.   And that would have been May 2021 to about August 2021, correct?

A.   Yes.

Q.   Okay.  And when you purchased them, you did not have an FFL, correct?

A.    No.

Q.    And did you tell Mr. Harris that you did not have an FFL?

A.    I don't think I outright stated we don't have an FFL, but it's, like, I never tried to say I had one.

Q.    Did he ever ask?

A.    No.

Q.    Okay.  So, to be clear, you never told him you had an FFL, correct?

A.    I never said we had an FFL, but, like, he would have known after all that that, like, we applied for one.

Q.    And when you purchased those firearms from Mr. Harris, you spoke to him face to face?

A.    Yeah.  It was always in person.

Q.    And you spoke to him about firearms?

A.    Yes.

Q.    And did you speak with him about what you were going to do with those firearms?

A.    It wasn't, like, sitting there, like -- I guess, could you explain, like --

Q.    Sure.

So you buy the guns, right?  And then the next step is:  What are you going to do with them?  Are you going to go shoot them?  Are you going to go sell

them?  Are you going to do something else?

MR. LAMAR:  Object to form.

A.   I guess he never asked what we were going to do with them, but, like, it wasn't, like, talking about what to do with them either, if that makes sense.

Q.   (By Mr. Lamar)  Got it.

At one point in time in the summer of 2021, Mr. Harris asked you how much money you made on reselling the firearms that you purchased from him; is that correct?

A.   Yes.

Q.   And from what you can remember, what did you tell him?

A.   The 50 to 80.

Q.   He never told you not to resell them, did he?

A.   No, he never, like, talked about not reselling.

Q.   And in the summer of 2021, you were purchasing Glocks, right?

A.   The majority, yes.

Q.   And there were some -- on direct, we were talking about a nickname, "Glizzy Boy"; is that right?

A.   Yeah, but it wasn't, like, a nickname.

Q.   Who called you "Glizzy Boy"?

A.   I think, like, Chris might have, like, said it. But it -- it wasn't, like, calling me a nickname.  It

was just, like, kind of, like, a joke name because,
like, we were, like, selling a lot of Glocks.

Q.    What does "Glizzy Boy" mean?

A.    I mean, "glizzy" is just, like -- like, a
rapper term for, like, Glocks.  So it's, like -- like,
making light of selling guns.  But it wasn't like:  Hey,
Glizzy Boy, come over here.  It was not used as, like, a
nickname.

Q.    Did Mr. Harris ever call you "Glizzy Boy"?

A.    I don't think so.

Q.    You don't think?  Okay.

And after that conversation about price
with Mr. Harris, you continued to purchase firearms from
him, correct?

A.    Yeah.  I think, like, it ramped up, like,
toward the end, kind of, like, a -- because it started
out, like, slower.  And then as time went on, it was,
like, more, because it -- like, well, it's working, so,
like, do more, like, you know, if that makes sense.

Q.    And during the summer of 2021, you purchased
Glocks from him, correct?

A.    Yes.

Q.    And as you were purchasing Glocks, did -- did
you see more Glocks piling up in his office?

A.    Yeah.  There was, like, a -- not a lot and not,

like, super, like -- like, there was, like, less when I was first there.  And as time went on, it was, like, dominating more shelf space.

Q.   And that's what you were primarily purchasing; is that right?

A.   Yes.

Q.   When you went there in May of 2021, were there a substantial number of Glocks there?

A.   I don't remember how many.

Q.   Was there a difference in the number of Glocks in Mr. Harris' office between May 2021 and, say, August 2021?

A.   Yes.

Q.   When were there more?

A.   In August.

Q.   Okay.  And you were the one purchasing Glocks, correct?

A.   Yes.

Q.   Was there a spreadsheet that was used for accounting for the sales of firearms that you were made aware of?

A.   My spreadsheet?

Q.   With either Mr. Harris or Mr. Remley.

A.   I'm not sure.  Like, I know they kept track of, like, ammo.  I don't know if they kept track of --

because I was the one buying all the guns, so it was, like, they wouldn't have really had much, like, involvement, I guess, in the inventory control, I guess.

Q.   Uh-huh.

A.   But I know they kept track of ammo and stuff.

Q.   And do you know if they did it in, like, an Excel spreadsheet?

A.   I'm not sure.

Q.   Did you ever see it?

A.   I don't think so.  I would -- I mean, I've seen, like, the receipts that lists ammo and the price, but I don't -- like, I never had access to, like, a spreadsheet, I guess, if that's what you're saying.

Q.   Okay.  So I'd like to talk to you about Mr. Corey Staub.

Do you know him?

A.   Yes.

Q.   I think you testified about him on direct; is that right?

A.   Yes.  Yeah, the letter from him.

Q.   Did you describe him as a loudmouth?

A.   Yeah.  It's, like -- like, that kind of, like, guy, I guess.

Q.   Based upon your interactions with Mr. Staub, is he the type of individual that exaggerates?

MS. AYERS:  Object to form.

A.   I think so, because, like, he was talking about, like, making, like, M16s, like to be, like, impressive, I guess.  It's just, like, that kind of guy, like, kind of, like, wanted to be cool, I guess, if that makes sense, or just, like -- like, trying to, like, name-drop, but, like, not names, but, like, doing stuff. And I don't know.  It's, like, a very specific, like, I guess, like, genre of guy, I guess.  I don't know how to, like, describe it.

Q.   (By Mr. Gaffney)  Understood.

You went to gun shows with Mr. Remley, right?

A.   Yes.

Q.   Did you ever see him under the influence of illegal drugs there?

A.   No.

Q.   And you had known Remley since seventh grade; is that right?

A.   Yes.

Q.   Did you ever notice him under the influence of drugs before a gun show --

A.   No.

Q.   -- while you were going there?

A.   Because they would, like, start early.  So it

Lane Koroly Vol 1
April 13, 2026                                          224

was, like, wake up and, like, go.

Q.   Have you ever observed or heard Mr. Staub lie, if you can remember?

A.   The M16 thing didn't, like, seem true, but I don't know if it was or not, because it's, like, not really -- he didn't, like -- I guess, like, I don't know why people, like, talk about that.  Like, to seem cool, I guess.  So I don't know if that was, like, true or not, but it seemed kind of, like -- I just kind of, like, ignored him saying stuff like that.  Like, I didn't really put stock in it.

Q.   Thank you.

Do you know Mr. Staub's relationship with Mr. Harris?

A.   Not really, because I met Corey at, like, Canton, so that was, like, later on.  So I don't know how they all knew each other.

Q.   Do you know Mr. Slade Turner's relationship with Mr. Harris?

A.   I know they both had FFLs.  And I remember, like -- I think it was, like, Chris talking like he was hooking up with someone his wife knew.

Q.   What do you mean by -- who is "he"?

A.   Oh, sorry.  Slade.  So, like, maybe a friendship, I guess.

Q.   So, to be clear, you'd describe Mr. Slade -- or Slade Turner and Mr. Harris as friends?

A.   Yeah, I would say, probably.

Q.   Did they have a business partnership that you're aware of, or were they just friends?

A.   I mean, like, they've done business.  I don't know if they're, like, a -- you know, like if it's, like, an official thing, you know, if it's, like, a, like, mutually beneficial, so, like, they work together or whatever.

Q.   In your opinion, do you think Mr. Remley is the type of person that would take advantage of anyone to try to get ahead?

A.   I don't think so.

Q.   And you've known him since seventh grade?

A.   Yes.

MR. GAFFNEY:  Retrieving Mr. Harris' Exhibit 6 from the court reporter.

THE REPORTER:  It looks like this (indicating)?

MR. GAFFNEY:  Yes.

Oh, can I see that, ma'am?

(Complies.)

MR. GAFFNEY:  Thank you.

Handing Exhibit 6 to the witness.



Lane Koroly Vol 1
April 13, 2026                          227



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

███████████████████████████

MR. GAFFNEY:  Retrieving the exhibit from the witness.

Thank you, sir.

Handing the exhibit back to the court reporter.

Thank you, ma'am.

Q.   (By Mr. Gaffney)  Sir, you made a proffer to the government in October 2022; is that correct?

A.   Yes.

Q.   And that proffer would have been closer in time to the -- the sale -- the purchase of -- purchases from -- from Mr. Harris, correct?

A.   Yes.

Q.   Sir, was your memory of those events better in October 2022, or is it better in April 2026?

MR. LAMAR:  Object to form.

A.   October 2022.

Q.   (By Mr. Gaffney)  Because it was closer in

time?

A.   Yeah.  And it's, like, I was thinking of all that stuff then, and, like, I haven't thought about this since, I guess, sentencing.  So it's, like, I -- not put it out of my mind, but it's, like, I just don't like to, like, think about it, if that makes sense.

Q.   Is it fair to say, you want -- you've tried to push those memories out of your head?

A.   Yeah.  Like moved on, basically.

Q.   It's a negative experience, correct?

A.   Yes.

Q.   People generally don't like to think about negative things; is that right?

MR. LAMAR:  Object to form.

A.   No.

Q.   (By Mr. Gaffney)  You don't like to think about negative things; is that right?

A.   Correct.  I do not like to think about negative things.

Q.   You testified on direct examination about a Glock T-shirt, right?

A.   Yes.

Q.   Who gave you that T-shirt?

A.   Tom gave me, like, two Glock shirts.

Q.   Why?

A.    I guess because he knew I liked Glocks, and he, like, got stuff from distributors, I guess.

Q.    Was it in advance of the meeting that you had with ATF?

A.    It was, like, before the meeting, but I don't think he gave it to me for the meeting, if that makes -- because, like, he gave me that shirt and, like, a really big shirt, like a sleeping shirt for my wife.  And I don't remember why, but it was, like, on the couch, like, by the door.  So when I answered, I was just, like, in my underwear, and so, like:  Okay.  Well, like, hold on.

And, like, I saw it, and I said:  This would be a good idea.  So I put it on to be like:  Oh, yeah, he's, like, a fan.

Q.    Sir, do you know how ATF tracing works?

A.    I guess kind of but, like, not super good.

Q.    In your own words, can -- in general terms, can you just tell us how it works?

A.    So they, like, get a gun and then look up, like, the serial number and, like, follow the transfers to whoever, like, most recently had it.

Q.    Okay.  I'm going to ask you a very specific question:  When did you learn of ATF's interest in the SCCY you purchased from Mr. Harris?

A.   The first time they came to the house.

Q.   Did you learn about it from ATF or through Mr. Harris?

A.   I think it was -- I think it was the ATF because they were saying it was, like, a casino.  I remember him, like, saying, like, they pulled, like, paperwork and, like, traces.  But I don't know if it that was specifically that gun or not.

Q.   Did Mr. Harris warn you the ATF was going to contact you regarding the SCCY?

A.   Yeah.  He said they were going to definitely, like, come.  I don't know if he said specifically, like, the SCCY or not.

Q.   And did you purchase that weapon in August 2021?

A.   Yes.

Q.   And did you sell that weapon?

A.   Yeah.  I sold it at the -- like, that weekend, I guess, because I remember they said it was, like, 7 days or something, and then they had it, so --

Q.   How long after you sold that weapon did Mr. Harris warn you about the ATF contacting you?

         MR. LAMAR:  Object to form.

A.   Maybe, like, two weeks.  It was, like -- like, a week or two before they actually came, he was saying,

like, they pulled it.  Like, they're definitely going to want to know about what's going on.

Q.   (By Mr. Gaffney)  Did he tell you why they were going to come?

A.   I don't think he said, like, why.

Q.   Okay.  Who told you the firearm was recovered in a gambling den?

A.   I think it was the agents, because I remember, like, thinking that was, like, kind of -- not unique, necessarily, but kind of -- like, I've never heard of, like, an underground gambling den before, so it, like, stuck in my head.

Q.   Did Mr. Harris instruct you or coach you regarding what you should say to ATF when they called you about the SCCY?

MR. LAMAR:  Object to form.

A.   He was just, like:  To say you only trade them or collect them, not to, like, admit to selling them.

Q.   (By Mr. Gaffney)  Why would he tell you that?

MR. LAMAR:  Object to form.

A.   I -- well, I guess, so, like, they wouldn't have my own statement to, like, start going deeper into what was happening, if that makes sense.

Q.   (By Mr. Gaffney)  But he did tell you not to tell the ATF that you sold them, correct?

A.   Yeah.  Only say, like, you traded for, like, silver or other guns or whatever or, like, crypto.

Q.   And it was after being approached by the ATF that you refrained from purchasing firearms with the intent to resell, correct?

A.   I think I was going to stop, like, before they came because I was figured it was getting, like -- like, it was already kind of getting too big.  But then, like, obviously, when they came, I definitely, like -- like, that was, like, a bigger deal than this thing.  Like, hey, like --

Q.   Did it seal your decision?

A.   Yeah.

Q.   Are you aware, however, that Mr. Remley continued to buy firearms from Mr. Harris with the intent to resell those firearms?

A.   Yes.

Q.   Do you know how many firearms Mr. Remley purchased?

A.   I'm not, like, totally sure.  It was less than me, though.

Q.   Okay.  Before you stopped, do you recall how many firearms you purchased from Mr. Harris?

A.   Maybe, like, over half.

Q.   What do you mean?  Half of what?

A.    Of the 118.

Q.    Okay.

A.    So -- but I don't know exactly, like, how many, no.

Q.    Can you give an approximate number?

A.    Oh.

MR. LAMAR:  Object to form.

Q.    (By Mr. Gaffney)  Can you give an approximate number of firearms that you purchased from Mr. Harris in the summer of 2021?

A.    Maybe, like, 70, give or take, because a bulk of those was, like, the lowers.

Q.    Thank you, sir.

Do you know how an ATF multiple sales report works?

A.    Like, I do now because, like, they send, like, the record in with -- I guess it's like the 4473 they, like, send.

Q.    You testified on direct that you discussed with Mr. Harris that Mr. Harris was required to record multiple sales of pistol handguns; is that correct?

A.    Yeah.  I think it's, like, everybody, though.

Q.    Who educated you about reports of multiple sales?  How did you learn that?

MR. LAMAR:  Object to form.

Q.   (By Mr. Gaffney)  How did you learn about multiple sales reports?

A.   I think it was, like, when the agents had, like, a list of everything.  But I thought that was because they pulled all the paperwork, like, a couple of weeks before they actually came.  So I don't -- I don't remember when I learned, like, specifically what they were.  It was, like, after all the buying stuff.

Q.   Thank you, sir.

MR. GAFFNEY:  One moment, ma'am.

(Conference between Mr. Gaffney

and Ms. Ayers.)

Q.   (By Mr. Gaffney)  Sir, just to put a finer point on it, in the summer of 2021, you went to Mr. Harris' office and purchased firearms, correct?

A.   Yes.

Q.   Okay.  And approximately how many occasions did you go there?

MR. LAMAR:  Object to form.

A.   It was at least, like, once a week, because, like, the shows and then maybe, like, more than once a week because I was selling to, like, other people outside the shows, too.  Like, for -- like, for, like, J.J., I would go separate because, like, it wasn't show prep days, if that makes sense.

Q.   (By Mr. Gaffney)  Okay.  So in August of 2021, you went there approximately once per week.

When you did that, how often were you accompanied by another individual?

A.   Probably most of the time.  Like, I'd go with, like, Chris or John.  I didn't go, like, alone super often because it -- like, they knew him better than me.

Q.   Okay.

A.   And it was, like, we were, like, friends, and we would, like, hang out.  So it was, like --

Q.   And would you go -- would Chris or John go into the office with you?

A.   Yes.

Q.   And when you said:  We were all friends, did those individuals have a comfortable relationship with Mr. Harris?

A.   I would say they had a more comfortable relationship than me because they'd known him longer.

Q.   Okay.  And did you observe them talking to Mr. Harris?

A.   Yes.

Q.   And would Mr. Harris come up and talk to you guys and just talk about a number of topics?

A.   It was mostly, like, guns and ammo-related or, like, the news, maybe, stuff like that.  But he was

usually, like, at his desk, though.  He wasn't, like, getting up.

Q.    But to be clear, when you went into that office with either John or Chris, you would have conversations with them about selling those guns, correct?

A.    Yes, like -- because we would talk about, like, the shows and what's, like, going on.

Q.    And what was going on at the shows was the sale of firearms, correct?

A.    Yes.

Q.    And Mr. Harris was there -- was nearby while you had those conversations, correct?

A.    Yeah, because, like, we weren't, like -- it was, like, we were, like, talking to each other and stuff, because it wasn't, like, trying to be, like, secretive about everything, because I figured, like, it was, like -- so everyone was, like, talking about what show was next and, like, what's going to happen when and stuff like that.  So it's, like, it wasn't, like, whispering and stuff.  It was, like, talking like normal, I guess.

Q.    Normal conversational tone?

A.    Yeah.

Q.    To your knowledge, Mr. Harris does not have an impairment with his hearing, does he?

A.    I don't think so.

Q.    Has he ever told you that he has an impairment with his hearing?

A.    I don't think so.

MR. GAFFNEY:  Thank you.

No further questions.

MR. LAMAR:  I have roughly 10 redirect questions.

FURTHER EXAMINATION

BY MR. LAMAR:

Q.    Mr. Koroly, do you recall during cross-examination agreeing that you bought firearms from Mr. Harris, quote, between May 2021 and August of 2021?

A.    Yes.

Q.    Isn't it true that you purchased your first firearm from Mr. Harris in June 2021?

A.    It could have been June, but it was, like, the summer, is how I'm, like, thinking of it.  So if it's, like if it was, like, June 1st, like a day from May, so it's, like, maybe I'm off on, like, a day or something. But it's, like, it was the beginning of summer.  So when I think of that, I'm thinking of, like, not really April, but, like, May/June is, like, the beginning of summer, because I don't know the exact date we met either about.  So it's, like -- just kind of seems like

the same, if that makes sense.

Q.   Do you recall testifying that Mr. -- you have reason to believe that Mr. Harris would have overheard conversations that you were having with Mr. Remley or Mr. Anderson?

A.   Yes.

Q.   You don't know that Mr. Harris overheard any such conversations, do you?

A.   No.  I couldn't know, like, what someone else would hear.

Q.   Do you agree that you are assuming that he could have overheard such conversations?

A.   I guess, not assuming, but, like -- like, knowing, being alive, like, when people talk, like, you don't have to, like -- like, you can just, like, hear stuff, especially if it's, like, quiet, you know.  It's, like, I don't have to, like, assume that someone could do something if, like, experience would tell you, like, they could have.

Q.   Do you recall testifying that Mr. Turner and Mr. Harris might have been friends?

A.   Yes.

Q.   On what basis do you believe that they were friends?

A.   He was, like, hooking up with, like, one of

his, like, wife's -- people that, like, lived there.  It was, like, a girlfriend, I guess.  So you wouldn't really do that for, like, a stranger, you know, or, like, somebody you're not -- you don't know -- you know what I'm saying?  You wouldn't, like, set two people up if you didn't know how the other person, like, is.

Q.   Are you assuming, based on this interaction that you're describing, that Mr. Turner and Mr. Harris were friends?

A.   Yeah.  Plus, like, he knew Tom, I think, longer than John and Chris.  He definitely knew Tom longer than I did.

Q.   Do you agree that you can be professionally acquainted with someone without being their friend?

MR. HORNSBY:  Objection as to form.

A.   Yes, you could be professionally acquainted and not be friends.

Q.   (By Mr. Lamar)  Do you agree that you don't know why Mr. Harris gave you a Glock T-shirt, correct?

A.   Do I know why he gave it to me?

Q.   Do you know for certain why Mr. Harris gave you a Glock T-shirt?

A.   No, I couldn't know, like, his pure motive, I guess, no.

Q.   So we're left to guess as to why?

A.   I -- I remember he said, like:  Here's a shirt for X reason.  But it's, like, he gave me two shirts that are both Glock shirts, and I was buying mainly Glocks.  So I figured it was because I was buying Glocks, and he got, like, a swag or whatever from, like, a distributor.

Q.   Do you recall testifying that you intended to cease buying and selling firearms for profit because it was, quote, getting too big?

A.   Yes.

Q.   What did you mean by the phrase "getting too big"?

A.   Like, it had, like -- like, my -- not, like -- it was, like, too much in, like, my name, if that makes sense.

Q.   Is it fair to say that you were perceiving a greater risk of getting into trouble?

A.   I was perceiving?  Or -- sorry -- I couldn't hear.

Q.   Is it fair to say that you were perceiving that your risk of getting into trouble was growing?

A.   The longer it went on, I figured, like, the bigger deal it would become.  But if I, like, stopped, like, ahead of time, maybe it would just kind of, like, go away, I guess.

Q.   Is it fair that after these events you're describing, you decided to get your federal firearms license so that you could continue?

A.   We didn't start, like, the FFL stuff till, like, after they had already been visited and, like, when they gave -- had the paperwork about engaging the business.

Q.   Isn't it true that the ATF approached you for this initial visit in September of '21?

A.   For, like, the first time?  Yeah, it was, like, September.

Q.   And is that the moment at which you decided to cease your involvement in the buying and selling of firearms for profit?

A.   Yeah.  That was, like, I guess, a wake-up call, I guess, because, like, before, I was figuring:  Okay. Like, I've got to put a cutoff point.

And then, like, that -- that was it, obviously.

Q.   Isn't September 2021 the same month that you and Mr. Remley began openly discussing obtaining an FFL?

A.   It could have been, like -- it was, like, in the fall, I remember.  I don't remember exactly when.

Q.   Do you recall testifying that you learned about a Report of Multiple Sale -- strike that.

Do you remember testifying that you became educated on Reports of Multiple Sale only once ATF approached you?

A.    Yeah, I think it was around that time.

Q.    So had you decided to get an FFL without any knowledge of what a Report of Multiple Sale was?

A.    Did I decide to get an FFL without knowing what that was?  I guess it was, like, independent of wanting an FFL.  It didn't, like, drive the decision or, like, the motive, I guess.

Q.    Is it fair to say, then, that you decided to seek an FFL without fully understanding the requirements asked of federal firearms licensees?

A.    No.  We wanted the FFL to sell guns.

Q.    Do you remember testifying during cross-examination that you noticed Mr. Harris' supply of Glocks increasing?

A.    Yes.

Q.    Do you have actual knowledge of the number of Glocks Mr. Harris had in his inventory in May 2021?

A.    Like the exact number he had, or are you saying like the number compared to, like, the end?

Q.    Did you know for certain the number of Glocks Mr. Harris had in his inventory at any given time?

A.    I guess I would not know his exact inventory

numbers, unless, like, when I go, I can look and see, like, one box style is bigger than the other, but I'm not, like, tallying what's what.

Q.   When you say that you saw his inventory increasing, does that mean you saw more Glocks on the shelf?

A.   Yes.

Q.   Is that the only place where Mr. Harris would keep Glocks in his inventory?

A.   As far as I know, yeah.  He just would have them, like, on the shelf or, like, little, like, side shelf, kind of.  It was, like -- like L-shaped.

Q.   Did Mr. Harris keep firearms in their box?

A.   What do you mean?

        MR. HORNSBY:  Objection, relevance.

Q.   (By Mr. Lamar)  Did Mr. Harris keep firearms in the manufacturer's box within that same office space?

        MR. HORNSBY:  Objection, relevance.

A.   You're saying, like, in, like, the case or, like, a shipping box.

Q.   (By Mr. Lamar)  In the case.

A.   Yeah, as far as I know.

Q.   At any point in time, did you count the number of firearms that were in his office space?

A.   I don't think I ever counted his inventory.

Q.   Are you certain that his inventory of Glocks increased as you interacted with Mr. Harris?

A.   Yeah, because it was, like, a section, like, on, like, the top shelf.  And then, like, by the end, it was, like, on the big top shelf.

Q.   Is it inconsistent with the business practices of a federal firearms licensee to increase their inventory of Glocks?

A.   I don't know, because I've never had an FFL.

Q.   Sitting here today, is it possible that Mr. Harris increased his supply of Glocks unrelated to your buying and selling of Glocks for profit?

MR. HORNSBY:  Objection, asked and answered in a previous line of questioning.

A.   I would be surprised if he was doing that, like, randomly buying more guns independent of what was selling.

Q.   (By Mr. Lamar)  Sitting here today, are you certain that Mr. Harris increased his supply of Glocks so that you would have more Glocks to buy and illegally sell?

MR. HORNSBY:  Objection, asked and answered under a previous line of questioning.  Redirect is -- is limited to just what was talked about in direct -- or in his redirect, so we've already gone over

this line of questioning.

MR. LAMAR:  My colleague asked questions about the increase of Glocks in Mr. Harris' inventory, so he can answer this question in a yes-or-no format.

MR. HORNSBY:  Objection, badgering the witness.  You're -- you know, he gets a little nervous, and you keep asking him the same question.

MR. LAMAR:  Are you instructing him not to answer my question?

MR. HORNSBY:  Yes.

MR. LAMAR:  No further questions.

MR. GAFFNEY:  If I can just have one moment.

(Conference between Mr. Gaffney and Ms. Ayers.)

MR. GAFFNEY:  No further questions.

MR. HORNSBY:  Well, no -- no questions on the redirect for us.

MR. LAMAR:  No questions.

THE VIDEOGRAPHER:  Okay.  We are going off the record at 4:08 p.m.

MR. HORNSBY:  Oh, before we go off the record, we need to have the witness to sign to certify the -- the deposition, so if we could just have that said on the record, for the witness within 30 days to

receive the depo and then sign it and certify it.

THE VIDEOGRAPHER:  All right.  We are now going off the record at 4:08 p.m.

(Off the record at 4:08 p.m.)

- - - - -

CHANGES AND SIGNATURE

WITNESS NAME:  LANE KOROLY

DATE OF DEPOSITION:  APRIL 13, 2026

        Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change.  Please sign each page of changes.

PAGE/LINE       CORRECTION       REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, LANE KOROLY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing under penalty of perjury.

_____
LANE KOROLY, VOLUME 1

_____ No changes made _____ Amendment Sheet(s) attached

THOMAS ROY HARRIS, JR., d/b/a SPORTING ARMS COMPANY

VS.

KRISSY Y. CARLSON, in her official capacity as Director

of Industry Operations, Dallas Field Division, Bureau of

Alcohol, Tobacco, Firearms and Explosives et al.

SERVICE NO. 7108859-001

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

THOMAS ROY HARRIS, JR.,          )
d/b/a SPORTING ARMS COMPANY,     )
     Petitioner,                 )
                                 )
VS.                              )
                                 )
KRISSY Y. CARLSON, in her        )    CASE NO.
official capacity as             )    4:24-cv-00737-SDJ
Director of Industry             )
Operations, Dallas Field         )
Division, Bureau of Alcohol,     )
Tobacco, Firearms and            )
Explosives,                      )
     Respondent.                 )

REPORTER'S CERTIFICATION OF THE ORAL,

VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

LANE KOROLY

April 8, 2026

I, Jamie K. Israelow, a Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify to the following:

That the witness, LANE KOROLY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness:

That the original transcript was delivered to William Chadwick Lamar, Jr..

That a copy of the certificate was served on all

parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

That the amount of time used by each party at the deposition is as follows:

          William Chadwick Lamar, Jr. - 5:00
          Daniel Gaffney  - 0:33
          Ashley V. Ayers - 0:00
          Jason L. Hornsby - 0:00

          That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of

record:

William Chadwick Lamar, Jr., Attorney for Plaintiff.

Daniel Gaffney and Ashley V. Ayers, Attorneys for Defendant.

Jason L. Hornsby, Attorney for the Witness.

CERTIFIED TO BY ME on this 24th day of April, 2026.

_____
Jamie K. Israelow, CSR, RMR, CRR
Texas CSR 3801
Expiration Date:  4/30/2027
US LEGAL SUPPORT, INC.
Firm Registration No. 122
16825 Northchase Drive, Suite 900
Houston, Texas  77060
713.653.7100

COUNTY OF DALLAS    )

STATE OF TEXAS      )

          I hereby certify that the witness was notified on _____ that the witness has 30 days (or _____ days per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there any changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them;

          That the witness's signature was/was not returned as of _____.

          Subscribed and sworn to on this, the _____ day of _____, 2026.


                    _____
                    Jamie K. Israelow, CSR, RMR, CRR
                    Texas CSR 3801
                    Expiration Date:  4/30/2027
                    US LEGAL SUPPORT, INC.
                    Firm Registration No. 122
                    16825 Northchase Drive, Suite 900
                    Houston, Texas  77060
                    713.653.7100




Charge for transcript and exhibits $ _____
To be paid by Plaintiff / William Chadwick Lamar, Jr.
SERVICE NO. 7108859-001

Lane Koroly Vol 1
April 13, 2026                                    1

### Exhibits

EX 0001 Lane
Koroly 041326
  3:11 8:9,10
EX 0002 Lane
Koroly 041326
  3:12 118:10,
  11
EX 0003 Lane
Koroly 041326
  3:12 132:9,
  10
EX 0004 Lane
Koroly 041326
  3:13 142:5,6
EX 0005 Lane
Koroly 041326
  3:14 152:4,6
  153:16
EX 0006 Lane
Koroly 041326
  3:14 155:14,
  15 225:18,25

### $

$80
  159:22
  160:1,21
  161:3

### 1

1
  8:9,10 58:19
  119:9,20
1.1
  193:19
10
  72:18 98:1
  105:7 111:1,
  7 181:12
  188:19
  210:22 238:7

10,000
  181:11
10-minute
  50:4
100
  172:22
1099
  10:20
10:05
  50:8,10
10:17
  50:10,12
11
  161:14,17
118
  179:3 234:1
11:24
  98:5,7
11:38
  98:7,9
12:32
  139:10,12
12:33
  139:6
12th
  153:18
13
  248:3
13th
  4:4
1445
  4:15
14th
  25:3
15
  41:22 43:9
  188:19
  214:15
  216:7,8
16825
  4:19
18
  10:21 28:21
  142:11
1911
  69:16 132:5

1994
  74:5 170:16
1996
  8:23
19s
  72:18
1:15
  139:12,14
1:18
  139:7
1st
  238:19

### 2

2
  118:10,11,24
  119:23
  142:13
20-something
  88:14
2018
  30:15,16
2020
  89:13 92:7
2021
  11:1,4,6,25
  19:23 21:8
  23:16 27:10
  31:4 34:1
  35:20 38:10,
  14 42:23
  43:1 52:1,14
  57:9 61:19
  64:16 65:21,
  22 67:21
  70:12,23
  71:1 72:5,7
  77:5,12
  78:16,22
  79:2 82:1,5,
  7,14,21
  83:4,5,8
  84:7,25
  85:10,16,23
  86:5,8,12
  88:1 89:13

95:17 97:9
  99:25 100:5,
  10 130:18
  161:6 170:11
  172:17
  174:22,24
  176:13
  211:20 212:2
  217:16,19,
  21,22 219:8,
  17 220:20
  221:7,11,12
  227:21
  231:15
  234:10
  235:14 236:1
  238:13,16
  242:20
  243:20
2022
  11:9 27:10
  52:1,15 54:5
  78:13,14,15,
  22,25 101:19
  152:21
  153:5,18
  179:21,22
  180:2,11
  182:12
  228:15,22,24
2023
  12:20,21
  36:24 65:1,
  18 102:11
  142:11
  179:24 180:1
2024
  12:22 36:24
  65:1
2026
  4:4 205:19
  206:8,19
  207:1,16
  209:6,13,20
  210:2 228:22
  248:3
21
  25:4 38:4,12

52:16 57:14
242:9
**21/maybe**
36:22
**22**
24:1 36:23
**23**
105:4
**27**
172:2 173:3
**28th**
8:23
**2:05**
175:17,19
**2:12**
175:19,21

---

**3**

**3**
120:1 132:9,
10
**30**
127:23
138:19,23
203:22
246:25
**3600**
4:16
**380**
69:16
**3:05**
211:1,3
**3:23**
211:3,5
**3D**
29:17,18,19
**3d-printed**
29:24 30:1,
3,5

---

**4**

**4**
120:3 142:5,
6 145:20

156:17
**42**
195:9
**43C**
148:18
**4473**
47:3,8,17
48:4,9,12,
13,15,19,23,
24 49:10
50:2 68:25
69:6 157:23,
25 158:13,15
159:5,12
164:17 166:8
179:12
234:17
**4473s**
40:24 79:5
86:9 98:25
158:6 159:1,
3,9 164:24
169:12
171:1,2
**45**
139:4,5
**47**
122:3
**4:08**
246:21
247:3,4

---

**5**

**5**
120:6,8,10,
15 121:19
128:22
129:13 147:3
152:4,6
153:16
**50**
159:22
160:1,4,21
161:3
212:21,22
219:14

**502**
103:21
115:23
**5K1**
113:13
**5K11**
193:19

---

**6**

**6**
155:14,15
225:18,25
**60**
126:10

---

**7**

**7**
58:9,15
153:23 154:2
159:15
231:20
**70**
234:11
**737.398.9270**
11:17
**75202**
4:16
**77060**
4:19

---

**8**

**80**
160:4 219:14

---

**9**

**9**
164:10,13,
19,22 165:4
**900**
4:19
**94**
88:14

**940.367.9383**
12:3
**9:01**
4:2,4

---

**A**

---

**a.m.**
4:2,4 50:8,
10,12 98:5,
7,9
**Aaron**
133:9,14
**ability**
7:23 8:1
**able**
49:18 64:8
74:16 75:16
81:22 87:8
88:25 94:20,
22 95:1
143:18,23
144:7,22
174:21
185:20,23
**absolutely**
201:23
**Academy**
22:19,25
34:5 42:14
48:1,3,5
53:18 54:9,
11,22 55:6,
9,24 185:11
187:21
**access**
15:1 164:8
222:12
**accommodate**
96:10
**accompanied**
236:4
**accompany**
214:23
**accord**
33:3

accounting
 221:20
accurate
 8:1
accurately
 8:5
accusation
 174:21
accusations
 114:2,8,16
 115:5 116:19
 120:18
 126:17 128:4
 196:23
accuse
 113:20
 126:21
accused
 121:10 128:1
Acknowledgement
 119:3
acquaintance
 140:18
acquainted
 175:7
 240:14,16
acquire
 42:12 49:16,
 22 50:1 88:2
 177:11,16
acquired
 37:14,21
 38:1 69:22
 160:15
acquiring
 39:9 41:7
 46:23 66:2
 83:13 100:24
 151:4
acquisition
 168:9
across
 42:15
acting
 150:22

action
 4:20 168:7
actions
 71:22 202:12
activities
 40:7,10
 96:22
activity
 122:17
 173:23
actual
 48:10,15,17
 49:13,24
 68:22 69:6
 158:2,16
 159:7 160:20
 179:15
 243:19
added
 145:13
addendum
 200:3
addition
 12:12
additional
 66:6 109:8
 114:15
 130:12
 207:10
address
 9:18,22
 103:2
addressed
 103:5
administered
 7:16
admit
 46:21 162:18
 232:18
admitted
 121:7
admitting
 164:3 186:2
advance
 230:3
advantage
 21:1 134:17

 225:12
advice
 62:12 103:13
advise
 24:11 30:20
 34:24 62:1
 195:24
advised
 62:3 103:23
advising
 205:20
affairs
 22:14 23:11
affordable
 90:12,20
 91:1
afraid
 70:21 125:7
after-the-
fact
 125:1
afternoon
 211:8
agenda
 187:5,11
agent
 53:17 54:9,
 11,13,19
 55:5,8,9
 56:1,2 79:10
 153:1,3
 164:15
agents
 41:1 52:14
 70:5 78:8,
 11,19
 109:19,20
 152:24 153:1
 169:14 181:8
 232:8 235:3
ago
 9:4 29:18
 39:3 42:18
 61:19 67:16,
 20 68:2
 75:20 76:19,
 24 84:11,14,

 16,18,21
 87:4,12
 94:10,25
 95:6 144:14
 155:4 160:23
 163:17 175:5
 198:22
 211:15
 226:13,16
agree
 4:6 8:14
 21:15,23
 37:1 49:17,
 20 60:1
 72:22 76:18
 77:11 78:1,
 24 83:4 89:6
 96:16,20
 101:22
 102:24
 103:4,9,11,
 12 106:25
 110:14
 114:6,14,24
 118:16,19,20
 119:12,15,
 19,22,25
 120:3,6
 121:23
 124:13,19
 132:16,19
 135:6,11
 137:12,16,20
 142:10,18
 151:18 156:2
 158:25
 169:20
 173:9,17,24
 174:1 196:8,
 14,21 199:16
 201:21
 202:11
 203:16,20
 208:23
 239:11
 240:13,18
agreed
 21:10 22:7

101:20
106:21
113:20
118:1,3
119:16
194:16 197:7
201:18
**agreeing**
202:24
238:12
**agreement**
18:8 21:13
35:11 37:6,
8,9 63:10,16
93:6 94:18
106:15,18
107:20 109:3
112:7,9,12,
25 113:2,7
114:22
115:18,20
116:7,12
117:14,17,
19,20
120:11,21
129:16
191:14
192:1,2,14
193:19,23
194:3,9
195:22
197:16 201:8
**agreements**
129:15
**agrees**
193:14
**ahead**
134:18
225:13
241:24
**Alan**
5:21
**Albin**
26:12,15,18,
22
**Albins**
27:1,4,12,
18,23,25

28:6
**alcohol**
7:22 14:2
**alive**
239:14
**allegations**
185:4
**alleged**
124:14,20
**allow**
81:14 88:7
99:12
**allowed**
28:24
**alongside**
150:22
**aloud**
133:7 142:24
144:2 153:25
154:1 156:17
**Amendment**
16:18,21,22
17:1,6,10,
15,21 18:20,
23 19:1,5
29:21 30:9
116:13
205:21,23
206:23
207:6,13,22
208:4,10,16,
21 209:3,10,
17,24 210:6,
10,14,18
**America**
118:21
**ammo**
22:19 25:10,
11 35:20
66:18 67:10
73:16,19,21
74:8 89:20
90:15 137:17
145:12
213:24
221:25
222:5,11

227:3
**ammo-related**
236:24
**ammunition**
21:8,24 22:3
27:13 28:5
33:19 105:17
106:2,7
**amount**
77:8
**analyze**
174:9
**Anderson**
22:18,21,23
23:5 25:12
61:20,25
62:5 106:3
239:5
**angle**
70:20 71:5
88:19
**announcement**
88:22
**answer**
6:15,18 7:4
16:10,12
20:21 23:22
24:12,19
30:20 34:24
35:2,13 67:4
69:9 70:10
87:20 101:17
102:22
103:23 104:1
110:12
115:10
116:24
122:25 123:7
130:22
139:25 140:6
151:9 158:20
160:25
173:21
195:25
202:19
246:4,9
**answered**
17:20 18:14,

19 21:21
26:6 29:7
30:8 31:14
32:4 37:17
44:3 53:14
55:12 71:24
79:12 80:20
81:3 82:10,
17,23 83:15
84:9 90:22
91:3 95:4,10
104:12,22
109:5,11
110:15,21
111:5,17
112:18,23
114:4,10
117:6,23
121:13,21
122:2,9
124:17,24
129:3,9
137:1 138:8
150:17,25
151:6 156:25
160:9,17
193:17 195:7
196:17 197:1
201:16
202:2,18
204:17,22
205:2,16
206:21,22
209:9 230:10
245:14,23
**answering**
161:1
**answers**
6:24 207:20
**anxious**
162:18
166:20
183:25
**anybody**
16:2,6,14
17:18 38:25
118:7

Lane Koroly Vol 1
April 13, 2026

5

**anybody's**
171:5
**anymore**
33:24 34:12
**anyone**
18:17 22:15
25:22 51:12,
16 60:16,21,
24 134:18
162:15
174:20 181:7
200:19 202:5
214:23
215:13
225:12
**anyone's**
138:22
**apart**
10:17 13:13
201:8
**apparently**
76:6
**appearances**
4:24
**appearing**
8:19
**appears**
120:9 132:16
142:10 144:1
227:13
**applicable**
165:1
**application**
36:23 57:10
62:2,13,16
63:19 64:1,
14,22,25
65:5,7,12
98:13,15
**applied**
10:11 62:8
151:13
218:11
**apply**
57:8,17,21,
24 62:10

**applying**
62:4,6
**approach**
21:18
**approached**
21:7 23:10
54:9,10,13
63:23 70:13
71:8 141:10,
21 233:3
242:8 243:3
**approaching**
43:4 53:18
72:4,7
**approved**
60:23 69:1,7
98:15 99:9
172:6
**approximate**
234:5,8
**approximately**
211:25
214:14
235:17 236:2
**April**
4:4 205:19
206:8,19
207:1,16
209:6,13,20
210:2 228:22
238:23 248:3
**AR**
30:3
**AR-15**
41:21
**Arant**
4:15
**area**
89:16 216:14
**arguing**
116:6
**argument**
202:10
**argumentative**
203:4
**arises**
96:25

**arms**
5:16 13:23
42:14 52:3,
7,10,20 53:2
56:3,12,15,
19 137:6,13,
24 143:7
177:1
**around**
7:2 75:9,17
126:6 166:16
183:17 187:7
188:4 228:2
243:4
**arrangement**
36:14 166:4
**arrested**
13:4
**ARS**
167:21,25
168:2
**Ashley**
5:9
**Asian**
25:25
**asked**
7:3 17:19
18:13,18
21:8,20 26:5
29:6 30:7
31:13 32:3,
16 37:16
44:2 51:24
53:13 54:24
55:11,15,22
56:7 80:19
81:2 82:9,
16,22 83:14
84:8 90:21
91:2 94:20
95:1,3,9
99:22 101:12
104:11,21
109:4,10
110:2,20
111:4,16
112:17,22
114:4,10,24

117:5,22
121:12,20
122:1,6,8,11
124:16,24
128:6 129:2,
6,9,10
135:12,16
136:25 138:7
150:16,24
151:5 152:14
156:24
159:16,20
160:8,16
164:15
178:19
180:20
186:25
187:14
193:16 195:6
196:16,18,25
198:14
201:15
202:1,17
203:17
204:14,16,21
205:1,15
206:20,21
209:8 219:3,
8 243:13
245:13,22
246:2
**asking**
12:11 24:15
25:21 33:10
35:3 51:14
53:22 67:20
94:2,6 99:12
111:6 113:14
121:14
124:6,8
130:14
144:14
155:18 161:7
178:8,11
181:10
193:3,21
194:22
203:12
204:12

205:24 246:7
**assertion**
135:16
**assigned**
189:4
**assistance**
195:13
**assistant**
196:2
**associate's**
10:5,6,8,10,
12
**associated**
51:10,12,16,
21 52:10
55:10
**assume**
70:9 147:22
239:17
**assumed**
70:6 146:14,
19
**assuming**
73:11 146:10
239:11,13
240:7
**ATF**
5:8,9 14:5
24:23 25:2
40:17,22
41:4 43:19
45:8 46:12
51:1 53:1,
10,11,15,17
54:7,9,10,13
63:23 65:6
70:13 72:4,7
75:25 76:11
78:20 79:24
83:23 85:4,
11,16,23
86:6,12 87:6
94:13 99:18,
24,25
101:11,20,22
102:4,11,16
104:3,10,16,
20 105:4,13

106:10,16,
21,25 107:8,
14,22 108:5,
9 110:2
113:24
122:11
125:9,15,24
128:9 130:17
133:9,14
151:24
152:20,23
153:12
154:5,9
159:19
164:17,19,22
167:8
168:15,18,23
169:5,20
170:18,23
171:11
173:18
174:2,7
184:24
187:14
199:18
207:17
208:13
209:20
230:4,16
231:2,4,9,22
232:14,25
233:3 234:14
242:8 243:2
**ATF's**
14:16 100:9
102:1 110:5
230:24
**attaches**
140:2
**attend**
9:25 21:24
26:15 33:18
145:14 153:8
**attendance**
109:24
**attended**
10:15 27:25
131:22

**attention**
135:24
**attorney**
7:8,10 14:24
15:4,15,21,
23 16:5,13
18:17 24:2,4
35:5,10
54:17 56:24
103:1,18,23
111:18,19
115:4,5,16
116:9,10,14,
18,19 117:2,
13 123:3
126:18
127:8,13
128:20,21
139:16 153:8
181:5,7,17
187:24,25
193:12
195:21,23
196:5,9,13,
22 198:20
203:12
204:7,14
**attorney's**
103:13
109:17 110:8
111:21
116:3,11,12
189:21
193:11
196:2,10
197:23
**attorney-
client**
16:7 24:8
30:18 34:23
35:3 101:15
102:20
110:10
115:8,25
123:5 139:23
140:2 195:20
**attorneys**
109:20

181:19 194:6
196:3
**attract**
135:24
**Audio**
4:4
**August**
70:12,23
71:1 77:12
78:16,22
79:2 84:25
85:1,10,16,
23 86:2,5,7,
12 170:11
174:1,22,24
217:22
221:12,15
231:15 236:1
238:13
**auto**
148:19
**automatic**
29:14 30:6
148:24
149:24
**Avenue**
4:15
**average**
90:5
**avid**
147:4
**avoid**
45:14
**avoided**
203:14
**avoiding**
45:2
**aware**
14:1 18:25
25:1 39:23
52:9 56:12,
15 58:12,15
61:12 69:2,
4,10,21
71:17 72:3,8
77:15,20
78:20 79:23

| | | | |
|---|---|---|---|
| 80:25 85:3 | **Ballpark** | 202:3,10,12 | 205:22 |
| 88:23 91:23 | 212:20 | 205:22 | **beneficial** |
| 92:6 101:7 | **banks** | 239:23 | 171:16 172:5 |
| 105:6 106:6 | 173:5 | **bathroom** | 225:9 |
| 108:2 110:25 | **bar** | 215:10 | **benefiting** |
| 111:8 115:19 | 200:12 | **began** | 37:11 |
| 120:13,17,21 | **based** | 24:24 32:15 | **besides** |
| 121:2 | 6:15 107:3 | 33:2,6,18 | 55:24 132:7 |
| 129:17,21,25 | 108:15 | 43:25 242:21 | 157:3 166:4 |
| 130:1 149:16 | 123:20 125:1 | **begin** | 187:3 |
| 158:1 159:7, | 157:25 | 23:14 33:22 | **best** |
| 11 169:25 | 166:12 | 99:18 | 6:15,20 |
| 170:5,9,10, | 172:25 | **beginning** | 72:20 98:20 |
| 13 190:2 | 222:24 240:7 | 32:10 65:25 | 127:12 |
| 192:2,5,13 | **basically** | 100:25 | 145:12 |
| 194:15 | 23:1 33:25 | 203:16 | **better** |
| 197:25 | 38:5 52:24 | 238:21,23 | 163:7 165:19 |
| 221:21 225:5 | 64:8 102:14 | **behalf** | 185:19 186:3 |
| 233:14 | 106:19 | 4:18,23 5:3, | 228:21,22 |
| **Ayers** | 108:21 | 5,7,9 28:6 | 236:7 |
| 5:9 139:2 | 169:18 | 171:3 | **big** |
| 223:1 235:12 | 180:3,24 | 178:12,13,14 | 56:10 58:1 |
| 246:15 | 186:10,14 | 203:12 | 81:5 126:19 |
| | 229:9 | **behavior** | 157:13 160:5 |
| **B** | **basis** | 77:21 123:12 | 171:19,25 |
| | 14:9 16:20, | **behind** | 172:16 |
| **back** | 22 35:2,7,13 | 125:8 180:5, | 174:14 |
| 50:11 80:10 | 103:20 | 6 227:25 | 214:9,10 |
| 94:10 98:8 | 115:13,14 | **belief** | 230:8 233:8 |
| 119:9 125:3 | 118:17,21 | 81:20 | 241:9,12 |
| 139:13 | 119:12,16 | **believe** | 245:5 |
| 142:21 | 120:18 | 14:8 20:13 | **bigger** |
| 156:14 | 121:4,10 | 47:13 66:12 | 167:6 171:20 |
| 165:12,13 | 122:6,21 | 75:22 76:2, | 172:16 |
| 171:9 174:16 | 123:4 128:16 | 3,7,25 78:3 | 174:18 |
| 175:20 | 129:1,6,7,22 | 80:11 92:13 | 233:10 |
| 180:13 | 130:2,7 | 103:15 | 241:23 244:2 |
| 211:4,12 | 140:1 183:6 | 130:17 131:7 | **biggest** |
| 228:11 | 189:9 190:1 | 134:16 | 124:12 |
| **back-and-** | 191:15,18 | 154:3,6,10 | **binder** |
| **forth** | 192:3,7,9 | 171:10 217:1 | 186:22 |
| 117:9 189:6 | 193:24 | 239:3,23 | **birth** |
| **backfilling** | 195:19 | **believed** | 8:22 |
| 164:23 | 196:15,24 | 99:25 134:4 | **Birthday** |
| **bad** | 199:1,17 | **believing** | 179:23 180:1 |
| 44:4 135:1 | 200:16 | 48:20 49:12, | **bit** |
| **badgering** | 201:7,11,13, | 23 68:22 | 34:5 92:1 |
| 246:5 | 14,17,23 | | |

100:15 139:2
**blind**
  75:2 144:4,9
**boast**
  142:1 143:9,
  15
**boasted**
  143:6
**bodyguard**
  68:7,8
**bolt**
  168:7
**bona**
  32:2
**bookshelf**
  214:5
**boot-strapped**
  60:20
**border**
  51:2,3,5
  53:12,19
  167:20,25
**borders**
  53:16
**Boss-25**
  135:3,20
  136:8
**bottom**
  194:17
  195:4,10
  197:8
**bought**
  25:10 32:5
  34:3,16,20
  38:11 39:14
  42:16 43:8
  47:24 48:7,
  8,11 49:7
  67:10,12
  68:10 83:5,
  8,17,23,25
  84:24 85:1,
  17,24 86:2
  90:14 91:10
  92:3 97:8
  104:24
  123:11,16

124:15
135:8,19
137:21 143:7
158:5,6
174:5 179:1,
18 212:3,4
238:12
**Boult**
  4:15
**bounced**
  187:7
**box**
  50:22 74:17
  244:2,13,17,
  20
**Boy**
  184:5,7,10
  219:21,23
  220:3,7,9
**Bradley**
  4:14
**bragged**
  145:22
**bragging**
  141:12
  146:24 171:5
**brain**
  88:11,16
**brand**
  68:3 97:18
**brands**
  97:17
**brash**
  142:3
**breached**
  197:16
**break**
  7:1,2,5 50:4
  97:25 138:11
  139:16
  175:11
**Brian**
  24:4,6 54:4,
  21 101:10,
  11,14
  102:17,19
  120:25 127:1

188:2 189:11
191:10
192:23
194:22
195:17
**Brian's**
  110:4 117:10
**brick-and-mortar**
  98:18
**brief**
  97:24
**bring**
  113:25
  114:7,15
  165:12
**bringing**
  177:1
**broad**
  84:19
**brother**
  215:2
**brought**
  53:8 111:22
**Buddy**
  26:18,22
**building**
  141:13
**built**
  95:19
**bulk**
  234:11
**bunch**
  46:14 75:9
  165:10,21
**Bureau**
  14:1
**Burleson**
  50:22 132:4
**business**
  5:15 12:19
  13:22 22:3,
  10,13 23:11
  36:14 44:9,
  11,12,13,21,
  23 58:4
  59:20,24

60:1,4,7,17,
22,24 61:1
62:24 63:2
72:23 74:7
75:21 76:4,
8,21 81:21
88:9 96:7,
13,16,22
98:11 105:23
106:2 114:12
134:1,5,9
136:5
145:22,24
146:2,25
150:14,18
155:2,7
156:12,20,23
157:4,5,11
162:22
165:21
172:10,11
177:6 178:12
180:10
212:25 214:7
225:4,6
227:24 242:7
245:6
**busy**
  76:4,8
**buy**
  39:24 41:11
  42:10 43:9,
  16 48:24
  64:9,15
  66:11 83:21
  85:3 89:18,
  20 90:11,19
  96:1 137:17
  145:11
  148:19 158:1
  159:8
  166:23,24
  177:19
  218:23
  233:15
  245:20
**buying**
  32:24 41:10

42:23 69:23 70:17 73:8, 19,20 74:8 77:2,17 80:16,23 81:4,24,25 83:11 84:15 86:5 88:25 90:14 91:20 92:9,12 97:3,5 100:10 151:16 155:2 162:23 163:2 173:19 174:3 179:8 222:1 235:8 241:3, 4,8 242:13 245:12,16

---

**C**

---

**call**
55:3 86:6,13 87:6,12 171:8 184:13,15, 17,22,23 210:16 220:9 242:15
**called**
5:16 13:22 22:12 40:25 54:18,20,23, 24 55:21 79:4,18 86:8 97:10 117:13 124:25 185:10 187:20,23 192:18 219:23 232:14
**calling**
219:25
**calls**
15:22 163:6

**camera**
156:8
**cameras**
75:15,17
**Canada**
51:7 52:13 55:10,14,16, 17,19 56:2
**Canadian**
51:3,5 53:19 56:12,15
**canceled**
65:9,13
**Canton**
135:13 136:11 141:6 164:20 165:9,14 166:1 224:16
**capabilities**
170:19
**capital**
60:2
**captive**
145:8,9
**cards**
22:10 157:11 186:11 227:24
**care**
90:16
**Carlson**
4:11 5:17
**carry**
56:20 136:14
**cart**
136:15 178:1
**cartel**
51:10,13 145:23 146:3,15,25
**cartels**
145:25
**case**
5:16 13:9 14:1 16:2,5 76:6 88:20

94:19 118:20 127:8 203:23 244:19,21
**casino**
53:23 231:5
**catch**
171:7
**catty-corner**
213:25
**caused**
173:23
**cease**
23:17 241:8 242:13
**ceased**
23:23 64:19
**cell**
11:12,14,16, 18,24
**centered**
188:4
**Cerakoted**
59:12,14,16, 18
**Cerakoting**
59:7
**certain**
119:17 172:22 178:3 193:14 195:3 240:21 243:23 245:1,19
**certify**
246:23 247:1
**Chadwick**
5:3,14
**challenging**
140:10
**change**
248:5,7
**changed**
213:21
**changes**
248:1,4,5
**changing**
40:3

**chaotic**
172:18
**character**
127:4 204:11
**characterizat ion**
67:3,8 73:6, 14 87:19,24 88:5 89:9 92:21 100:20 113:22 114:4,10,19 116:22 118:6 121:6 122:9 123:18 125:13 126:25 129:9 152:1 166:15 197:11 200:18 202:9
**charged**
13:1 52:19 91:8 111:24
**charges**
64:2 111:22 112:3,13 114:1,7,13, 15
**charging**
108:23
**charter**
26:16
**cheap**
69:16 90:7, 10
**cheapens**
183:21
**cheaper**
90:3,5 91:4
**chef**
9:11
**chest**
186:4
**childhood**
19:12
**children**
9:12

Lane Koroly Vol 1
April 13, 2026
10

**Chris**
16:16,24
17:3,9,13
18:22 19:8
22:20,25
23:4 24:7,22
25:7 32:10,
16,19,22
33:13 35:16
36:3 38:11,
13,19 60:6
61:4,12
62:1,18
64:20 66:18,
20 67:9 69:3
78:9 82:25
83:22 88:23
89:5,6 92:23
93:5,6,14,20
95:25
101:22,25
102:5 104:4,
9,14,18
105:6
110:18,25
111:9,14,19
126:2
129:17,21
130:1,7
131:6 133:3,
8,10,12,17,
20,25 134:3,
6,8,23
135:7,16
136:20
137:7,13,25
138:3 141:25
143:14
144:7,8,16,
21 145:2,4,
24 147:7,12
148:10
165:20,25
174:20 175:7
176:10 177:5
178:17
180:16,23
182:17,25
186:17

205:18
206:1,7,11,
18,25 207:8,
15,24 208:6,
12,18,23
209:5,12,19
210:1,9,13,
16 211:24
215:1 219:24
224:21
236:6,11
237:4 240:11

**Chris'**
215:2

**circumstances**
202:7

**circumstantial**
78:2

**cited**
203:23

**city**
9:20 10:22

**civil**
5:16

**claimed**
31:5,10,18,
22 133:10

**claiming**
143:19

**clarify**
6:4 9:16
10:14 11:2
12:5 18:1
21:17 24:1
32:14

**clear**
6:13 34:11
77:10 218:8
225:1 237:3

**clearly**
147:5

**client**
24:11,13,19
30:20 34:24
35:2 101:17
102:22

103:10,18
110:12
115:10,15
116:8,10,14
123:7 139:25
195:23,24
216:11

**client's**
116:3

**clients**
163:3

**close**
176:19
215:22

**closer**
228:17,25

**coach**
159:12
232:13

**coached**
31:8,15
40:25

**coaching**
70:10 71:25
124:11,14,20

**colleague**
246:2

**collect**
32:5 71:7
232:18

**collected**
82:12

**collecting**
77:24 80:7
185:8

**collector**
31:6,11,19
32:2 41:2
45:17 70:5,
19,20,24
71:1,3,9,12
72:17 74:10,
14,19 79:7
80:5 86:17
97:2

**collectors**
71:6

**College**
10:7

**colored**
59:18

**come**
54:19 78:7
79:6 80:3
81:8 86:23
96:8 101:12
110:3 121:1
131:5 174:12
187:25
191:20 220:7
231:12 232:4
236:22

**comfortable**
236:15,17

**comment**
144:22
146:21

**comments**
144:4,8,10,
12

**common**
40:5 59:17

**communication**
24:14 35:4
103:1,7,8

**company**
5:16 9:11
10:20 13:23
137:7,24
177:1

**compared**
89:24 90:4
168:2 243:22

**competitive**
90:1

**completed**
158:13
164:17

**completely**
23:20,25

**completing**
171:1

**compliant**
62:13 156:21

Complies
  225:23
component
  30:5
computer
  110:1
conceal
  41:4
concern
  57:3 122:13
  207:9
concerned
  43:18,20
  52:2,19 70:2
  71:24 74:11,
  15 78:10
  96:13 125:19
  187:18
  209:13
concerns
  118:21
concert
  150:23
conclusion
  56:23 174:13
  199:20
condition
  7:22
conduct
  119:20,23
  120:1,4
  123:21,22,23
  165:3 172:25
conducted
  153:17
conference
  13:19 235:11
  246:14
confess
  186:7,9
confessed
  184:24
confident
  167:22
  178:15
confidential
  102:25

confidentiali
ty
  101:16
confined
  215:15
  216:14
confirm
  127:20
confused
  204:3
confusing
  76:23 80:22
confusion
  55:4
consider
  20:2 74:22
  112:2,5
considered
  90:10
considering
  26:11
consistent
  96:21,24
  104:15,19
  207:17
consoling
  183:23,24
  184:4
conspiracy
  35:17 92:24
  93:2,15
constantly
  73:7 185:21
  187:6
consultation
  35:9
contact
  83:2 117:10
  231:10
contacted
  55:5,8 110:2
contacting
  231:22
contacts
  74:23
contains
  120:14

contents
  35:4 102:25
  107:3 116:17
continue
  4:5 58:7
  64:7,9 81:18
  83:12 98:14
  208:25 242:3
continued
  172:7 220:13
  233:15
continuing
  19:4
contractor
  10:20
contribute
  32:10 37:10,
  19,20
contributed
  36:8
contributing
  38:23
control
  222:3
controlled
  75:10 147:13
conversation
  15:14 24:16
  69:14 78:15,
  25 79:16,18
  86:19,25
  95:5 116:18
  136:20
  140:21
  143:12 144:1
  180:19
  184:20
  196:2,5
  220:12
conversationa
l
  215:21
  237:22
conversations
  4:8 84:6,10
  125:2 163:4
  196:9,12

215:16
  216:2,24
  237:4,12
  239:4,8,12
conversion
  30:3
convert
  30:6 148:21
converted
  29:13 148:18
convicted
  12:16,20,23
  19:2 30:24
convincing
  79:13
cooked
  63:10,12
cool
  36:16 223:5
  224:7
cooperate
  117:24
  118:2,3
  191:12 197:4
  198:5,6
cooperating
  117:4 191:4,
  9
cooperation
  112:20,25
  113:3,8
  117:21
  193:18
  195:19
  196:15,24
  197:12
  199:1,17
  200:16
  201:4,5,14
  204:15
  205:12
cooperative
  199:13
cooperativene
ss
  202:16

copy
  8:16 107:19
  127:16,18
  171:5 194:3,
  9 203:5
  204:6
Corey
  140:13,17,
  21,25 141:3,
  8,9,20
  142:15,19
  149:17
  222:15
  224:15
Corinth
  132:20
corny
  141:14
correct
  33:18,21
  34:8 38:10
  40:8 42:9
  43:9 44:21
  46:23 47:5,
  7,8,20 49:24
  57:7 59:15
  62:23 63:24
  64:3,5 67:4
  75:19 77:6
  79:19 82:15
  84:12,24
  87:22 89:13
  91:11 92:19
  93:3 94:23
  95:2 99:10
  101:19
  102:12 105:4
  106:21
  109:3,14
  110:2,17
  111:10,21,24
  112:10 113:6
  126:5,9
  127:6 130:9
  131:1,21,25
  132:22
  136:6,24
  143:19,24

145:21
149:15,18,21
150:6,15
152:21,24
154:18 157:1
158:2,8,17,
22 159:14
170:16,19
173:13
177:22
178:4,21
179:16
200:16 203:9
204:25 205:8
217:14,16,
19,22,25
218:9 219:10
220:14,21
221:17
226:23 227:4
228:15,19
229:10,18
232:25 233:5
234:21
235:15
237:5,9,12
240:19
CORRECTION
  248:7
correctly
  69:1
corroborate
  174:21
corroboration
  105:1
cost
  69:20 74:10
  165:24
costs
  37:10,19,21
  38:23 96:17
couch
  180:16 230:9
counsel
  4:9,24 15:14
count
  111:25
  129:18

244:23
counted
  244:25
counterintuit
ive
  186:1
counterpromis
es
  193:15
countries
  53:16
country
  53:12
County
  62:24
couple
  63:5 65:3
  77:23 97:4
  216:10 235:5
course
  160:12
court
  4:12,22,25
  6:3,7,11,22
  7:16 118:8
  119:13
  128:13
  190:15 195:8
  197:25
  198:24
  203:12
  225:18
  228:11
courtroom
  6:6 13:16
cover
  157:17
covered
  64:12 123:25
  124:9
crazy
  74:7
crime
  12:16,18,20,
  24 13:2,5
  39:23 52:20
  57:2 63:21

129:4 186:3
194:5
crimes
  19:1 46:21
  81:9
criminal
  17:25 18:11
  28:25 29:4,9
  64:2 101:8
  107:9,16
  108:3 111:22
  112:13
  113:17
  114:1,7
  122:16 127:8
  128:17
  146:11
  207:10
criteria
  198:25
cross-
examination
  226:22
  238:12
  243:16
crypto
  233:2
Cummings
  4:15
cumulative
  174:17
cup
  227:25
current
  10:18
customer
  50:25 176:8
customers
  125:19 156:8
  227:14 228:5
customizing
  29:5
cut
  176:2
cutoff
  75:1 242:17

**D**

Dallas
  4:16 51:22
  89:16
  145:23,25
  146:3 147:1
Dan
  127:1
Danny
  5:7
date
  8:22 67:22
  68:1 154:13
  182:19
  238:24 248:3
dated
  142:11
day
  108:18
  117:13
  189:22
  191:6,7,11
  192:23
  238:19,20
days
  105:7 110:19
  111:1,7
  231:20
  235:25
  246:25
De
  14:13
deal
  56:10 84:2
  101:20,22
  126:20
  133:4,9,13,
  16,18
  171:19,25
  172:16
  174:14,18
  210:2 233:10
  241:23
dealer
  26:9 43:13

44:1 133:11
dealers
  42:4
dealing
  52:22 53:5
dealings
  160:12
decades
  12:10
deceive
  46:12 48:19
  49:12,15,23
deceived
  46:22 68:21
deceiving
  48:5
December
  34:4 36:22
  57:11
deception
  46:18
deceptive
  45:6,9,10,20
  46:20
decide
  57:24 186:14
  197:20 198:7
  243:7
decided
  23:1 33:21
  34:5 57:8,12
  98:19 100:23
  120:25
  171:12
  172:3,14
  195:16
  198:24 199:2
  242:2,12
  243:5,11
decides
  197:24
  198:12
decision
  72:23 198:1
  233:12 243:9
declaration
  132:17

134:12
declare
  132:20
decline
  113:25
deep
  166:21
deeper
  232:22
default
  12:9
Defendant's
  119:2
define
  19:11 43:20
definitely
  157:17,20
  168:12
  182:15,21
  187:24 199:8
  228:4,5
  231:11 232:1
  233:9 240:11
degrees
  10:5,6,8,12
delete
  12:4
deleting
  12:6,12,14
Deliberately
  45:6
delivered
  41:25
demand
  89:15 167:1
demanding
  79:25
demonstrate
  202:16
den
  99:20 182:24
  183:23
  232:7,11
denied
  36:23 65:1,6
  185:3

Denton
  9:5 10:1
  62:23
deny
  94:20,22
  95:1 127:20
denying
  141:20
dep-
  13:25
departure
  194:21
  195:15,19
  196:6,15
  198:12,13,17
  200:19
depends
  60:4
depo
  247:1
deposition
  6:1,23 8:9
  14:18 15:3,
  18,24 16:1
  17:14,18,24
  18:2,12
  51:21 61:17
  94:5,17
  103:20
  118:10
  123:24 124:9
  127:7 139:19
  140:9 152:5,
  19 158:19
  192:10
  203:17,18
  207:16,25
  208:19,24
  209:13
  246:24 248:3
depositions
  207:2,10
describe
  20:18,25
  26:8 124:6
  131:17
  140:17 146:7
  165:2 167:13

175:25
188:22 199:9
212:24
222:21
223:10 225:1
**described**
51:21 108:19
136:23
**describing**
34:9 46:11
53:1 240:8
242:2
**desk**
157:8,10,21
214:2,5
216:5,10,11
227:19 228:3
237:1
**detail**
166:20
**details**
67:24 69:13
109:8 166:3
**devotion**
182:10
**Dick's**
66:17
**died**
127:1
**diesel**
10:9,11
**difference**
168:6 221:10
**different**
9:18,20
11:21 34:7
38:16 55:22
58:12 97:12
114:13 150:3
168:1 192:3
**direct**
219:20
222:18
229:20
234:19
245:25

**directly**
160:13
**dirty**
133:11
**disability**
144:5
**disabled**
88:19,21
**disagree**
134:20,22
**disclosed**
115:17
**discovering**
40:17,22
**discovery**
196:3
**discuss**
39:8 62:9
65:6 104:10,
15 111:13
119:20,23
120:1,4,7
125:16,25
130:6
139:18,21
145:4 188:11
207:1,9
209:6
**discussed**
16:2,5,14,16
17:12 104:19
116:6
119:19,22,25
123:24 173:1
195:21
234:19
**discusses**
113:7
**discussing**
62:16 125:24
164:18 165:3
182:13
190:19
191:15
242:21
**discussion**
15:18 103:16

164:22
**discussions**
115:15
116:3,13
**dishonest**
131:8,9,20
**disjointed**
187:10
**disposition**
168:15
**dispute**
85:15,22
86:1 87:8
133:12
135:15
143:18,23,25
183:6,11
**disputing**
71:8 136:8
**distance**
180:7
**distinct**
150:2
**distinctly**
94:6
**distributor**
241:6
**distributors**
91:19 230:2
**District**
4:11,12 5:17
**Division**
4:13
**divulge**
35:4 103:7
**divulged**
102:25
**divulging**
15:13 116:17
**doctor**
74:25
**document**
8:8,11
118:14
119:5,7
120:14
121:18,25

132:9,13,24
142:5,7
152:4,7,10,
16 153:15
155:11,17,20
156:8,11,13,
18 189:23
190:2,18
191:24
192:22
193:8,13
194:1,14
203:8,10
226:3
**documentary**
163:8
**documents**
17:24 18:3,
7,10 100:4
192:3,13
203:17,20
204:7
**doing**
5:15 35:25
38:7 40:14
44:8 52:24
64:8,10 74:5
86:14,15
87:7 88:12,
13,15 95:19
98:20 102:10
107:12
108:24
110:18 111:7
123:13,16
131:18 143:8
145:22,24
146:2,24
147:22
162:13
163:11
172:11 173:2
174:9 197:2
198:4,8
223:7 245:15
**domain**
75:14

dome
  182:5
dominated
  73:1
dominating
  221:3
door
  35:24 79:12,
  25 99:24
  103:16
  213:2,22,23
  230:10
double
  154:21
doubt
  123:15,19
downward
  195:15,18
  196:6,14,24
  198:17,25
  199:17
  200:15,19,25
  201:14 202:6
  204:8,14,19
dozen
  84:24
drafted
  63:13 128:22
  198:24
dragging
  211:11
drawing
  167:8
drive
  4:19 243:9
drug
  145:25
  147:5,7
drugs
  147:10,22
  223:16,22
dudes
  77:23
duly
  5:11
duty
  173:6

— E —

earlier
  77:7 89:12
  94:5 99:23
  105:20
  158:19 162:5
  170:14
  173:17
  192:10
  226:22 227:1
early
  23:16 50:25
  180:11 181:8
  223:25
earn
  10:6
earned
  11:6,9
earshot
  216:13
easier
  166:23
  167:4,7
  168:12
  174:12
easiest
  72:20
Eastern
  4:12 5:17
easy
  33:24 35:24
  36:12 69:16
  88:2,6
  151:17
educated
  234:23 243:2
education
  10:2,4
effect
  174:17
effort
  40:16 43:23
  46:12
efforts
  40:21 41:4

  201:24
either
  68:14 74:25
  91:5 101:6
  134:25
  172:16
  176:16
  215:23 219:5
  221:23 237:4
  238:25
elementary
  26:13
Elevated
  62:22,24
elicited
  207:20
emailed
  163:21
  189:12
emails
  163:18
employed
  39:5
employee
  10:21
employment
  5:19,23 11:3
end
  14:8 39:6
  45:22 53:7
  77:16 95:12,
  16,17,18,20
  128:17 136:3
  165:11
  220:16
  243:22 245:4
ended
  34:17 79:8
  108:23
  150:12
engage
  172:3 181:1
engaged
  50:14
engaging
  12:19 114:12
  242:6

enjoin
  28:22
enjoy
  29:1,5,10
enter
  4:25
entered
  35:11 74:1
entering
  112:16
  162:22
entire
  20:11 127:11
  143:20
  166:19
entirely
  66:25 67:1
entry
  213:23
errors
  171:8
essentially
  117:13 176:2
establish
  62:24
established
  47:24 90:15
  152:19 164:5
establishing
  83:3
event
  102:6
events
  136:23
  228:21 242:1
eventually
  98:16,17
  111:22 112:9
everybody
  97:23 138:13
  234:22
everyone
  42:21 174:17
  182:4 216:22
  237:17
evidence
  103:21

Lane Koroly Vol 1
April 13, 2026

16

| | | | |
|---|---|---|---|
162:10 163:8 | excuse | | 193:24 |

**exact**
68:1 71:7
87:3,11
238:24
243:21,25

**exactly**
10:10 14:14
25:4 26:17
27:8 34:2
39:20 41:13
55:20 65:24
69:18 70:1
78:8 82:11
83:17 91:25
100:13
101:1,6
108:22
191:19,22
199:4 234:3
242:23

**exaggerates**
222:25

**examination**
5:12 211:6
229:20 238:9

**examples**
50:19

**Excel**
222:7

**excess**
217:8

**exchange**
60:21 107:7,
13 108:5
109:2 112:16
114:1,8,15
115:1,6
116:20 117:4
121:10,18,25
193:14
194:16
196:23 210:3

**exchanged**
87:11

**excluding**
192:14
196:12

**excuse**
188:4

**Executive**
9:11

**exhibit**
8:9,10
118:10,11
132:9,10
142:5,6
152:4,6,13
153:16
155:14,15
225:18,25
228:8,11

**expand**
43:21 107:5

**expected**
108:4 188:11

**experience**
29:16 67:24
81:10 172:2
229:10
239:18

**explain**
29:12 35:7
45:12 112:19
218:21

**explained**
159:9

**explicitly**
159:25

**Explosives**
14:2

**expressly**
113:7

**extent**
158:25
166:11
179:10
201:4,5

**extra**
21:10 35:22
171:14

**eye**
74:24

**EZ**
68:8

---

**F**

---

**face**
101:8 108:3
157:14 212:1
218:14

**Facebook**
83:1 186:23

**Facetime**
15:12

**facilitate**
81:13 82:20
115:5 116:19
173:8

**facilitated**
117:3

**facing**
156:8

**fact**
14:9 68:14
70:1 72:8,18
73:7 78:24
89:5 104:10
123:12
135:19
148:23 159:7
161:2 170:23
171:1 209:6

**facts**
78:2 119:17,
18,19,22,25
120:3,6
190:19

**factual**
118:16,21
119:12,16
120:18
121:3,9
122:6,21
123:3 128:16
129:1,6,7,22
130:2,6
146:8 189:8
190:1
191:15,18
192:3,7,9

**fair**
14:17 20:25
26:8 28:12
38:18 42:3
44:6,19
64:17 70:6,9
91:6 94:12
96:12 130:16
140:17
200:23
214:14 229:7
241:16,20
242:1 243:11

**faith**
181:22 183:3

**fall**
38:12 54:5
57:9,14
242:23

**false**
136:24

**familiar**
12:8 13:22
38:19,21
58:11,19
59:6 129:14
157:22

**family**
19:10,11

**fan**
230:15

**far**
22:20 83:19
116:8,14
195:22
202:11 216:6
244:10,22

**father**
26:18

**favorable**
114:25 115:6
116:20 117:3
128:2

193:24
201:7,11,13,
17,23 202:3,
10,12

Lane Koroly Vol 1
April 13, 2026                                          17

**federal**
  14:3,6 16:2,
  6 17:25 18:3
  25:18,23
  26:9,22
  27:2,4,12,18
  28:25 29:4,9
  39:23 40:8
  54:15 57:1,
  2,4,8,13,17,
  21,24 58:9,
  13,16,19
  64:2 89:25
  103:21
  111:22
  112:13
  113:3,17
  115:23
  128:17
  156:21
  170:15
  177:18
  209:14 210:3
  242:2 243:13
  245:7
**federally**
  45:2
**feel**
  8:4 96:25
  130:16
  172:18
  174:14 179:8
  183:18 186:2
**feeling**
  185:18,25
  186:3
**feet**
  214:15
  216:8,10
**felt**
  100:15
  193:25
**FFL**
  25:10,19
  36:19,20
  42:9,11,14
  43:5,7,19,24
  47:4,12,19,

21 48:24
58:6 59:21,
23 60:6,9,
10,12,15,17,
24 61:21
62:1,4,6,8,
10,13,16,19
63:1,9 64:1,
6,7,9,11,14,
17,24 65:5,7
66:10,11,15,
16 69:7
81:11 85:4
98:13,15
99:3,6,8,14
100:25
101:4,6
131:4 135:8,
20 136:6,7,
9,14 156:21
158:21
159:11
164:16
167:17
168:17
172:3,6
177:20,25
212:6,9
217:25
218:3,5,9,10
242:4,21
243:5,7,9,
12,14 245:9
**FFL's**
  99:4
**FFLS**
  42:12 47:24
  63:5 82:21
  89:17,20
  91:5 224:20
**fide**
  32:2
**Fifth**
  16:18,20,22
  17:1,6,10,
  15,21 18:20,
  23,25 19:4
  29:21 30:9

116:13
205:20,23
206:23
207:6,13,22
208:4,10,16,
21 209:3,10,
17,24 210:6,
10,14,18
**figure**
  136:1 157:16
  169:1 181:1
  182:7
**figured**
  34:17 44:4
  52:22 84:18
  100:21
  169:23
  170:25
  171:19 233:7
  237:16
  241:4,22
**figuring**
  242:16
**file**
  202:20
**filed**
  4:11 62:23
  64:2 112:13
  119:12
**fill**
  46:10,13
  47:3,16
  48:23 49:15
  50:1 68:25
  158:16 159:1
**filled**
  48:12,13,18,
  23 49:15
  159:3,9
  179:17
**filling**
  49:10 158:15
  159:12 166:8
**financial**
  60:11 61:3
**financially**
  4:21

**find**
  14:22 145:3,
  6 168:24
  169:21
  171:12
  173:18 174:7
**finds**
  170:23
**fine**
  50:6 97:22
  138:25 139:1
**finer**
  235:13
**fingerprinted**
  189:1
**fingerprints**
  188:17
**finish**
  175:11
**fire-**
  173:20 227:8
**firearm**
  28:19 29:23
  30:12,14,16
  31:1 34:8,
  11,21 37:2,
  13 47:5,20
  48:8,21,24
  51:15 59:11
  124:15,21
  137:25 138:4
  141:24
  148:23 149:3
  158:1,21
  160:21 161:2
  166:9 168:19
  176:8 177:5
  179:4,14
  232:6 238:16
**firearm(s)**
  156:19
**firearms**
  11:7,10
  14:2,3,6
  18:5 21:4,
  15,19 25:18,
  23 26:9,23
  27:2,4,5,12,

18 28:10,13,
23,24 29:1,
5,10,19
30:22 31:6,
9,11,15,19
32:2,5,8,11,
16,17,20,23
33:3,7,22
34:16 35:17
36:8,11
37:22,25
38:9,14,20,
24 39:9,13,
22,24 40:18,
23 41:3,5,7,
9,11,14
42:4,13,24
43:1,24,25
44:20,23
45:3 46:23
48:3 49:1,2,
16,18,20,22
50:1,14,15,
19 51:1,4,9
52:10,18
53:11 55:10
57:8,13,18,
21,25 58:4,
7,9,13,15,
16,17,19,23
59:7 60:10
61:13 62:22,
24 63:20
64:14,15,18
66:2,7,13,21
68:3,11,15,
17,21 69:3,
5,10,22
70:14,24,25
71:3,10,18
72:3,9,13,
15,23 73:4
74:3 75:4
77:1,2,13,20
78:4,21
79:1,24
80:11,16,24
81:16,22
82:5,15,21

83:5,8,11,
13,21,24
84:25 85:7
88:2 89:1,
13,18,20,25
90:11,19,25
91:7,10,15,
19,24 92:3,
9,12,18
93:7,15,21
94:3,7 95:2
96:1 97:7,13
99:4,9,13
100:1,10,24
111:25
120:19
123:16 124:3
125:11
129:18
131:22
137:18
141:4,10,21
143:10,15
144:23 145:5
146:13
147:25
149:9,19,23
150:6,8
151:4 154:4,
7,11,15,17,
23 155:2,8
158:5,12
159:2,17,20
160:1,7,15
162:23
163:9,14,19
164:16
165:21
170:15
171:13
172:23
173:20
174:22
177:11,17,18
178:8,11,20,
22 184:25
185:4 208:7,
14 209:1,7
213:9 215:17

216:3 217:14
218:13,16,19
219:9 220:13
221:20
227:6,9
233:4,15,16,
18,23 234:9
235:15 237:9
238:12 241:8
242:2,14
243:13
244:13,16,24
245:7

**firearms-selling**
87:15

**first**
5:11 10:23
28:9,18
30:11,14,25
34:20 35:23
43:4 48:8,
11,25 49:3,
7,8,11,22
53:22 54:16
57:20,23
65:19,22
66:1 67:12,
14,15,17,18,
19,22 68:11,
20 69:3,4
72:25 75:23
89:3 91:22
100:9 105:10
132:19
133:2,5
142:21,24
143:2 147:2
148:8 153:25
156:14
164:13 174:5
181:12
184:25
189:13
190:6,8
211:19
212:1,2,3
221:2 227:13

231:1 238:15
242:10

**fish**
172:16

**five**
11:19 20:11
29:18 39:3
42:18 61:19
67:16,20
68:2 84:11,
14,16,18
87:4,12
94:10,24
95:5 144:14
149:5,13,14
160:23
161:7,9
163:16
174:10
211:15

**fixed**
189:15,19

**flag**
39:16 81:5
135:23

**flea**
135:13

**flip**
118:24 119:9
142:13
153:21
155:22
156:14

**fly**
165:5

**focus**
98:20 180:5

**focusing**
116:9,10
196:7

**foggy**
67:23,25

**follow**
197:9 230:21

**followed**
14:15 185:7

**following**
39:12 119:18
**follows**
5:11
**foolish**
171:22
**foolishness**
172:3
**forefront**
84:17
**foregoing**
132:21
**forever**
100:22
123:13
**forget**
189:17
**forgot**
185:11
**form**
13:6 17:5
21:9 22:9
23:7,12
25:14 26:6,
10 27:6,14,
20 28:1
31:7,12,14,
20,21,24
32:3 33:8
35:18 40:12,
19 43:10,11,
15 44:2
46:13,24
47:4,8,9,12,
14,15,22
48:9,13,15,
18,19,22
49:10,14,25
52:21 56:3
58:5 60:3,8
62:18,23
69:7 71:11
76:16 78:5
79:3 85:12,
18,19,25
87:10 93:9
96:4,23
101:23

108:22
122:24
126:23
128:11,23
129:23 130:4
147:21
151:14
154:19
157:23,25
158:13,15
159:12
164:2,17
166:25
167:19
168:20,25
169:6,22
170:3,8,12,
20 171:15
179:17
181:24
201:2,10
202:9 205:5,
9 206:3,4,9,
16,21 207:3,
4,5,12
208:2,9
210:5 213:10
219:2 223:1
228:23
229:14
231:23
232:16,20
234:7,25
235:19
240:15
**formal**
11:3
**formality**
188:21
**formally**
62:3
**format**
246:4
**forms**
46:5,9 158:4
165:12
**formulate**
185:22

**Fort**
5:21 8:25
9:1,3 10:23,
24 179:25
180:3 206:5
**forward**
165:19
**found**
53:12,19
63:14 80:15
90:25 99:20
169:16
**foundation**
58:25 152:13
207:19
**four**
9:2,4 10:19
84:20 126:6
161:8 175:5
206:5
**fourth**
134:11
**frame**
41:19,20
**frames**
41:23 42:3,7
**Franklin**
4:17
**free**
75:13
**Freedom**
21:25 22:1,
3,5,8,14,21,
24 23:6,10,
15,18,24
105:16,21,24
106:6
**frequently**
143:1,6
**fresh**
180:4
**Friday**
207:25 210:9
**friend**
19:11 20:3
83:16 240:14

**friends**
19:10,13,17,
21 20:6
35:19 36:15
131:16 151:7
225:2,5
236:9,14
239:21,24
240:9,17
**friendship**
224:25
**front**
8:12 39:6
74:2 132:14
142:8 152:8,
10,17 153:16
155:17
157:14
161:14
164:10 213:4
**fry**
172:17
**full**
5:18 80:25
120:19
123:10
133:2,7
134:11
148:19 189:9
**full-auto**
148:11,13,17
149:7,20
**fully**
6:16,17 8:5
131:10
148:24
149:24
243:12
**fun**
144:5,17
**fund**
60:9
**funding**
60:6
**future**
61:1

## G

**Gaffney**
5:7 21:9
23:12 25:14
31:7,12,20
40:12 43:10
47:14 50:6
56:21 60:3
79:3 85:12,
18 96:4,23
97:21 98:2
101:23
122:24
126:23
128:11,23
129:8,23
131:14
138:12,18,21
147:21
151:14
167:19
168:20,25
169:6,22
170:3,20
175:12,15
181:24
201:10 205:9
206:3 207:3
208:2,9
210:22 211:7
213:13
223:11
225:17,21,24
226:1,5
228:8,14,25
229:16
232:3,19,24
234:8 235:1,
10,11,13
236:1 238:5
246:12,14,16

**gambling**
53:24 99:20
232:7,11

**game**
166:19

**gang**
51:16,19,25
145:23,25
146:3,11,14,
25

**gangs**
51:21

**gave**
52:23 79:8
114:12 138:4
151:24
192:17
229:23,24
230:6,7
240:19,20,21
241:2 242:6

**general**
47:23 230:18

**generally**
229:12

**genre**
223:9

**getting**
60:10 64:21
67:9 70:22
95:23 100:15
115:16 135:7
137:17 186:4
190:10
193:25 199:5
204:3 233:7,
8 237:2
241:9,11,17,
21

**girlfriend**
240:2

**gist**
87:13

**give**
6:16,17,23,
24 8:1 10:22
45:1 46:14
47:4,16,17
60:14,16,21,
25 66:22
81:23 100:7
115:12
195:14

197:19
234:5,8,11

**given**
6:5 14:24
52:25 158:4,
6 243:24

**giving**
108:15
115:22
160:25 248:5

**glasses**
74:24

**glizzy**
184:11,12
219:21,23
220:3,4,7,9

**Glock**
30:1 54:25
55:1 72:18
79:8 184:12
229:21,24
240:19,22
241:3

**Glocks**
55:22 71:10,
13,14 72:19,
25 73:3 77:8
79:14 97:16
167:2 219:18
220:2,5,21,
23,24 221:8,
10,16 230:1
241:4,5
243:17,20,23
244:5,9
245:1,8,11,
12,19,20
246:3

**goal**
59:4

**goes**
35:9 74:7
96:8 103:17
125:3

**going**
6:12 12:13
44:16 45:11,
19,21,23

46:1,4 48:20
49:4,8 50:7
52:19 57:1
60:9 61:23
66:18 68:11
72:17 74:12,
16 75:13
78:11 79:6
80:3 81:9,25
82:2 84:21
86:6,13,23
87:6 94:3
95:2 98:4
101:7 103:19
104:1,8
105:2 107:22
108:3 118:9
132:8 137:22
139:9 140:8
142:4,21
152:3 153:15
155:11,14
157:21
169:5,8
171:25
172:19 174:7
175:16
181:10
184:3,15
186:25
190:22
195:24
199:8,16,21,
25 209:14
210:12,16,25
215:17 216:3
218:19,24,25
219:1,3
223:24
230:23
231:9,11
232:1,2,4,22
233:6 237:7,
8,18 246:20
247:3

**gold**
54:25 55:1,
23 160:22

**good**
5:14 66:21
69:12,17
71:14,15
74:12
126:18,20
127:3,4
134:25
138:12 161:4
173:21
181:22 183:9
185:25 186:2
211:8 214:18
230:14,17

**Goods**
66:17

**Googled**
169:17

**Googling**
168:5

**government**
16:3,6 18:4
54:15 113:3
117:25
118:2,3,4
120:24 122:6
168:12
171:19
193:12
194:16 195:3
196:14
197:7,16
198:6 203:1
210:4 228:15

**grade**
19:9,16
223:18
225:15

**graduated**
10:15

**graduation**
19:22

**grand**
181:13

**great**
34:6 162:11

**greater**
241:17

**Grok**
15:2

**ground**
6:12 7:6
59:24

**Group**
5:22,24

**growing**
241:21

**guess**
11:5 14:14,
15 23:19
24:2,25
25:11,20
26:13 28:11,
21 29:3,8
31:25 38:21
40:2,4,5,24
42:1 43:20
45:10,13,14
46:3,18
52:16,23
55:4 57:14
58:1 59:2,3,
4,17 60:4
63:15,21
65:25 66:15,
23 71:7
73:22,25
75:11,14
76:22 79:22
80:21 84:13,
19 86:3
89:4,15
90:15 93:12
95:12,14,17
100:6,7
101:4,10
102:18 104:7
107:1,5
108:4 112:19
113:14
120:22,24
121:15,22
123:22
124:11
125:6,8
126:19

128:13
131:6,17
136:1 137:4
142:3 144:19
146:12
147:23,24
148:5,20
151:1,7,10
154:20,21
160:11
163:25
164:3,9
165:6
166:13,16
167:3,9,15
168:6 171:6,
20 172:15
173:6,22
174:24
177:15
180:5,12,24,
25 182:9
185:16
186:4,12
187:10
188:4,6,7
189:7,18
190:8,10,15,
24 191:2,18,
19 192:5
195:2,11,14,
16 197:3,24
198:2,9,13
199:14
200:4,8
203:25
211:15
213:4,15
215:24,25
216:15
217:12
218:21 219:3
222:3,13,23
223:4,5,9
224:6,8,25
229:4 230:1,
2,17 231:19
232:21
234:17

237:21
239:13
240:2,24,25
241:25
242:15,16
243:8,10,25

**guideline**
126:5 197:8

**guidelines**
194:18 195:5
200:22
204:25

**guilty**
6:11 12:21
36:25 52:18
55:25 56:13
57:2 65:2
83:9 84:15
112:2,6,8,16
119:13
120:13
121:22
129:18,22
188:12,13,
16,23 189:5
190:19
192:19,21,25
193:1,14
194:16

**gun**
21:11,15,19,
24 27:25
30:22 31:1
33:16,18,23
34:3,13,15
35:23 38:9,
23 42:10
73:15 74:9,
11,20 97:5
140:24 141:4
145:2,5,7,
11,14,16
147:11,14,23
148:1,11,13,
17 150:3
159:8 188:5,
6 223:12,22
230:20 231:8

guns
37:11 38:6,
11,15 39:14
45:11,18,21,
24 46:2,4,14
47:17 49:4,
7,8 53:19
55:15 56:6
58:2 59:17,
18,22,25
64:20 66:10,
11 67:10,12
69:12,19
70:7,17
72:10,12,21
73:8,16,19,
21 74:9,10,
17 75:7
76:20 77:17,
24 80:13
81:4,6,12,
19,25 82:3,
6,8,12,18
84:16 97:8
104:24
123:11
133:10,21
143:7 144:6
145:11
149:7,14,20
151:8 155:10
159:4 163:2
164:5 165:16
166:24 167:7
174:5 177:19
178:16
179:2,8
212:3,4
213:25
218:23 220:6
222:1 233:2
236:24 237:5
243:14
245:16

guy
50:21 79:10
141:15,16
222:23
223:4,9

guy's
153:4

guys
74:7 88:21
236:23

---
**H**
---

Hagood
127:1

half
63:11
214:10,11
233:24,25

hand
100:4 118:9

handed
118:14

handful
41:12

handgun
43:8 137:21
157:11

handguns
39:17,21
43:3 136:12
165:19
166:24
167:2,5
168:9 234:21

handing
8:8 225:25
228:11

hands
39:13 42:24

hang
236:10

happen
44:5 65:17
81:14 88:7
117:11
136:22
144:12 173:7
187:3 199:8
237:18

happened
64:24 65:15

68:2 84:18
86:20,21
87:1,2 124:7
128:7,13
136:21 138:9
162:12 164:3
177:14 188:5
190:13,15
191:1 194:19
201:19,21
203:4 205:25
211:15

happening
38:17 84:4
121:8 164:7
174:19
232:23

happy
45:19 88:7
179:23 180:1

hard
40:14 67:21
70:20 74:24
174:8

Harris
4:10 5:4,15,
16 13:14
18:17 25:6,
8,13,17,22,
23 26:3,9
34:9,12,20
48:9,14,20
49:1,11,12,
17,23 62:10,
12,15 63:17
66:5,6,13,
20,25 67:12,
24 68:4,10,
21 69:5,21
70:7,14,23
71:2,9 72:3,
8 74:2,21
75:2 76:7,9,
20,25 78:3,
21,25 80:11,
16,17,24,25
81:15 83:21
84:6,25

85:10,15,22,
24 86:4,11
87:5,15
88:2,24,25
89:7 90:12,
20 91:11
92:9,12,13,
18 93:6
94:6,21,22
95:1 97:13,
16 105:14,17
106:7 107:23
112:21
113:10,12,
16,20 114:2,
8,16 115:1,6
116:19
117:4,21
120:7,19
121:4
122:13,16
123:10,15
124:2,14,15,
20,21 125:2,
10,16,25
126:3,17,21
127:14,21
128:1,5,16
133:11
137:25 138:4
144:9 145:13
149:9 151:4,
11,13 154:3,
6,10,14,22
158:4,5,6,7,
12,25 159:6,
16,19 160:1,
6,13,20
161:20,24
162:1,21
163:5,9,13,
18 164:16
165:3,20
166:8 169:3,
25 170:6,15,
18 171:2,10
172:2,14
174:2 175:24
178:8,11,19,

179:5,6, 15,20 181:4, 21 182:12 184:6 187:1, 15 188:11 189:23 190:3,7,20 191:5,10,16 196:23 201:9 204:15 205:12 208:13,25 209:6 210:3 211:17 215:6 216:4 217:14 218:2,14 219:8 220:9, 13 221:23 224:14,19 225:2 227:10 228:19 230:25 231:3,9,22 232:13 233:15,23 234:9,20 236:16,20,22 237:11,24 238:13,16 239:3,7,21 240:8,19,21 243:20,24 244:8,13,16 245:2,11,19

**Harris'**
14:6 63:8 66:1,16 74:2 75:20 76:1, 12 77:11 78:16 81:21 90:5,17,24 92:24 123:20 143:10 151:12 155:1 156:3,11,12, 23 157:3 177:6 178:11 180:10 189:9 212:14

221:11 225:17 226:23 227:19 235:15 243:16 246:3

**head**
6:24 229:8 232:12

**headphones**
216:16,18

**health**
7:22 25:13

**hear**
54:3 65:17 211:8 217:2 239:10,15 241:19

**heard**
61:16 89:4 164:25 216:23 224:2 232:10

**hearing**
184:19 237:25 238:3

**held**
4:14 10:19

**help**
6:13 21:8,18 32:23 93:15 177:11 181:22 201:13

**helped**
61:4 127:5 172:8

**helping**
23:10 35:21 126:20 171:7

**Henry**
175:23

**hey**
36:15 80:3 81:8 88:21 120:25 164:6 184:17

187:25 194:23 197:5 198:4 199:7, 12 220:6 233:11

**high**
9:25 10:1 19:18,22 26:15 28:12 35:21 190:23

**higher**
59:5 89:15

**highway**
91:5

**hire**
15:23 101:11,14 181:5

**hired**
54:4 102:7

**history**
140:15

**HOA**
74:12

**hold**
11:4 177:20 178:8,11,20 230:12

**hollering**
215:23

**home**
212:14

**honest**
20:19,23 197:4

**hooking**
224:22 239:25

**hope**
201:13

**Hornsby**
5:5 7:11 13:6 16:7,11 17:5,19 18:13,18 19:19,24 20:4,8,15,

17,20 21:20 22:9,16 23:7 24:8,11,13, 17,20 26:5, 10,20,24 27:6,14,19 28:1,7,17,20 29:2,6,11,20 30:7,18 31:13,21,24 32:3,13 33:8 34:14,23 35:6,9,14,18 36:10 37:3, 7,16,23 38:2 39:1 40:19 41:16 42:5 43:11,15 44:2,14,22 46:24 47:9, 15,22 48:22 49:14,25 50:5,16 51:11,18,23 52:4,12,21 53:3,13,20 55:11 56:4, 17,22 57:5 58:5,24 59:8,13 60:8,13,18 61:15,18,22 62:7 63:3 66:8 67:2,7 68:23 70:8 71:11,20 72:24 73:5, 13 75:5 76:16 77:14 78:5 80:19 81:2 82:9, 16,22 83:7, 14 84:1,8 85:19,25 87:10,18,23 88:4 89:2,8, 22 90:2,8,21 91:2,12,16, 21 92:4,15,

Lane Koroly Vol 1
April 13, 2026

93:1,9,11 95:3,9 97:24 98:3 99:15 100:19 101:9,15 102:20 103:2,6,11, 15,25 104:6, 11,21 105:18 106:4 107:10,17,24 108:13,16 109:4,10 110:10,16,20 111:4,16 112:17,22 113:5,9,11, 21 114:3,9, 18 115:8,14, 21,24 116:1, 5,21 117:5, 22 118:5 121:5,12,20 122:1,8,19, 22 123:5,17 124:5,10,16, 23 125:12 126:13,22,24 127:22 128:19 129:2 130:4,21,24 132:2 133:15 135:21 136:25 138:7,14,20 139:5,8,23 140:4,7,11 141:1,5 142:2 143:13 144:18 145:15 146:1,16,22 147:9,15 148:2,16 149:1,4,10, 25 150:10, 16,24 151:5, 15,25 152:12 154:19

156:24 160:8,16 164:1 166:14 167:11 170:8,12 171:15 174:23 175:13 176:4,11,15, 23 177:2,7, 13,23 178:5 181:25 186:20 193:16 194:13 195:6,20 196:4,11,16, 25 197:10 199:19 200:17 201:1,15 202:1,8,17 204:2,16,21 205:1,5,15 206:2,4,9, 16,20 207:4, 12,18 208:1, 3,8,15,20 209:2,8,15, 22 210:5,24 240:15 244:15,18 245:13,22 246:5,10,17, 22

**horse**
136:15 178:1
**Hospitality**
5:22,24
**hot**
165:6
**hour**
7:3
**hours**
15:16 106:24 157:4,5
**house**
25:1,2 45:7,

9 53:22 54:16 56:9 79:12 160:24 178:9 181:16 187:18,20 212:6,7 213:12,13 217:10 231:1
**Houston**
4:19
**huh-uh**
6:25
**hungry**
138:24
**hunter**
28:15
**hunting**
168:2,7
**husband**
42:17
**hyperbolic**
146:6,8

_____

I

_____

**idea**
38:5 57:17 78:17 104:17 110:5,8,18 125:8 129:12,15 135:23 137:4 162:11 226:8,15 230:14
**identical**
97:8
**ignorant**
171:21
**ignore**
81:6
**ignored**
174:6 224:10
**II**
150:3
**illegal**
40:1 44:23

60:9 100:17 147:5,7,23 148:1,3 159:11 223:16
**illegally**
37:21 45:2 93:6 245:20
**immediately**
74:16
**immunity**
107:2 108:14,24 109:2,8
**impact**
112:21 211:13
**impacts**
211:16
**impair**
7:22 8:1 73:13
**impairment**
151:12 237:25 238:2
**implicate**
122:16 126:2 210:2
**implicates**
205:23
**implicating**
189:23 190:3,7 201:9
**implies**
21:13
**imply**
72:13,14
**import**
148:20
**important**
167:14
**impression**
110:22
**impressive**
223:4

imprisonment
  126:7
improper
  67:2,7 73:5
  87:18,23
  88:4 89:9
  92:20 100:19
  113:21
  114:3,9,18
  116:21 118:5
  121:5 122:9
  123:17
  125:12
  126:24 129:8
  151:25
  152:12
  166:14
  197:11
  200:18 202:8
  207:18
include
  83:24
included
  120:18
  121:19
  122:21
  128:13 129:1
  189:9
including
  128:15
inconsistent
  151:19 245:6
increase
  245:7 246:3
increased
  75:21 76:1,
  12,14,21
  77:1,6,7
  245:2,11,19
increasing
  243:17 244:5
incriminating
  45:15
independent
  150:20 243:8
  245:16
indicate

66:20 77:12
248:4
indicating
  157:9 174:2
  192:17 194:4
  213:7 214:13
  225:20
individual
  51:9 222:25
  236:4
individuals
  215:16
  216:24
  236:15
infer
  104:7
inflated
  89:13,14
influence
  147:5,13
  223:15,21
inform
  153:12
informally
  61:25
information
  109:23
  193:24
informed
  159:1
initial
  43:5 48:14
  66:24 68:15
  242:9
initially
  58:9 68:4
innocence
  186:18
ins
  198:9
inside
  75:4 155:6
  156:5 212:16
instruct
  110:12
  139:25
  232:13

instructed
  24:6
instructing
  16:9,11
  24:18 35:1,
  12 101:17
  102:22
  103:22
  115:10 123:7
  140:5 246:8
intend
  48:6 49:12
intended
  41:8,15
  42:8,13
  47:20 49:2
  100:11
  120:20
  177:12 179:4
  241:7
intending
  66:6
intent
  48:5 80:24
  81:1 156:20
  233:5,16
intentions
  34:21
interacted
  54:14 245:2
interaction
  53:21 155:5
  185:6 240:7
interactions
  54:6 184:6
  187:19
  222:24
interest
  230:24
interested
  4:21 28:10,
  13 42:23
  43:2 71:10,
  13
interjection
  148:2

international
  52:3,5,7,10,
  20 53:2
  56:3,19
interrupt
  6:18
interview
  56:16 94:13
  101:12
  102:10,13,16
  103:14,24
  105:3,7
  106:9,13,16
  107:3,8,14,
  23 108:2,6,
  10 109:3,14,
  17,24 110:3,
  5,7,19
  111:1,2,10,
  13 122:12,15
  152:20,24
  153:5,9,11,
  17 154:10
  186:25
  187:15,23
  188:10
interviewing
  188:20
interviews
  209:21
intimately
  38:18
intricate
  166:3
introduced
  25:6
introduction
  36:7 151:17
inventory
  73:1 74:18
  75:9 92:7,
  10,14,24
  93:2,8 99:5,
  6 135:20
  136:9 222:3
  243:20,24,25
  244:4,9,25
  245:1,8

246:3

**investigate**
104:8

**investigated**
104:3,5

**investigating**
99:18 102:4
104:10
105:13

**investigation**
24:22,24
102:1 151:24
152:14

**investigative**
125:23
170:19

**investigators'**
70:10

**investor**
61:3

**investors**
60:12

**invoke**
19:4 206:23
207:6,13,22
208:4,10,16,
21 209:3,10,
17,24 210:6,
10,14,18

**invoking**
16:18,20
17:1,6,10,
15,21 18:20,
23 29:21
30:9 205:20

**involved**
22:21,23
61:20 105:21
176:14,22
182:4

**involvement**
23:2,15,17,
24 38:19
222:3 242:13

**iphone**
11:13 12:8

**irresponsible**
75:11

**Israelow**
4:22

**issue**
20:11 56:12,
16 96:25
97:2 189:17
203:12

**issues**
25:13 26:4

**item**
95:24 96:17

**items**
215:19

**Izzy**
184:10

---

**J**

---

**J.J.**
50:21,25
235:24

**Jack**
4:17

**Jamie**
4:22

**January**
36:22 57:11

**Jason**
5:5 7:11

**job**
6:14,15
10:18,25
88:15 200:13

**jobs**
10:18

**Joe**
36:1,4,6,8
50:21,25
51:20 55:22
64:8 72:20
81:19,23
82:2,21,24
83:13,16,18,
20 84:2
180:24

**John**
22:18,21,23
23:4 25:7
61:5,9,20,25
62:5,8
66:18,20
67:9 105:25
131:6 174:25
175:3,7
211:24 215:1
236:6,11
237:4 240:11

**joke**
220:1

**Jr**
4:10

**judge**
188:20

**Judicial**
14:13

**July**
83:4 161:6

**June**
38:9 65:24
212:2
238:16,17,19

**justify**
179:8 199:13

---

**K**

---

**keep**
34:17 35:25
40:10,13
88:15 98:20,
21,23,24
103:20 140:9
244:9,13,16
246:7

**kept**
65:9 81:24
82:15 165:23
186:5
221:24,25
222:5

**kind**
20:25 27:9

50:24 51:7
56:10 60:4
64:12 71:5
74:24 75:13
80:21 95:22
101:4
131:10,13
136:15
141:14,15,25
142:3 147:7,
24 150:19
157:16
166:17
172:17,20
174:10 178:1
182:3
183:18,20
184:18 186:1
187:7,10
190:23
196:19
214:1,2,5
215:24
216:11,14
220:1,16
222:22
223:4,5
224:9 230:17
232:9,10
233:8 238:25
241:24
244:12

**kinds**
58:13

**kitchen**
213:7

**knee**
166:21

**knew**
23:3 25:19,
25 26:13,25
28:3,4 36:1,
4 38:22 40:7
51:10 61:5,9
62:8 70:3,7
71:22 73:15
76:14,20,25
77:12 78:3

79:1,4
80:11,13,17
81:15 82:2
86:15 104:25
106:22 111:7
123:13,14,15
125:5 151:17
159:16,19
163:9,14,19
169:18
171:10,11
172:23
174:21
180:24,25
191:12
208:13,25
224:17,22
230:1 236:7
240:10,11

**know**
6:20 7:2
9:22 11:22
12:10 13:14
14:5,9 18:22
19:8 20:21
22:6,8,11
24:24 25:8
27:3 36:2,5
38:15,17
40:1,15 42:6
43:17,21
44:16 45:12
46:21 51:12,
19,24 52:5,7
55:14 56:24
58:18 59:9
61:6,11,14
63:4 70:11,
14,25 71:23
72:18 73:17
74:5,12,22,
25 75:12,18
76:4,11
77:19,23
79:4 80:17
81:7,10,11
84:3,4 88:12
89:19 90:9
92:16 93:10,

19 95:7,11
97:4 101:24
102:2,14
103:7
104:23,25
105:19
106:20
109:18,19,22
110:7 112:14
113:14
116:9,12,24
117:16
120:25
122:20 123:9
128:21
130:16
131:5,9,17,
19 132:6
133:16
136:19,21,23
138:3
140:14,15
141:15 143:8
144:14
145:16
146:11
147:10
148:12 149:5
150:2,4,18
153:3 155:3,
19 157:24
162:4 163:1
164:5,7
165:24
166:3,22
167:13
168:3,11,13,
21 169:13,15
170:24,25
171:4,19
172:9,12,21
173:5 174:15
175:4,9
178:16
180:14
182:18,21
184:11
186:23,24
187:21

188:7,22
190:17
191:2,3,4,9,
17,19,21
192:20 195:9
196:18
198:9,12,18,
20,22 199:2,
3,9,14,15
200:2,3,8,
11,12,14
202:11,14,20
204:13
205:11
206:15 209:7
211:15,17,
21,22 212:12
213:8 220:19
221:24,25
222:5,6,16
223:8,9
224:5,6,8,
13,16,18,20
225:7,8
226:10,19
230:16
231:7,12
232:2 233:18
234:3,14
238:24
239:7,9,16
240:3,4,6,
19,20,21,23
243:23,25
244:10,22
245:9 246:6

**knowing**
51:16 239:14
243:7

**knowledge**
13:11 72:2,8
78:16 80:25
91:18 104:4
120:19
123:10
127:12
128:25
134:3,6

143:11,16
166:11 176:7
177:10
189:10
212:13
237:24
243:6,19

**knowledgeable**
170:18

**known**
19:12 40:6
70:16 73:3
76:13 88:17
97:6 124:3
134:23
218:11
223:18
225:15
236:18

**Korol-**
166:6

**Koroly**
4:9 5:6,10,
14,21 18:25
23:21 35:16
49:10 50:13
98:10
118:13,22
123:1 132:14
139:15
142:8,21
152:9 154:3
155:12,16
159:16
161:20,24
164:15
175:22
193:14
238:11 248:2

**Koroly's**
196:9

**Krissy**
4:11

---

**L**

---

**L-SHAPED**
214:2,3

244:12

**labeled**
 119:2

**lack**
 58:24

**Lamar**
 5:3,13,15
 8:11 13:8
 16:9,13
 17:8,23
 18:16,22
 19:21 20:2,
 6,10,18,22
 21:12,23
 22:13,18
 23:9,14
 24:13,18,21
 25:16 26:8,
 12,22 27:1,
 11,17,22
 28:5,9,18,22
 29:4,9,13,23
 30:11,22
 31:10,16,23
 32:1,7,15
 33:11 34:19
 35:1,7,12,15
 36:3,13
 37:5,13,20,
 25 38:8 39:5
 40:16,21
 41:18 42:7
 43:13,18
 44:6,19,24
 47:3,11,19
 48:1,25
 49:17 50:3,
 13,18 51:15,
 20 52:1,9,
 17,25 53:10,
 17 54:8
 56:1,11,19,
 25 57:7 58:8
 59:6,11,15
 60:5,11,16
 61:2,16,20,
 25 62:9 63:7
 66:12 67:4,

11 69:2
70:12 71:16
72:2 73:2,
11,17 75:19
76:18 77:19
78:12 79:16
80:23 81:15
82:14,20
83:3,10,20
84:5,12
85:14,21
86:4 87:14,
20 88:1,16
89:5,12,24
90:4,11,24
91:6,14,18,
23 92:6,17,
23 93:3,13
95:7,15
96:12 97:5,
19 98:1,10
99:17 100:23
101:11,19,25
102:24
103:4,9,12,
19 104:1,9,
14 105:3,20
106:6
107:13,19
108:1,14
109:1,7,13
110:14,17,24
111:8,18
112:20
113:1,6,10,
15,24 114:6,
14,21
115:12,19,
22,25 116:2,
17,24 117:12
118:1,9,12,
13 121:9,17,
23 122:5,11,
20,25 123:9,
20 124:8,13,
19 125:1,15
126:15
127:6,25
128:15,21,25

129:5,12
130:1,6,22,
25 131:21
132:8,11,13
133:17 136:5
137:6
138:10,16,23
139:4,6,15
140:1,5,8,
12,13 141:3,
9 142:4,7
143:14
144:21
145:18
146:4,20
147:2,12,17,
25 148:4,22
149:2,8,12
150:5,14,21
151:3,9,18
152:3,7,16
154:22
155:16 157:2
160:12,19
162:1 164:10
166:23
167:16,22
168:23
169:3,19,25
170:5,10,14,
22 172:1
175:2,10,14,
22 176:7,13,
17,25 177:4,
10,16 178:3,
7 182:11
186:24
194:2,11,14,
15 195:18
196:1,8,12,
22 197:6,15
199:24
200:23
201:7,12,22
202:5,15,22
204:6,19,24
205:4,7,11,
18 206:7,13,
18,25 207:8,

15,24 208:6,
12,18,23
209:5,12,19
210:1,8,20
213:10
219:2,6
228:23
229:14
231:23
232:16,20
234:7,25
235:19
238:7,10
240:18
244:16,21
245:18
246:2,8,11,
19

**Lane**
 4:9 5:6,10,
 21 118:22
 136:20
 193:13 248:2

**language**
 120:9 128:15
 189:9

**Larry**
 26:18

**late**
 171:8 182:19

**laugh**
 142:1 143:9,
 15

**laughed**
 143:6

**law**
 7:16 75:10
 141:24
 156:21
 203:23

**laws**
 40:3 81:11

**lawsuit**
 13:11 14:18
 16:14,16

**lawyer**
 199:15

laying
  166:19
layout
  212:24
lead
  209:14
leading
  111:12
  152:14
lean
  88:19
learn
  77:4 105:10
  230:24 231:2
  234:24 235:1
learned
  26:3 102:4
  190:6,8
  235:7 242:24
learning
  55:17 65:6
lease
  63:16
leased
  98:11,23
  99:1
leave
  210:12,16
led
  76:3,7 78:3
left
  23:19 53:25
  188:18 213:3
  214:12 215:8
  240:25
leg
  175:23
legal
  4:18,23
  20:11,14
  56:22,23
  103:17
  115:15 116:8
  130:15
  148:21
  199:19

legally
  58:6 159:8
legit
  137:21 138:4
legitimate
  58:3 72:22
  73:22 96:21
  172:9 178:23
  179:6,10
legitimately
  64:5
leniency
  210:3
letter
  82:19
  142:10,18
  143:20
  149:17
  222:20
  226:18
letters
  127:5 204:11
level
  105:22
liability
  207:11
liberal
  183:20
license
  12:19 14:3,6
  26:23 27:2,
  4,12,18
  50:20 52:18
  57:9,13,18,
  22,25 58:9,
  15,16,20
  61:13,24
  99:8 100:1,
  24 111:25
  129:19
  141:11,22
  148:1 155:8
  170:15
  177:18
  209:1,7
  242:3
licensed

60:7 63:2,8
  65:20,23
  66:1 74:2
  81:21 98:11
  99:1,9,13
  123:21 155:7
  156:12
  178:12
  180:10
licensee
  25:18,24
  245:7
licensees
  89:25 243:13
licenses
  58:13
lie
  128:12
  130:20,23
  207:24 224:2
lied
  209:20
life
  84:22,23
  93:19 132:25
light
  126:12
  201:24 202:4
  220:6
light-hearted
  184:14
lighter
  108:7,10
  113:19
limited
  245:24
line
  22:25 124:17
  132:19
  245:14,23
  246:1 248:5
lined
  89:17,19
lines
  57:21
liquidate
  92:14

list
  165:23 235:4
listed
  90:25
Listen
  107:1
listening
  136:21
lists
  222:11
literally
  88:25 144:22
little
  34:5 66:22
  91:25 139:2
  244:11 246:6
live
  8:24 9:3
lived
  9:1 206:5
  240:1
living
  78:6 162:6
  179:25
  180:16 213:6
LLC
  62:18,21
located
  4:15,18
location
  212:8,13,25
long
  9:1,8 15:14
  138:16
  165:15
  166:24 167:7
  231:21
longer
  19:1 20:6
  134:23
  193:10,20
  236:18
  240:10,11
  241:22
look
  75:16 121:1
  135:1 174:10

175:25 182:2
194:8 226:2
230:20 244:1

**looked**
63:5 98:19

**looking**
74:20 80:10
174:16
180:23 182:1
192:12

**looks**
156:4 164:6
225:19

**lose**
134:1,4,9

**losing**
172:8

**lot**
44:7 106:2
117:9 155:4
172:18
174:12
185:18
200:21
212:19
220:2,25

**loud**
161:19
164:14
184:19 217:3

**loudmouth**
141:15
222:21

**love**
183:11,12,
14,17

**Loving**
133:14
153:2,4

**low**
93:25 94:23
98:21

**lower**
41:18 136:12
137:5 165:7

**lowers**
41:17 234:12

**lucrative**
36:12

**lunch**
138:11
139:16
182:17

**lying**
130:18
208:12

---

**M**

**M16**
224:4

**M16s**
141:13 223:3

**machine**
148:11,13,17
149:7,20

**Maddie**
176:12,16

**made**
24:25 59:1
88:2,6
121:2,10
144:4 153:13
157:19
168:11,12
171:17 185:6
219:8 221:20
228:14

**Maggie**
176:12,14,
16,18,20,22
177:1,5,11

**main**
56:8 72:21
187:19

**maintaining**
186:18

**majority**
219:19

**make**
6:13 21:10
31:8 35:22
37:12 39:2
41:14 44:15,

16,17 53:1
58:2 59:4,22
64:10 71:7
73:21 77:10
86:16 95:23
97:1 121:23
125:4,20
128:4,14
135:1 140:16
141:18
144:8,16,21
146:20 151:8
159:6 161:3
168:9 171:14
172:7 185:7
197:7 207:16
215:13

**makes**
113:2 130:14
131:19
141:16 164:9
165:7 166:18
167:15
171:25
173:25
174:15,19
180:8 181:3,
17,20
184:16,23
187:4,11
188:9 189:7
190:10 193:6
194:1 197:25
200:12
216:22 219:5
220:19 223:6
229:6 230:6
232:23
235:25 239:1
241:14

**making**
36:16 44:16
88:8,22
96:13 136:18
144:5 146:5
147:20
159:17,21
160:1,7,15

162:17 172:5
220:6 223:3

**man**
20:24

**managed**
22:13,17

**maneuver**
201:20

**manufacture**
58:16,22

**manufacturer's**
244:17

**March**
8:23 97:11

**mare's**
175:23

**margin**
74:11 92:3
95:8,11
161:4

**margins**
94:8 96:21

**mark**
8:8 47:7
48:4,9,15,19
118:10 132:9
142:5 155:14

**marked**
8:10 48:17
49:19,21
69:5 91:7
118:11
132:10 142:6
152:6 153:16
155:15
179:15

**market**
90:4 135:13
145:8,9
167:6

**marking**
47:11 152:4

**markup**
91:15

**married**
9:6,8

marshal
  188:25
match
  161:25 162:2
materials
  14:18,20
matter
  4:10 88:10
  103:21 161:2
matters
  216:25
May/june
  238:23
mean
  14:12 29:12
  37:5,9 38:16
  42:19 43:6,
  16,17 44:9,
  13 45:10,12,
  22,23 51:13
  59:16 63:13,
  23 73:24
  79:1 92:11
  93:4,19
  95:16 98:24
  112:19 118:2
  144:11 145:9
  161:6 173:2
  182:14 183:8
  184:11 185:5
  192:24
  205:20
  213:16,21
  215:22
  220:3,4
  222:10
  224:23 225:6
  233:25
  241:11
  244:5,14
meaning
  183:21
meant
  46:8 159:4
meantime
  98:22
mechanics
  10:11

mechanism
  200:9
medication
  7:21
meet
  15:3,6,8,10,
  20 19:15
  21:2 54:20
  78:6 111:18
  139:15
  180:22 181:8
  189:3 195:12
  197:21
  198:16,25
  200:12
  210:12
  211:19
meeting
  15:14 25:22
  34:12 54:19
  62:15 65:8,
  10,16 66:5,
  14,24 75:21
  78:18 79:9,
  10 94:15
  181:15,16
  182:12
  230:3,5,6
meetings
  84:20
members
  51:19 145:23
  146:3,11,15,
  25 151:3,7
memo
  94:18
memorandum
  18:8 127:7,
  10,13,16,21
  198:24
  203:6,11,21
memories
  229:8
memory
  67:23
  211:13,16
  228:21

mention
  56:2 61:7
  113:3 127:13
  157:19
mentioned
  26:2 99:20
  120:8 147:4
  148:23 162:5
  169:11
  185:11
mentions
  113:12
  127:21
mentor
  127:2,3
mere
  78:24
message
  163:4
messages
  12:4,7,13,14
  163:13,16
met
  15:17 22:20,
  25 25:9,16
  34:9 36:6
  52:14 61:5,7
  67:12,14,22
  72:25 75:23
  78:23 82:24,
  25 91:7
  108:21
  140:19 141:8
  162:6 182:16
  201:3,6
  206:1,7
  212:1,3
  224:15
  238:24
Mexican
  51:2,13
  145:23,25
  146:3,9,10,
  14,25
microphones
  4:7
middle
  19:9,16

  216:12
mind
  78:3 84:17
  123:15
  175:15 229:5
mindset
  20:21
minimal
  72:25
Mint
  11:15,23
minutes
  76:24 98:1
  138:19,23
  188:19
mis-
  67:2 200:17
mischaracteri
zation
  66:9 68:24
  131:15
  146:17,23
  197:11
  200:18
misconduct
  113:20
  121:10
  126:21 128:1
  190:3,7
misleading
  204:2
missing
  124:2
mistaken
  193:2
misunderstand
ing
  198:3
mixed
  193:25
model
  71:7
models
  70:18 79:15
  97:1,8,12,14
  125:4

**modifying**
  29:10,12
**moment**
  174:15 226:1
  235:10
  242:12
  246:13
**moments**
  75:20 76:19
**Monday**
  165:13
**money**
  21:10 35:22
  36:16 37:21
  44:15,16,17
  58:2 59:1,4,
  22 60:14,17,
  21,25 61:4
  64:10 88:8
  96:14,17
  105:14,17
  106:2,7
  151:8 160:14
  171:14,17
  172:5,7,9
  219:8
**money-
controlling**
  105:22
**month**
  17:12 65:22
  70:12 102:7
  170:11 174:1
  242:20
**months**
  10:21 122:3
  190:13 195:9
**months'**
  97:4 126:10
**morning**
  5:14 6:13,22
  7:13,19
**motive**
  151:21,23
  240:23
  243:10
**move**

  9:14,16,17,
  20,23
**moved**
  10:23 19:25
  24:2 98:16
  162:14 175:4
  179:21
  180:3,12,13
  206:11 229:9
**moving**
  9:3
**multiple**
  39:17 47:24
  50:17 69:8
  73:8 85:2,3,
  5,7,9,11,15,
  22 97:17
  166:25
  167:18,23
  168:8,14,18
  169:4,20
  170:1,6,11,
  22 171:11
  173:9,10,18
  174:3
  234:14,21,23
  235:2 242:25
  243:2,6
**multiples**
  43:16
**music**
  217:3
**mutual**
  57:19
**mutually**
  171:16 172:4
  225:9
**myriad**
  200:20

————————

**N**

————————

**name**
  4:17 5:14,18
  22:2 36:5
  46:15 56:2
  61:6,10

  62:21,24
  127:21
  142:15 153:4
  167:3 193:11
  220:1 241:14
  248:2
**name-drop**
  223:7
**named**
  36:4 61:3
  176:14,22
**names**
  223:7
**navigate**
  181:22
**nearby**
  131:25
  237:11
**necessarily**
  32:6 40:13
  72:13 75:16
  232:10
**necessary**
  128:16
**need**
  7:1 17:13
  44:15 75:16
  104:15,19
  138:17,18
  179:8 207:1
  246:23
**needed**
  32:22 92:14,
  18 93:21
  133:25
  134:4,9
**needs**
  21:2 91:7
**negative**
  154:21
  229:10,13,
  17,18
**neighborhood**
  217:8
**nervous**
  130:14
  211:10 246:6

**never**
  28:3 35:16
  43:8 46:3
  47:19 51:24
  54:9 61:5,7
  82:24 83:1
  86:20 104:19
  118:7 131:16
  133:17
  136:13
  137:22 144:6
  145:2,3,6
  154:15,16
  156:22
  157:19 159:9
  169:10
  180:12 186:6
  195:3,11
  201:6 218:5,
  8,10 219:3,
  15,16 222:12
  232:10 245:9
**news**
  40:3,4
  105:11
  236:25
**nice**
  199:22
**Nick**
  26:12
**Nick's**
  26:18
**nickname**
  184:5,10,21
  219:21,22,25
  220:8
**nod**
  6:24
**noise**
  217:8
**normal**
  47:2 75:23
  215:21,24
  217:10,11
  237:21,22
**Northchase**
  4:19

**note**
4:6 156:9
228:5

**notes**
94:9,11,14,
16 132:5
160:4 162:6
171:4 180:15
182:16

**notice**
223:21
227:14,23

**noticeable**
76:5

**noticed**
157:13
243:16

**November**
142:11

**Novo**
14:13

**NPRS**
135:23 165:6
169:11,13,15

**number**
11:16,18,24
83:25 155:14
189:18
221:8,10
230:21
234:5,9
236:23
243:19,21,
22,23 244:23
248:5

**numbers**
244:1

**numerous**
217:13

O

**oath**
6:5 7:13,15
140:3

**Object**
71:20 208:9

213:10 219:2
223:1 228:23
229:14
231:23
232:16,20
234:7,25
235:19

**objection**
13:6 16:7
17:5,19
18:13,18
19:19,24
20:4,8,15,20
21:9,20
22:9,16
23:7,12 24:8
25:14 26:5,
6,10,20,24
27:6,14,15,
19,20 28:1,
7,17,20
29:2,6,11,20
30:7,18
31:7,12,13,
20,21,24
32:3,13 33:8
34:14,23
35:8,18
36:10 37:3,
7,16,23 38:2
39:1 40:12,
19 41:16
42:5 43:10,
11,15 44:2,
14,22 46:24
47:9,14,15,
22 48:22
49:14,25
50:16 51:11,
18,23 52:4,
12,21 53:3,
13,20 55:11
56:4,17,21,
22 57:5
58:5,24
59:8,13
60:3,8,13,18
61:15,18,22
62:7 63:3

66:8 67:2,7
68:23 70:8
71:11,20
72:24 73:5,
13 75:5
76:16 77:14
78:5 79:3
80:19 81:2
82:9,16,22
83:7,14
84:1,8
85:12,18,19,
25 87:10,18,
23 88:4
89:2,8,22
90:2,8,21
91:2,12,16,
21 92:4,15,
20 93:1,9
95:3,9 96:4,
23 99:15
100:19
101:9,15,23
102:20
104:6,11,21
105:18 106:4
107:10,17,24
108:13,16
109:4,10
110:10,20
111:4,16
112:17,22
113:5,9,11,
21 114:3,9,
18 115:8,13,
14,22 116:21
117:5,22
118:5 121:5,
12,20 122:1,
8,19,22,24
123:5,17
124:5,10,16,
23 125:12
126:13,22,23
127:22
128:19,23
129:2,8,23
130:4,21,24
131:14 132:2

133:15
135:21
136:25 138:7
139:23
140:10
141:1,5
142:2 143:13
144:18
145:15
146:1,16,22
147:9,15,21
148:2,16
149:1,4,10,
25 150:10,
16,24 151:5,
14,15,25
152:12
154:19
156:24
160:8,16
164:1,2
166:14
167:11,19
168:20,25
169:6,22
170:3,8,12,
20 171:15
174:23
176:4,11,15,
23 177:2,7,
13,23 178:5
181:24,25
186:20
193:16
195:6,20
196:16,25
197:10
199:19
200:17
201:1,10,15
202:1,8,9,17
204:2,16,21
205:1,5,9,15
206:2,3,9,
10,16,20,21
207:3,4,5,
12,18 208:1,
2,8,15,20
209:2,8,15,

**observe**
236:19

**observed**
224:2

**obtain**
14:20 81:22
156:21 167:7

**obtained**
27:2 99:14
177:18

**obtaining**
27:11,17
41:8 43:2
205:13
242:21

**obviously**
38:6 44:10
45:13 46:8,
19 47:24
54:1 56:9
63:6 71:23
73:9 80:8
81:5 160:5
164:8 169:17
171:23
180:6,23
183:18,25
192:25
199:23 233:9
242:19

**occasion**
15:17,20
148:10

**occasions**
214:23 215:3
217:13
235:17

**occupation**
9:10

**occur**
79:17

**occurred**

22,23 210:5
240:15
244:15,18
245:13,22
246:5

**October**
102:11 105:4
152:20
153:5,18
185:15
228:15,22,24

**Off-highway**
10:9

**offense**
36:15 126:6
189:19

**offer**
197:13,14

**offered**
90:12,20

**offering**
208:24

**office**
63:11 75:6
79:22 99:1
109:17 110:4
111:21
116:11,12
155:25
156:3,5,11
160:24
189:3,11,13,
21,25 191:6,
11 192:23
196:10
197:23
198:23
213:3,4,12,
17,19 216:25
217:11
220:24
221:11
226:23,25
227:2,3,6,8,
12,21 235:15
236:12 237:3
244:17,24

**official**
22:11 65:10
225:8

**officially**
22:12

**okay**
35:19 46:13
48:2 96:3
125:22 139:8
140:11 143:5
155:13
176:19
201:20
211:8,25
212:7,11,13,
16,24
213:16,19
214:9,17,19,
21 215:6
217:16,24
218:8 220:11
221:16
222:14
226:19
227:17
230:11,23
232:6 233:22
234:2 235:17
236:1,8,19
242:16
246:20

**on-highway**
10:9

**once**
7:2 60:7
74:15 98:14
177:17
215:1,2
235:20,21
236:2 243:2

**one**
10:17 26:25
34:16,17
42:15 48:7
49:20 55:23
58:1 59:2
68:7,9
76:19,24
81:9 99:22
111:7,24
117:7,12,20
129:18
143:23 149:6

150:12,23
161:8 173:10
175:10
176:12
181:12,18
182:4,17
186:12
189:4,14
192:14,17
193:25
218:5,12
219:7 221:16
222:1 235:10
239:25 244:2
246:12

**ones**
42:19,21
72:21 136:3
188:6

**online**
42:1,10,20
63:14 90:6,
7,9 98:21

**open**
96:9 98:17
103:20 140:9
207:10

**opened**
35:24 103:15

**opening**
119:15

**openly**
242:21

**opens**
193:23

**opinion**
20:22 147:17
225:11

**opportunity**
199:7 202:15

**opposed**
205:13

**order**
41:23 49:22
69:19,25
72:10 95:13

| | | | |
|---|---|---|---|
| ordered | | 10,15 121:19 | parties |
| 41:22 42:3,7 | P | 128:22 | 4:6 |
| 177:25 | | 129:1,13 | partner |
| ordering | p.m. | 133:3,5 | 33:6 105:23 |
| 69:24 72:12 | 139:10,12,14 | 134:11,13 | 106:2 136:6 |
| 82:2 | 175:17,19,21 | 135:2 | 150:15,18 |
| ordinarily | 211:1,3,5 | 137:10,12 | partners |
| 96:13 | 246:21 | 142:22,25 | 35:17 |
| ordinary | 247:3,4 | 144:3 145:1, | partnership |
| 74:6 | PACER | 19,20 147:3 | 225:4 |
| organic | 14:21 | 148:9 153:23 | party |
| 73:22 | packet | 154:2 156:17 | 4:20 |
| organization | 8:14,17 14:1 | 159:15 | passed |
| 51:17 | page | 161:14,17 | 185:14 |
| ourself | 118:24 119:9 | 164:10,13, | passing |
| 184:15 | 142:13,21 | 19,22 165:4 | 144:15 |
| outcome | 153:21 | paragraphs | past |
| 4:21 | 155:22 | 227:14 | 11:19 |
| outright | 156:14 | parents | patterns |
| 218:4 | 161:14 226:6 | 19:13 183:17 | 164:4 173:4 |
| outs | 227:13,17 | part | pay |
| 198:10 | 248:5 | 30:3 32:6 | 39:6 91:14 |
| outside | PAGE/LINE | 90:19 102:17 | paying |
| 42:4 89:17, | 248:7 | 106:16 | 91:19,24 |
| 19 205:24 | pages | 117:24 | 96:10 |
| 235:23 | 127:23 | 119:13 129:4 | penalties |
| overhead | 203:22 226:2 | 160:5 194:20 | 53:6 |
| 98:21 | paid | 197:12 | penalty |
| overheard | 91:10 | 200:2,6 | 7:19 132:21 |
| 239:3,7,12 | pamphlets | 202:23 | pencil |
| overly | 157:7 226:17 | partake | 227:25 |
| 183:20 | 228:1 | 147:8 | pending |
| owe | paper | participate | 5:17 |
| 105:14 | 52:23 107:19 | 102:15 | people |
| owed | 133:8 248:4 | 103:13,23 | 21:1,13 36:2 |
| 105:16 | papers | participated | 46:22 50:17, |
| 106:2,7 | 52:25 53:8 | 56:16 108:1, | 19,21,24 |
| owned | paperwork | 9 111:9 | 51:24 60:14 |
| 28:19 | 47:16 54:2 | 152:20 | 64:9 73:9 |
| owner | 70:2 79:21 | participating | 78:11 82:2 |
| 96:16,18 | 136:2 231:7 | 111:1 | 83:16,18,21 |
| owners | 235:5 242:6 | participation | 88:22 89:17, |
| 96:13 | par | 21:13 107:7 | 19,20 100:8 |
| owns | 90:6 | 108:6 109:2 | 135:1 145:11 |
| 22:5,8 | paragraph | 147:4 186:17 | 146:9,14,19 |
| | 119:20,23 | particular | 164:4 172:11 |
| | 120:1,3,6,8, | 99:22 121:24 | 180:24 |
| | | 203:13,15 | |

181:19
183:10,17,21
184:17,22
215:4 217:2
224:7 229:12
235:22
239:14
240:1,5

**perceiving**
241:16,18,20

**percent**
172:22

**period**
20:1 27:9
75:24

**perjury**
7:19 132:21

**permit**
58:16

**person**
15:6 20:19,
23 21:1
38:16 55:3
105:8,10
109:21,24
110:23 131:8
134:17
141:25
159:12
218:15
225:12 240:6

**personal**
20:22 33:23
34:8,11
178:23
179:6,11

**personally**
52:19 56:25
58:3 83:5,10
127:25
141:17

**persons**
122:13,16,21

**perusing**
194:14 226:3

**Petition**
14:13

**phone**
11:12,14,16,
18,24 12:12
15:22 55:3
87:12 162:7,
21 163:1,6
185:10
206:14,19
216:20,21

**phones**
77:21 180:20

**photo**
155:19
156:2,7
157:10
188:18

**photos**
163:2

**phrase**
63:12 73:23
95:15 154:20
241:11

**pick**
4:7 177:5

**picture**
155:24 156:7
157:7 189:2
226:5,19
227:19,22
228:2,4

**pictures**
74:17,18
75:3 215:19

**pile**
158:10

**piling**
220:24

**pistol**
148:18
234:21

**pistols**
43:9 48:14
85:4,9,16,23
86:5 169:4
174:3

**place**
4:5 5:19,23

98:13 145:12
214:7 244:8

**places**
90:3 98:19

**plan**
9:22 39:9,12
59:20,23
62:9 64:7
98:10,14,25
99:4 166:19
207:24

**planned**
98:22

**plans**
9:14,17,20
17:8 61:21
62:6 98:17
210:8

**platform**
15:11

**play**
83:20

**played**
113:16
205:12

**playing**
217:3

**plays**
126:19

**plea**
18:8 35:11
94:18 112:6,
9,12,16
113:2,7
114:22
115:17,19
116:12
117:8,14,17,
18,20 119:13
120:11,21,25
121:1,14,22
127:9,24
129:15,16,22
188:12,13
189:5
190:14,17,19
191:1,7,14,
18,22 192:1,

2,7,8,11,14,
19,21,25
193:1,2,3,5,
10,20,21,22,
23 194:3,9,
16 195:22
197:16
202:23

**plead**
57:2 193:14

**pleaded**
56:13 129:17

**pleading**
52:17 112:2,
5 120:13
188:23
205:25

**please**
4:6 5:18
6:20,24 7:1
50:18 69:13
115:12 156:9
228:5 248:4,
5

**pled**
6:11 12:21
36:25 55:25
65:2 83:9
84:15 112:8

**Poe**
24:4,6
101:10,11,14
102:8 109:13
153:8

**Poe's**
189:11,25
191:5,10
192:23

**point**
23:9 33:5,21
52:1,17 65:7
67:17 71:17
77:20 83:2
84:15 88:9
90:13 111:8,
12 125:23
130:7 153:11
169:16

182:12 219:7
235:14
242:17
244:23

**pointed**
157:20

**Polish**
148:11,12

**poor**
74:21,23
87:16

**popular**
74:12 167:13

**position**
116:2 162:16

**positions**
11:3

**positive**
67:16 178:6

**possible**
75:3 77:4
79:23
144:16,19
181:21
201:25
245:10

**post-high**
10:2,4

**posted**
156:8 157:3,
6

**postponing**
65:9

**potential**
60:22,25

**PPS-**
148:15

**PPS-43**
148:11,12,17
149:9,20,23

**PPS-43C**
150:3,5

**PPS-43S**
150:1

**PPSC**
148:18

**practice**
12:6,13

**practices**
245:6

**prayer**
183:15

**praying**
183:2,7,8,14

**precautions**
77:25

**precise**
67:23

**premises**
63:2,8
65:20,23
66:2 74:2
81:17,21
98:12 99:1,
10,13 123:21
155:2,7
156:12,23
162:22
165:21
178:12
180:10

**prep**
235:25

**preparing**
14:17 15:3
16:1 17:23
18:2,11
203:18

**presence**
138:1 143:14

**present**
109:13,17
152:13,24

**presented**
191:24

**pressure**
32:19
125:15,25
126:2 207:15

**pretty**
11:23 35:24
47:18 54:7,
23 56:20

65:16 67:17,
19,23 81:5
84:18 102:6
109:20
123:25
126:19
136:10
180:13,25
181:15
182:19
189:5,13
201:3,4
211:11

**prevent**
40:17,22

**previous**
23:22 35:10
60:20 124:17
245:14,23

**previously**
64:18 75:20
89:15 164:6

**price**
90:13,20,25
96:10 159:23
160:22 161:5
220:12
222:11

**prices**
35:20 89:13
90:1,5,17,23
91:7,24
93:24 94:23
95:21

**primarily**
84:3 221:4

**primary**
77:9 83:2
97:18

**principally**
43:1

**print**
29:19

**printer**
29:18

**printing**
29:17

**prior**
10:22,23
13:25 23:2
25:1,22
27:17 28:25
29:4,9 34:3
52:17 60:10
66:13 72:4,7
76:13 79:20
86:9 94:15
100:12
120:13
186:17
187:23 188:3
189:21,24,25
191:12

**priorities**
171:20

**priority**
165:7

**prison**
56:20 57:1,4
126:16
130:19
204:25
205:4,13
209:14

**private**
4:8 36:20
37:14 41:11
63:20 64:11
101:3 132:4
164:16
179:18

**privately**
177:20

**privilege**
16:8 24:9
30:19 34:24
35:3 101:16
102:21
103:13
110:11
115:9,25
116:16 123:6
139:24 140:2
195:21

**privileged**
  24:16 116:4,
  6 196:3,10
**probably**
  10:21 36:18
  61:19 62:14
  86:6,12,23
  87:6 104:7
  106:24
  134:24 137:9
  157:16
  185:15
  212:23
  214:11 225:3
  226:16 236:5
**probation**
  57:6 126:10,
  16 130:9
  189:3 195:10
  198:23 199:3
  205:8,13
**problem**
  92:10,11
**proceeding**
  4:9,14 18:11
  107:16
  188:12
**proceedings**
  5:1 17:25
  28:25 29:5,
  10 107:9
  119:13
  128:17
  129:22
**process**
  59:7 64:14
  101:6 135:7
  151:24
  158:15 159:5
  168:8 181:22
  182:6 184:6
**processes**
  125:24
**products**
  96:14 140:24
**professional**
  140:18

**professionall
y**
  240:13,16
**proffer**
  54:4 56:16
  94:9,13
  101:12
  102:10,13,15
  103:14,24
  104:24
  105:3,6,7
  106:9,12,15,
  16 107:7,12,
  14,20,23
  108:2,6,10
  109:3,14,17,
  24 110:3,5,
  7,18 111:1,
  2,3,6,9,12
  117:7 118:8
  122:12,15
  125:18
  152:20,24
  153:5,8,11,
  17 154:10
  159:24
  180:15
  185:2,3,17
  186:5,8,10,
  24 187:3,15
  188:3,10
  190:9,12
  191:13 197:3
  198:4 201:8,
  11 209:20
  228:14,17
**proffered**
  201:3
**proffers**
  186:17
**profile**
  136:12 137:5
**profit**
  21:5 27:5
  30:17 36:9,
  11 38:24
  39:23,24
  48:21 49:2

  50:14 59:5
  68:12,15,18
  69:11 70:14
  71:18 72:4,9
  73:4 74:3,11
  79:2,24
  80:12,13
  81:16 82:5,
  8,15 83:6,24
  92:3 94:8
  95:8,11,23
  96:21 97:7
  124:4 135:17
  149:19 155:8
  156:20
  159:20 160:7
  161:4
  163:10,15,20
  172:23
  173:20
  174:22 185:1
  208:7,14
  241:8 242:14
  245:12
**profiting**
  32:24
**profits**
  37:1,6,15
**progress**
  181:3
**prohibited**
  158:21
**promise**
  60:16 107:2,
  8,15 108:5,9
**promised**
  60:21,25
  108:14 109:1
**prompted**
  99:17 101:14
  102:15
  186:7,9
**proofread**
  171:6
**Properties**
  10:24
**prosecute**
  107:12

**prosecuted**
  45:2
**prosecution**
  18:4 40:8
  101:8 107:3
  108:3 113:17
**prosecutorial**
  125:24
**protect**
  70:20 89:10
  125:6
  151:22,23
  162:15
**protected**
  58:6 195:22
  196:6
**protecting**
  182:10
**protects**
  19:1
**provide**
  50:18 69:13
  178:23 179:6
  194:2,7
**provided**
  5:25 6:3
  18:3 179:10
**provider**
  11:14,21
**proximity**
  217:2
**public**
  40:14 115:20
  128:4
**pulled**
  40:24 70:2
  79:5,21 86:9
  169:8,12
  231:6 232:1
  235:5
**punished**
  19:2
**punishment**
  194:17
**purchase**
  39:17 43:25
  77:9 82:1

138:5 156:19
178:24 179:7
220:13
228:18
231:14

**purchased**
48:3,14,25
49:3 68:4,21
69:3,5 82:6,
12 85:7,9
97:13,14,16,
17 124:21
136:8 137:25
149:5,9,12,
13 158:12
178:22
179:14
217:13,24
218:13 219:9
220:20 227:9
230:25
233:19,23
234:9 235:15
238:15

**purchaser**
39:6 46:6,16
49:19,21

**purchasers**
39:2 80:14
81:17,21
83:12,25

**purchases**
49:11 80:1
81:17 105:17
151:13
167:18 169:4
170:2,7
228:18

**purchasing**
47:4 69:11
159:2 175:23
179:5 219:17
220:23
221:4,16
233:4

**pure**
240:23

**purported**
153:16

**purports**
118:16
142:18
155:24
194:11

**purpose**
23:6 33:19
62:16 63:8
66:2 96:1
135:20 136:9
177:17

**purposes**
83:3 93:13
94:17 140:9
151:4 155:2

**pursue**
57:13 59:3
100:25

**pursuing**
64:6

**push**
229:8

**put**
44:20,24
45:5 63:18
65:11 79:12
157:15
162:16
224:11 229:4
230:14
235:13
242:17

**putting**
44:7 136:15
178:1 180:5

---

**Q**

---

**qualified**
63:1

**Queen**
108:18

**question**
6:17,20 7:4
19:7 23:22

24:12 30:21
31:16,17
34:25 35:2
49:5,6 93:13
101:18
102:23
107:13
110:13,15,24
115:11
116:25 123:8
158:20,24
159:5 160:11
161:1 179:13
195:25
204:3,5
205:23
230:24
246:4,7,9

**questioning**
124:17
245:14,23
246:1

**questions**
6:14 7:23
46:14 69:8
70:10 71:25
122:12,13
152:14
157:25
158:23
186:25 188:1
207:19
210:21
238:6,8
246:2,11,16,
17,19

**quickly**
92:19

**quiet**
217:6 239:16

**quietly**
215:20

**quite**
33:24 171:20

**Quizzy**
184:5,7

**quote**
20:14 43:8

45:21,22
46:1 73:23
86:13 94:21
106:1 115:2
123:10
132:20
133:24
134:4,16
135:3 147:14
159:16
183:11
199:24
238:13 241:9

---

**R**

---

**racks**
213:24

**raining**
53:9

**ramped**
220:15

**random**
66:25 67:5

**randomly**
245:16

**range**
126:6 195:5,
9 197:8

**rapper**
220:5

**reach**
112:12

**reached**
112:9 128:18

**reaching**
128:17

**read**
14:11,18
127:11 133:7
142:24
143:21
144:2,25
145:18
147:2,6
148:8 153:25
154:1 156:17

161:19,21
164:13
175:15
188:15,24
200:1 203:17
**reading**
14:10 200:10
**ready**
64:22 118:12
132:11
**real**
36:5 70:2
93:19 166:20
**realize**
174:11
**realized**
33:24 200:7
**reason**
6:19 7:1,21,
25 8:4 32:15
76:19,22,25
85:14,21
112:5 124:2
131:7 133:12
135:15
137:22 138:4
162:14
178:23
179:6,11
217:1 239:3
241:2 248:5,
7
**reasons**
58:1 124:9
200:20
**recall**
10:25 11:24
26:3 27:1
28:9,18
30:11,25
39:11 53:17
55:15 57:12,
20 62:15
63:16 64:21
65:19,22
68:3 71:2
84:5,10
86:4,11

93:20,24
94:2 97:12,
14 99:12,16,
17 102:7,10
106:12,15
109:7,23
112:15
143:17
144:10,24
146:24 150:9
154:5,9
155:1 159:19
162:1 164:18
166:10
175:22
176:21,25
180:9,18
182:11,15,23
183:2,3
184:24 186:7
192:9 233:22
238:11
239:2,20
241:7 242:24
**recalled**
86:25
**receipts**
222:11
**receive**
108:7,10
113:19
121:17 128:2
247:1
**received**
114:25
121:11 126:9
205:7
**receiver**
41:21
**receivers**
41:24 42:4,8
**receives**
173:18
**receiving**
13:25 112:15
126:16
**recent**
180:14

182:15
**recently**
230:22
**recess**
50:9 98:6
139:11
175:18 211:2
**recognition**
167:3
**recognize**
8:11 13:16,
19 61:6
118:13 137:2
155:16 157:6
226:17
**recollection**
6:15 94:17
155:6
160:13,20
177:4 178:7,
10,19 183:22
**recommend**
194:17
198:12
**recommendatio
n**
121:24 197:7
**recommended**
69:15 122:3
195:11
**record**
4:2,4,6,25
5:1,20 6:13
50:8,12
77:10 98:5,9
139:10,14
169:14
175:17,21
211:1,5
234:17,20
246:21,23,25
247:3,4
**recorded**
153:6
**recording**
4:5

**records**
79:25 98:23,
24
**recovered**
51:1,5,6
52:13 232:6
**red**
81:5
**redirect**
238:7
245:23,25
246:18
**reduce**
92:24 93:2,7
**reduced**
90:23
**reference**
53:1 61:17
106:3 164:23
**referenced**
69:14 148:13
**referred**
164:23
**referring**
33:12,16
41:20 78:13
123:23 128:8
197:22
**reflected**
179:11
227:18
**reflects**
156:2
**refrained**
233:4
**refresh**
94:16
**regarding**
231:10
232:14
**regular**
12:6 59:2
72:17 100:7
**regularly**
12:12
**rein**
75:13

**related**
4:20 17:24
18:10 52:20
**relation**
18:4 201:24
**relationship**
90:15 95:19
224:13,18
236:15,18
**relevance**
19:19,24
20:4,8,20
26:20,24
27:15,19
28:2,7,17,20
29:2,11,20
30:7 32:13
34:14 37:3,
7,23 38:2
39:1 41:16
42:5 44:14
50:16 51:11,
18,23 52:4,
12 53:3,13,
20 55:11
56:4,17 57:5
59:8,13
60:13,18
61:18,22
62:7 63:3
83:7 84:1
90:2 91:12,
16 99:15
101:9 104:6
105:18
107:10,17,24
108:13,16
113:5,11
114:19
122:19,22
127:22 132:2
133:15
141:1,5
142:2 146:1,
22 147:9,15
148:16
149:1,4,10,
25 150:10

176:4,11,15,
23 177:2,7,
13,23 178:5
206:10,17
208:8,15,20
209:2,15,22
244:15,18
**reliable**
43:24 66:13
**remain**
16:18,21,23
17:1,6,11,
16,22 18:21,
24 19:5,17
30:9 205:21
206:23
207:6,13,22
208:4,10,16,
21 209:3,10,
17,24 210:6,
10,14,18
**remember**
11:22 14:14
25:4,15
26:7,17 27:8
28:4 34:2
39:3,7,10,20
41:12,25
42:2,16,18,
20,21,22
50:23 51:7
53:4,15
54:14,22
55:2,16,17,
20,21,24
56:5,8 57:23
60:19,21,24
62:3,4 64:23
65:15,24
67:22 68:1,
6,8 69:17,23
70:1 71:4,
17,19 77:15
78:8 82:11
83:17 84:14,
19 85:1
86:1,7,8,9,
21,22 87:1,

3,11,12
91:25 92:22
93:23 94:1,
4,6,8,9,10,
12,14,24
95:5 100:2,
13 101:1,2,
5,6 104:13
108:18,22
109:25
114:22 119:7
125:14
127:15,23
132:3,5
135:22
138:2,9
141:23
143:12
144:11
153:14
154:12
155:3,5
157:5,10,21
159:13,22,23
160:3,6,18,
21,22 161:5,
8,10,12
162:24 163:7
165:18 166:1
168:3 176:5,
9 177:3,8,9
181:6,11,14,
17 183:12,
14,24
185:18,25
186:3,21
187:16,17
192:18,24
193:12
198:13,21
199:4 200:10
203:23
204:18
213:22
215:10
219:12 221:9
224:3,20
227:22 230:9
231:6,19

232:8 235:7
241:1 242:23
243:1,15
**remembered**
183:5
**remind**
187:9
**reminisce**
84:22
**Remley**
16:17,25
17:3,9,13,17
18:22 19:8,
10,12,15,17,
22 20:2,7,
13,18,23,25
21:4,7,18
23:4,9,25
24:7,22
25:12 32:10,
16,19,22
33:6 35:16
36:4,13
37:1,15
38:1,8,13
39:8,11
44:12 57:8,
12 58:8,22
59:12,20,23
60:6 61:12
62:1,18
87:14 88:23
89:5,6 92:23
93:5,14
95:25 98:25
99:12 100:25
101:22
102:1,5
104:4,9,14,
18 105:6
106:1
110:18,25
111:9,14
126:2
129:17,21
130:2,7
133:13,17,20
134:4

135:16,19
137:7,25
141:25
143:1,6,9,15
144:8,16,21
145:4,22,24
146:13,14
147:4,8,13
148:4 150:8,
14,22 151:11
152:8 164:15
165:2,20
166:7,8,12
171:2 174:20
175:7,23
176:8,13,21,
25 177:5,11,
16 178:8,10,
19 186:18
205:18
206:1,7,18,
25 207:8,15,
24 208:6,12,
18,23 209:5,
12,19 210:1,
9,13,17
221:23
223:12,18
225:11
233:14,18
239:4 242:21

**Remley's**
38:19 105:23
111:19 136:5
171:2 176:10
178:14

**remote**
5:1

**rental**
63:10

**rented**
63:7

**repeat**
5:23 31:17
72:6 76:17
78:7 80:22
85:20 91:9
108:8 114:5

120:16
122:25
124:18
130:22 154:8
189:24 191:8
204:5

**repeated**
125:3

**repeatedly**
70:17 72:11,
12

**Repeating**
175:23

**repetitively**
39:24

**rephrase**
6:21

**reply**
179:23

**report**
14:16 43:19
85:5 152:15
166:25
167:17,23
168:8,14,18
234:15
242:25 243:6

**reporter**
4:22,25 6:22
132:12 139:1
161:21
225:18,19
228:12

**reports**
39:17 85:11,
15,22 168:24
169:20
170:1,6,11,
22 171:11,13
173:9,11,14,
18,19,22,23
174:2 234:23
235:2 243:2

**represent**
5:15 153:15
176:17

**representatio
n**
93:17

**representativ
e**
53:10 187:14

**representativ
es**
109:16

**represented**
7:8

**representing**
93:14

**reputation**
25:18,19

**request**
7:3 200:4

**requested**
195:4

**requesting**
7:4 199:12
204:7

**required**
85:4,11
168:17
234:20

**requirements**
243:12

**requires**
56:22,23
60:1 199:19

**research**
15:2

**resell**
41:15 42:8,
13 43:9
47:20 48:21
49:2 64:16
66:3,21
80:17,24
81:1 82:6,13
83:11 88:3
100:11,24
120:20
131:19 143:7
177:12 179:4
219:15

233:5,16

**reselling**
34:21 69:22
72:9,13,14
73:4 74:3
76:20,25
77:13,20
78:4 81:16
96:2 123:11
124:3 219:9,
16

**reserve**
103:19 140:8

**residence**
5:19

**residential**
217:7

**resold**
69:11 83:6,
24

**respect**
39:12

**responded**
87:7

**response**
86:11 95:2

**responses**
8:1

**responsibilit
y**
162:19

**restaurant**
139:3

**restock**
72:23

**restocked**
73:3

**result**
115:3,16
116:15

**resume**
64:18

**Retrieving**
225:17 228:8

**return**
60:17 136:3

revenue
  11:7,10
review
  14:13 17:24
  18:3,10
  127:10 190:1
  226:2
reviewed
  94:19 127:7
  191:15
  192:15
  203:8,21
reviewing
  192:9
revoked
  14:2,5
rid
  92:19 93:15,
  21
rifle
  29:14 30:6
  148:19 176:2
rifles
  167:18,24
  168:2,7
right
  16:18,21,22
  17:1,6,10,
  15,21 18:20,
  23 19:5
  29:21 30:9,
  23 33:14
  40:25 68:12
  73:12 75:17
  80:8 96:5
  97:16 103:19
  108:20 130:9
  131:23 132:6
  140:9 145:10
  157:9,14,23
  158:13 163:7
  164:7 166:5
  172:10,12
  173:6 191:3
  192:7 194:4
  200:1 205:21
  206:23
  207:6,13,22

208:4,10,16,
21 209:3,10,
17,24 210:6,
10,14,18
211:10
215:14
218:23
219:18,21
221:5 222:19
223:13,19
226:9,11,13,
20 227:6,10
228:2
229:13,17,21
247:2
rights
  205:23
risk
  108:4
  171:17,24
  172:14
  174:7,9
  241:17,21
risked
  40:7
riskier
  168:9,11
robbery
  91:5
rode
  66:19 67:9
role
  83:20 113:16
  126:19
  205:13
romantically
  176:14,21
room
  13:20 75:6,
  17 78:6
  162:6 180:16
  187:12
  213:4,6,15,
  16 214:6,9
  215:6 216:12
  217:3
Ross
  4:15

roughly
  238:7
Roy
  4:10 5:4
ruined
  84:22
Rule
  103:21
  115:23
rules
  6:12 7:6
  200:21
run
  44:11,20
running
  23:6 44:9
  63:9 64:21

──────────────

            S

──────────────

safer
  165:8
Safety
  157:11
sale
  37:15 85:5,
  11,16,23
  90:12 166:25
  167:18,23
  168:8,14,18
  169:21
  170:1,6,22
  171:11
  173:10,18
  179:18
  227:11
  228:18 237:8
  242:25
  243:2,6
sales
  37:2 60:10,
  20 64:11
  75:21 76:1,
  12,13 77:1,
  5,11 91:8,10
  98:21 101:3
  131:18

164:16
221:20
234:14,21,24
235:2
Sam
  83:16 180:23
  215:1
saying
  6:9 14:8
  33:1 36:3
  43:21 45:16,
  23 59:14
  60:14 61:23
  67:25 75:25
  88:18 89:11
  93:12,18
  94:24 107:11
  108:25
  114:23
  121:15
  146:13
  149:13 150:2
  154:12 155:7
  157:14
  158:10 159:3
  161:2 162:8
  163:11 167:4
  173:16
  183:12,15
  184:12
  185:7,22
  188:16
  190:11,16
  192:6,8
  195:14,17
  197:12,18
  199:11,15
  200:1,4,6,13
  201:18
  202:23
  203:14 216:8
  222:13
  224:10
  231:5,6,25
  240:5 243:21
  244:19
says
  46:5 119:18

132:19
133:8,24
134:16
135:3,6,11
137:12,16,20
143:1 156:8
159:16
193:13 194:5
**SCCY**
53:22 69:15
99:19 230:25
231:10,13
232:15
**scenery**
180:7
**scheduled**
65:8
**scheme**
76:15 78:7
87:15 95:22
100:18
125:10
**schemed**
96:1,5
**school**
9:25 10:1,2,
4,16 19:9,
16,18,22
26:14,15,16
28:12
**sciences**
10:11
**screen**
75:18
**screwed**
161:25
162:3,4
**scrutiny**
167:8
**seal**
233:12
**searching**
42:2
**second**
53:8 54:16
67:19 79:13
100:6 117:7

135:2 144:2
153:21
155:22 156:7
157:6 161:17
226:6 227:17
**secret**
40:10,13,14
**secretive**
237:16
**section**
119:2 192:19
193:6 245:3
**see**
38:17 59:11
75:3,18 80:4
88:25 114:12
119:2 132:13
133:2,23
134:2,11,16,
19 135:2,10,
14 137:10,
17,23
142:15,22
144:7,23
153:23
155:24
156:7,10
159:15
161:14,17
164:10
165:21
169:17,20
181:10
184:20
186:11
213:2,20
220:24 222:9
223:15
225:22
227:15,17,19
244:1
**seeding**
136:9
**Seeds**
21:25 22:1,
3,5,8,14,21,
24 23:6,10,
15,18,24

105:16,21,24
106:7
**seeing**
174:16
227:22
**seek**
62:12 243:12
**seized**
53:23
**self-interest**
181:23
**selfless**
182:10
**sell**
21:8,15,19,
24 27:12,18
29:23 30:14
32:5,11,15,
16,19 34:6,
16 35:17
37:25 38:14
39:13,24
41:1,8
45:11,21,24
46:2,4 48:6
49:4,8 50:15
51:9,15
58:2,7 59:22
68:11,14,17
69:16 72:23
74:12,16
77:17 82:18
86:18,22
90:1 93:7
96:17 136:3,
11 137:22
140:24 144:6
145:12
148:10
149:19,23
150:5,8
154:4,6,11,
15,16,23
155:7 159:2,
4 165:22
166:23,24
167:4 171:12
177:21 185:8

218:25
231:17
243:14
245:21
**seller**
69:17
**sellers**
90:6,7,9
**selling**
11:7,10 18:5
21:4 22:19
27:5 32:7,
23,25 33:2,
6,9,19,22
34:18 35:20,
22 36:8,20
37:11,21
38:9,20,24
39:22 40:18,
23 41:3,5
45:3,18 47:1
50:14 52:6,
18 59:25
61:13 63:20
64:13,18,20
70:3,4,7,14
71:18 72:3
73:16 74:8
75:23 77:16
78:21 79:1,
24 80:2,4,
11,13,18
81:6,12
82:4,8,15
84:16 94:7
96:14 97:7
100:1 111:25
125:10
129:18
133:10,21
135:12,17
141:4,10,21
143:10,15
144:7,23
145:5 147:25
150:12 151:8
155:9 156:20
158:21

159:17,20,21
160:2,7,15
163:9,14,19
164:5 165:7,
11 172:23
173:20
174:22 176:8
177:17
184:25
185:4,12
208:6,13
209:1,7
220:2,6
232:18
235:22 237:5
241:8 242:13
245:12,17

**sells**
66:10

**semi-auto**
168:6

**semiautomatic**
29:14 30:6

**send**
81:16,18
168:17 174:2
234:16,18

**sending**
83:12

**sense**
37:12 128:14
140:16
141:16 164:9
165:7 166:18
167:15
171:25
173:25
174:16,19
180:8 181:3,
20 184:16,23
187:4,11
188:9 189:7
193:7 194:1
200:12
215:13
216:22 219:5
220:19 223:6
229:6 232:23

235:25 239:1
241:15

**sensitive**
4:7

**sentence**
108:7,11
113:19
119:15
121:24
126:9,12
133:2,7,23
134:16
135:2,6,11
137:16,20
142:24
143:2,21
144:2,25
145:19 147:3
148:8,14
154:1 159:15
161:17
164:13 195:4
197:7 201:24
202:4
203:13,15
205:7,14

**sentenced**
12:21

**sentences**
133:23,24

**sentencing**
18:9 94:19
112:21 126:5
127:7,10,13,
16 194:17
195:5 198:1,
14,24 203:5,
11,21 229:4

**separate**
105:2 150:12
192:5,8
201:8 235:24

**September**
25:3 38:4,
10,14 39:15,
19 52:16
55:25 64:16
72:4 77:5

82:1,5,7,14,
21 83:5
97:10 99:24
100:10
242:9,11,20

**September/
october**
25:5

**serial**
230:21

**serious**
56:20

**served**
8:16,19 13:9

**session**
184:2

**set**
54:19 63:2
200:7,22,24
240:5

**setting**
215:15

**settings**
12:9

**setup**
226:17

**seven**
161:9

**seventh**
19:9,16
223:18
225:15

**several**
135:8
137:13,17
143:7 170:1
174:2

**severe**
114:1,7

**share**
37:1,6,14
38:24

**sharing**
96:20

**sheet**
248:4

**shelf**
157:8 214:1
221:3 244:6,
11,12 245:4,
5

**Sherman**
4:12

**shield**
182:3

**shiny**
176:3

**shipping**
244:20

**shirt**
79:8 230:7,8
241:1

**shirts**
229:24
241:2,3

**shoot**
218:25

**shop**
98:18

**shot**
149:2

**shotgun**
39:20 135:3,
12,17 137:2,
3,4

**shotguns**
39:16,18
135:8,20,22
136:9,10
164:20
165:5,8,18
166:4 167:1,
10 168:10

**show**
25:2 31:1
33:16 37:18
42:15 50:22
54:22 101:2
132:4,8
135:25 142:4
147:11,14
148:1 152:3
155:11

223:22
235:24
237:18

**showed**
45:9 79:24
99:24

**showing**
25:1 189:21,
25 197:3
198:4 203:8

**shows**
21:11,16,19,
24 27:25
30:22 33:9,
19 34:3
35:20 38:9,
24 50:21,24
73:16 74:9
82:18 98:20
131:22
136:11
140:24 141:4
145:3,5,7,
11,14,17
147:6,23
150:11
223:12
235:21,23
237:7,8

**sic**
102:11
133:24
146:18

**side**
198:7 214:4
244:11

**sidestep**
125:5

**sign**
119:5 123:3
129:7,11
157:3,13,16
171:2 202:3
246:23 247:1
248:5

**signage**
155:6

**signature**
119:3 142:15
171:6 248:1

**signed**
122:6,10
129:5 130:2
142:19
189:8,19,20
190:1,14
191:7,14,25
192:1,22
201:7,11,12

**significant**
195:13

**significantly**
77:8 91:4

**signing**
53:7 63:16
106:15 113:2
119:7 120:14
121:9,18,25
189:23 190:2
201:23

**signs**
155:9

**silent**
16:19,21,23
17:2,7,11,
16,22 18:21,
24 19:5
29:22 30:10
205:21
206:24
207:7,14,23
208:5,11,17,
22 209:4,11,
18,25 210:7,
11,15,19

**silver**
233:2

**similar**
45:1 146:20
172:3

**simple**
44:9

**simplified**
190:24

**simply**
71:17

**single**
106:9 123:15
155:3

**singular**
178:25

**sir**
211:8 226:1
227:15
228:7,10,14,
21 230:16
234:13
235:9,13

**sits**
75:7

**sitting**
14:5 92:2,17
96:6 157:8,
15 160:19,23
169:19
172:22
182:23
187:12
204:13
205:11
216:21
218:20
245:10,18

**situation**
137:4

**Slade**
33:13 36:19
88:23 89:10
101:2 131:1,
3,5,7,21
132:20
134:23,24
136:17 137:7
138:1
149:11,14
224:18,24
225:1,2

**Slade's**
42:14

**slang**
184:12

**sleeping**
230:8

**slower**
161:22
220:17

**small**
73:25

**smaller**
75:6

**Smith**
68:5,6

**sneak**
202:13

**sold**
28:5 30:12,
16,22,25
31:8,15
33:23 34:8,
11,13,15
35:23 36:11
37:13 38:15
39:20 41:17
50:19 51:2,4
53:11 55:22
69:12 71:15
72:19 80:9
82:12 83:8
86:16 120:19
131:22 132:4
136:1 146:13
150:11 161:2
164:16 166:9
186:6 188:8
231:18,21
232:25

**solid**
186:5

**sort**
60:23 107:2
109:1 165:23

**sounds**
102:12
159:14
164:25
184:18

**source**
43:24 66:6,
13,21

**Soviets**
150:4
**space**
63:8 98:11,
14,23 99:1,5
214:20
217:11 221:3
244:17,24
**span**
97:4,9
**speak**
17:8 62:5
97:23 115:18
146:18 210:8
218:18
**speaking**
216:25
**Special**
164:15
**specific**
47:25 55:15
56:6 66:23
72:10,12
74:4,20 82:3
94:24 123:13
130:15
160:11
161:11
189:18 223:8
230:23
**specifically**
14:12 15:23
22:17 24:25
26:2 50:23
53:4 55:14,
16 63:4
71:5,22
86:22 99:21
100:3 104:13
113:13 132:3
149:6
154:12,24
159:23
160:14
162:2,24
165:18
167:3,12
174:24 200:9

204:10
217:18
231:8,12
235:7
**specifics**
82:3 84:3,5,
10 198:20
**speculation**
20:17 22:16
61:15 70:8
71:21 72:24
75:5 77:14
89:2,8,22
90:8 91:21
92:4,15
93:1,11
106:4 124:5,
10,23 126:13
128:19
130:21,24
135:21
143:13
144:18
145:15
151:15 164:1
167:11
174:23
181:25
186:20 208:3
209:16,23
**spend**
181:11
**spoke**
16:24 18:16
24:14 175:2
179:19
206:13 212:1
218:14,16
**spoken**
17:3,18
205:18
206:18
**spook**
146:18
**Sporting**
5:16 13:23
42:14 66:17
137:6,13,24

143:7 177:1
**Sports**
53:18 54:9,
11 55:6,9
**spot**
173:4
**spouse's**
9:10
**spreadsheet**
221:19,22
222:7,13
**spring**
21:8 23:16
24:1 34:1,2
180:12
211:20
**stairs**
213:3
**stake**
60:17,22,25
**standard**
196:19
**start**
48:1 180:4
187:8 223:25
232:22 242:4
**started**
24:25 33:25
36:18 57:15
64:14 83:12
101:1,5,6
102:2 220:16
**starting**
60:1 133:3
**state**
4:24 5:18
10:7
**stated**
159:16
161:20,24
218:4
**statement**
5:1 232:22
**statements**
153:13
**states**
4:11 109:16

112:7,10,16
113:25
114:6,14,25
115:7 116:3
117:3 118:21
121:11,18
128:2,22
129:6,10
168:1 193:15
196:2,10,14
197:16,23
**Statutory**
132:17
**Staub**
140:13,17,
22,25 141:3,
8,9,20
142:16,19
143:18 146:5
147:19
148:23
149:17
222:15,24
224:2
**Staub's**
151:19
224:13
**stay**
29:21
**step**
138:22
218:24
**stipulated**
119:16
**stock**
135:9 165:12
176:2 177:25
224:11
**stone**
200:7
**stop**
24:6 38:6
53:6 54:3
81:12 82:8
100:14,23
141:10,21
148:4,6
233:6

Lane Koroly Vol 1
April 13, 2026                                                        48

**stopped**
  23:19,24
  24:21 27:8
  38:3 39:15,
  19 52:6,15
  55:18 64:13
  81:25 82:4,6
  83:10
  100:10,12
  141:7 169:13
  233:22
  241:23
**store**
  74:17,18
  75:4 98:25
  99:4,9,13
**stories**
  105:1 161:24
  162:2
**storing**
  12:10
**story**
  17:13 78:18
  104:15,19
  151:19,23
  207:1
**straight**
  17:13 78:18
  207:1 213:6
**straightforwa
rd**
  20:24
**stranger**
  240:3
**strategic**
  39:8
**strategizing**
  116:15
**strategy**
  43:4 60:6
  103:17
  115:15 116:8
  145:5,7
  151:12
  166:12
  195:23 196:5
**straw**

39:2,5
49:19,21
80:14 81:17,
20 83:12,25
**stress**
  211:13
**stressful**
  102:6 184:1
  211:11
**strict**
  25:23 26:9
**strike**
  13:18 44:24
  45:25 58:11
  69:3 85:7
  94:21 113:24
  118:19
  127:19
  147:17 152:8
  153:25
  160:25 166:6
  167:16 175:6
  178:9 242:25
**strokes**
  84:20
**strong**
  183:4,19
**stuck**
  232:12
**stuff**
  14:15 39:15
  40:2 41:2
  44:10,17
  45:7 46:15
  47:1 55:19
  57:16 67:20
  69:20,24
  71:25 74:15,
  18 76:10
  77:22 78:10
  80:15 81:13
  83:17 84:17,
  21 88:21
  89:11 95:21
  96:7 123:13
  127:5 130:15
  136:2,11
  141:13,24

144:13,15,19
150:20
159:14
161:11
162:20 164:8
166:1,17
169:8 171:7
172:19 179:1
181:10,19
182:7,16
184:3 185:23
186:6 187:7
188:14
191:20
193:5,8
197:24
199:8,15
200:21,22
202:13,19,20
203:23,24
204:11,12
205:24,25
222:5 223:7
224:10
227:11 229:3
230:2 235:8
236:25
237:15,19,20
239:16 242:4
**stumble**
  181:2
**style**
  244:2
**subject**
  7:19 103:20
**subjectively**
  200:15
**submachine**
  150:3
**submit**
  62:13 64:22
  85:4,11,13
  129:12
  167:17,23
  171:11
**submitted**
  64:1 65:3
  85:15,22

86:3 127:8,
13 129:21
168:15
170:1,6,10
203:11 204:7
**submitting**
  65:5 120:18
  173:9,11,14
**subpoena**
  8:14,17,20
  13:9,25
**substance**
  15:13 24:14
  106:12
  111:13
  120:15
  121:19
  139:18
  147:13
  164:18
  180:18
**substantial**
  198:16 221:8
**successful**
  76:4,10
**sudden**
  74:8
**suggest**
  163:8,14
**suggesting**
  76:14 163:19
**suit**
  13:13 14:7,
  10,11 89:3,4
**Suite**
  4:16,19
**summarized**
  86:20
**summarizing**
  153:12
**summary**
  153:17
  190:24 203:3
**summer**
  23:16 34:2
  39:14 65:25
  95:18 179:22

217:19
219:7,17
220:20
234:10
235:14
238:18,21,24

**Sunday**
165:13

**super**
44:9 183:13
214:10 221:1
230:17 236:6

**supply**
243:16
245:11,19

**Support**
4:18,23

**suppose**
57:19 167:9
214:16

**supposed**
65:12,15
81:13 204:24

**sure**
11:23 12:8
27:21 28:14
31:8 34:10
41:12 50:5
54:7,23 61:9
65:16 67:15,
17,19 70:21
77:10 86:16
99:11 106:5
109:18,20
110:6,9
111:20
113:18
122:23 123:2
125:20
126:14
128:24
136:10 137:2
138:20
141:6,18
144:15
150:12 153:7
157:15
165:17,23

168:21
170:21 173:3
175:12,13
177:9 178:15
180:13
181:15
182:19
184:13 185:7
186:21
187:16
189:13
204:23
205:17
207:16
210:24 216:1
218:22
221:24 222:8
233:20

**surplus**
148:20

**surpris-**
190:21

**surprised**
245:15

**surprising**
105:12
190:18,22

**suspect**
76:19

**suspicion**
13:4

**suspicious**
168:24
169:2,5,21,
23 170:23
171:12
173:4,10,12,
15,19,22
174:7

**swag**
241:5

**swear**
5:2

**switch**
30:1

**switched**
39:16,18

**sworn**
5:11

**systematicall
y**
36:8,11 39:9
43:25

---

**T**

---

**T-SHIRT**
229:21,23
240:19,22

**table**
22:11 33:9,
10,13,15,16
37:10,18,19,
20 38:23
42:15 97:22
131:25 132:1
135:4 213:23
214:11,12
216:9

**take**
4:5 7:2
10:22 21:1
50:3 77:24
97:19 98:1
134:17
135:25
138:10
162:19
165:9,20
171:18,23
172:14
210:22
215:19
225:12
226:1,5
234:11

**taken**
4:9 50:9
98:6 139:11
175:18 189:2
202:12 211:2
226:8

**taking**
74:17,18
75:3 177:5

**talk**
24:3 54:20
73:25 121:4
185:20,23
210:2
215:18,20,25
222:14 224:7
236:22,23
237:6 239:14

**talked**
54:1 78:20
94:8 104:23
105:9,11
106:23
108:21
110:23
136:13
139:22
159:24
160:3,23
180:2 182:4
187:2 190:9,
11,12 200:7
216:20
219:16
245:24

**talking**
23:20,24
24:6,21
36:18 59:2
73:18,24
74:9 76:9
78:11 95:21
96:7 101:25
136:19,22
141:23
149:6,16
159:13 161:5
180:21
181:19 182:3
187:6,8,13
188:14
216:19
219:4,21
223:2 224:21
236:19
237:14,17,20

**talks**
204:11
**tallying**
244:3
**tapped**
97:22
**target**
66:6 87:14
88:2,6
159:23
**targeted**
89:6 151:11
**targeting**
88:24
**tattoos**
79:11
**tax**
91:8,10
**team**
23:1 151:3,7
**teamed**
23:5
**teamwork**
151:1
**technical**
10:7,13,16
**telephone**
216:19
**tell**
12:2 25:12
32:22 41:1
46:1 49:1,4,
7 53:11 55:9
68:10 69:12,
20 70:19,23
78:18 80:3,
4,5,6 92:2,
18 95:12
99:25 102:5,
14,19
106:19,21
107:22
118:24 119:9
123:3 125:9
128:6 133:20
135:12,16
154:22

156:14
162:16 181:4
186:13 187:4
209:12,19
210:1 218:2
219:13
230:19
232:3,19,24,
25 239:18
**telling**
36:19 53:18
71:2 86:5,12
93:20,24
94:22 101:3
130:13
154:5,9
159:4,19
160:6,14
162:2,8
166:19
170:13
183:11 184:2
198:21
206:12
**template**
63:14
**Ten**
98:2
**tend**
12:4
**term**
108:17,20
117:20
164:25
184:12 220:5
**terms**
106:18 109:8
114:22 116:7
117:17,18
230:18
**test**
43:13,17,23
**testified**
5:11 45:20
75:20 76:19
87:5 89:12
113:2,7
118:7 130:25

152:23
157:22
170:14 197:6
214:6 222:18
226:22,25
229:20
234:19
**testify**
8:5 13:9
76:24 82:4
94:5 105:20
118:4 158:19
199:24
208:25
**testifying**
23:5 36:7
37:5 86:19
95:25 172:1
197:15
198:23
239:2,20
241:7 242:24
243:1,15
**testimony**
5:25 6:3,5
7:18 22:7
23:23 32:1
33:2 34:19
35:15 38:13
45:8 46:11
54:8,12 60:5
61:2 66:24
67:11 71:16
73:2 74:1
80:10 90:16
97:15 104:18
106:13
107:4,8,14,
15,23 108:15
111:14
113:1,15,16
114:21 115:1
117:12,16
122:5,15
123:14
125:21
126:15
130:11

131:12
136:17
139:19
141:19 146:4
147:19
148:22 149:8
150:21
154:14,16
156:22 157:2
159:25 174:6
178:18
201:22
207:9,17,25
208:19,24
**Texas**
4:12,16,19
5:17,21 8:25
9:5 10:7
42:4,9,12
**text**
12:4,6,13,14
132:19 133:3
134:11
142:22
163:4,13,16
**texted**
179:22
208:19
**texting**
163:2
**thank**
183:8,15
224:12
225:24
228:7,10,13
234:13 235:9
238:5
**thanked**
183:7
**therapy**
184:1
**thing**
25:25 26:1
53:24 69:1,
24 96:25
97:3 100:7
113:13
114:11

| | | | |
|---|---|---|---|
| 124:12 125:4 | 100:7 105:15 | 190:21 | 6,21 196:18 |
| 127:11 | 107:21,25 | 193:11,22 | 198:2,3 |
| 157:6,11 | 108:17 | 194:4,19 | 199:16,25 |
| 162:9,18 | 109:6,19 | 195:8 196:18 | 200:2 229:3 |
| 164:7 172:7 | 112:24 | 199:2,3,21 | 235:4 |
| 173:6,10 | 113:12 | 200:19 | **three** |
| 183:9 184:1, | 114:11,20 | 203:14 | 15:16 54:6, |
| 14 192:20 | 115:2,3 | 204:9,10 | 14 56:6 |
| 198:14 | 116:23 122:4 | 211:14 | 95:19 126:6 |
| 202:11,14 | 123:25 125:7 | 213:7,14,25 | 133:24 |
| 203:4 214:4, | 126:18 | 215:1,2,8 | 140:20 161:8 |
| 5,12 224:4 | 127:4,24,25 | 216:17,20,23 | 179:2 198:22 |
| 225:8 227:25 | 128:20 | 217:9 218:4 | **threshold** |
| 228:5 233:10 | 129:10 131:9 | 219:24 | 195:12 |
| **things** | 133:19,22 | 220:10,11,15 | 197:21 |
| 56:8 94:12, | 134:10 | 222:10,18 | **throw** |
| 19 105:2 | 136:13,16 | 223:2 224:21 | 183:17 |
| 124:6 198:19 | 138:16 | 225:11,14 | **till** |
| 214:3 | 140:19 | 229:6,12,16, | 54:4 97:10 |
| 229:13,17,19 | 141:6,7,12 | 18 230:6 | 170:4 177:20 |
| **think** | 144:13 146:2 | 231:4 232:5, | 191:18 242:4 |
| 20:24 22:15 | 150:11 | 8 233:6 | **time** |
| 25:4 26:17, | 151:21 | 234:22 235:3 | 6:16,17 |
| 21 27:7,16 | 154:24 158:9 | 238:1,4,22 | 16:24 18:16 |
| 34:4 38:3,11 | 159:13 | 240:10 243:4 | 24:4,21 |
| 39:2,15,19 | 162:10 | 244:25 | 25:16 27:5,9 |
| 41:6,22 | 163:6,16,21 | **thinking** | 36:1,17 |
| 42:16,19 | 164:20 | 36:18 199:5 | 39:22 41:3 |
| 43:12 44:10, | 165:17 | 200:10 229:2 | 45:11 48:11 |
| 15 52:13,14 | 167:20,25 | 232:9 | 49:3,7,8 |
| 53:6,7 | 168:6 169:7, | 238:18,22 | 52:7 53:22 |
| 54:10,12,18, | 10,14 | **third** | 54:16 55:5 |
| 25 55:7,13, | 171:16,18 | 109:24 | 56:20 61:16 |
| 23 56:6,18 | 172:4,15 | 137:10,12 | 64:1,20 |
| 57:10,15 | 173:11,14 | 142:22,25 | 67:12,14,15, |
| 59:16,18 | 174:4,18 | **Thomas** | 17,18,19 |
| 61:4,8 64:4 | 175:11 | 4:9,10 5:4 | 68:19 69:2,4 |
| 65:1,8,10, | 176:5,9 | **thought** | 73:1,9,20 |
| 11,13 66:22 | 177:14,24 | 35:23 44:7, | 79:13 80:23 |
| 67:14 68:5,7 | 178:2 | 20 45:1,5 | 84:22 85:2 |
| 69:17 70:15 | 179:13,18, | 51:3 67:21 | 89:3 90:23 |
| 71:12,13 | 22,24,25 | 105:8 125:9 | 96:8 97:9 |
| 79:11 80:2 | 180:16 | 141:13 | 100:6,23 |
| 82:24 83:22 | 181:6,8,9 | 162:25 | 105:13 108:1 |
| 88:1,6 | 182:1,5,9, | 182:6,25 | 126:16 132:3 |
| 89:10,20 | 14,16 184:3 | 184:21 | 137:21 140:2 |
| 96:11 99:2, | 185:13,21 | 192:4,11,20, | 155:3 162:5, |
| 3,6,19,21 | 186:9 187:2 | 24 193:1,4, | 13,22,25 |
| | 189:4,11,14 | | |

Lane Koroly Vol 1
April 13, 2026

52

168:15,18
171:17
174:5,13
175:2 178:25
179:17,19
180:1,9,15
182:15,17,
20,21 183:5
184:25
185:14
186:16
187:21
188:10
189:14
190:6,8
201:12
206:13
212:1,3
215:10
216:21 219:7
220:17 221:2
228:17 229:1
231:1 236:5
241:24
242:10
243:4,24
244:23

**timeline**
83:4

**times**
41:12 54:14
137:13
140:20 155:4
212:18,21,22

**tinkering**
28:22 29:1

**title**
118:19
132:16

**Tobacco**
14:2

**today**
7:8 8:2,6,19
14:5 20:3
92:2,17
127:17
130:11,25
154:14

160:19
169:19
170:5,9
172:22
179:20
203:6,9
204:8,13
205:11
211:10
245:10,18

**toes**
138:22

**told**
24:2 25:22
38:6 47:19
53:15 70:3,
25 71:9
73:20 75:25
76:11 78:7,
23 79:5
83:23 86:7,
9,16,23
88:23 94:13
101:10
103:10,16
116:10 118:4
133:3,8,13,
17 135:7
141:10,21
154:3,6,11,
15,16,24
159:25
161:9,20,24
166:12
169:7,15
186:23
208:13 218:8
219:15 232:6
238:2

**Tom**
5:15 13:14
18:17 25:6,8
34:9,16,20
40:24 42:1
45:16 48:9
49:12 52:13
62:10,12,15
63:8 66:1,5,

6,12,16,20,
25 67:12,22,
24 68:21
69:5,10
70:13,23
71:2,8,17
72:3,8 73:3
74:1,2 75:25
78:3,16,20,
25 79:23
80:11,16,17,
24,25 81:15,
21 83:21
84:6,25
85:9,10,15,
22,24 86:4,
11 87:5,15
88:1,24
89:6,25
90:5,11,17,
19,24 91:7,
11,19,24
92:9,10,12,
13,18,24
93:6,7,15,
20,21,24
94:2,6,20,22
95:1 96:20
97:6,13,16
99:12
105:14,16
106:2,7
107:23
112:21
113:10,12,
16,20 114:2,
8,16 115:1,6
116:19
117:4,21
120:7,19
121:4,10
122:13,16
123:9,15
124:2,14,15,
20 125:2,9,
16,25 126:3,
17,21
127:14,21
128:1,4,16

133:11,25
134:4,9
135:12,16
137:25 138:4
143:8,10
144:4,6,9,22
145:2,3,5,
13,16 149:5,
9 151:16,17,
22 169:25
170:18,24
171:10
172:23
174:1,21
175:6,24
177:6 178:8
179:18
182:11,23
183:2,7,11,
22 187:1,15
188:11 189:9
190:20 191:5
196:23
204:15
205:12
208:13,25
209:6 210:2
211:17
229:24
240:10,11

**Tom's**
65:19,23
91:6,14
92:2,6 95:7
98:11 99:1,9
104:17
143:16
144:5,17
182:23

**ton**
74:8 77:16

**tone**
237:22

**tool**
201:19

**top**
163:25
245:4,5

| | | | |
|---|---|---|---|
| **topics** | 158:2,17 | 163:23 | 134:20,22 |
| 236:23 | 159:8 179:16 | 165:15 | 136:17,24 |
| **totally** | **transferred** | 168:14,17,23 | 137:7 138:1 |
| 97:22 233:20 | 42:9,20 | 169:3 224:4, | 149:14 225:2 |
| **touch** | 50:24 168:19 | 8 238:15 | 239:20 240:8 |
| 38:6 | **transfers** | 242:8 | **Turner's** |
| **tour** | 230:21 | **trust** | 135:15 |
| 65:13 | **treatment** | 131:10,12 | 151:20 |
| **traces** | 114:25 115:7 | **trusting** | 224:18 |
| 231:7 | 116:20 117:3 | 95:20 | **TV** |
| **tracing** | 128:2 | **truth** | 217:9 |
| 230:16 | **trick** | 128:6 130:13 | **twice** |
| **track** | 130:14 | 152:2 201:21 | 140:19 215:1 |
| 221:24,25 | 187:22 | **truthfully** | **two** |
| 222:5 | **tricky** | 8:5 | 10:5 21:13 |
| **trade** | 202:14 | **try** | 34:16 36:14 |
| 232:17 | **trip** | 6:18,20 7:2 | 42:16 48:11, |
| **traded** | 161:11 | 79:13 89:20 | 14 49:11,22 |
| 41:2 45:17 | **trouble** | 125:5 134:18 | 55:22 56:5,6 |
| 70:4 79:7 | 20:14 36:19 | 151:21,23 | 65:4 68:3, |
| 80:5 86:17 | 52:2 57:15 | 162:14 181:1 | 11,14,17,21 |
| 185:8,13 | 63:20,22 | 185:21,22 | 105:2 106:23 |
| 233:1 | 64:21 70:21, | 195:18 | 109:18 |
| **trafficking** | 22 125:7 | 196:22 | 133:23 144:1 |
| 52:3,8,11,20 | 130:12 | 225:13 | 152:23 153:1 |
| 53:2 55:10 | 133:10,21 | **trying** | 161:8 179:2 |
| 56:3,12,15, | 134:25 | 23:21 45:14 | 182:24 183:1 |
| 19 | 241:17,21 | 88:19 89:10, | 192:3 212:3, |
| **training** | **truck** | 17 100:17 | 4 229:24 |
| 10:13,16 | 53:9 165:10 | 130:14 | 231:24,25 |
| 173:4 | **true** | 131:18 | 240:5 241:2 |
| **transaction** | 21:7 29:16 | 161:11 | **two-year** |
| 34:20 37:14 | 31:5,10,18, | 162:20 | 20:1 |
| 43:5 | 23 33:5 | 181:21 | **TX** |
| **transactions** | 46:6,16,19 | 187:22 | 132:20 |
| 41:11 | 47:8,11,12, | 198:21 | **Ty** |
| **transcribing** | 13 48:4 | 200:24 223:6 | 61:3,4,5,8, |
| 6:23 | 51:1,4 56:11 | 237:15 | 12,17 |
| **transfer** | 63:1,7 68:20 | **turn** | **Ty's** |
| 42:10 49:18, | 83:11 89:16, | 77:21,22 | 61:10 |
| 20 82:20 | 24 90:24 | 78:9 162:7, | **type** |
| 167:23 | 98:22 99:8 | 21 163:1 | 58:9,15,19 |
| **transferee** | 100:9 105:16 | 180:20 | 134:17 |
| 47:8,12,13 | 119:17,18 | **Turner** | 222:25 |
| 48:4,10,16, | 129:5 132:21 | 88:24 131:1, | 225:12 |
| 17 49:13,24 | 135:19 | 3,5,8,21 | **typically** |
| 68:22 69:6 | 136:24 141:9 | 132:20 | 96:16 |
| | 143:9 145:24 | 133:13 | |

Lane Koroly Vol 1
April 13, 2026

54

---

**U**

**U.S.**
4:18,23
111:21

**uh-huh**
6:25 132:12
213:5 215:12
222:4

**ultimate**
198:1

**ultimately**
64:24

**unable**
127:20

**unaware**
117:2 129:25
177:15

**under-**
7:25

**underground**
53:24 232:11

**underlying**
17:25 18:11
190:19

**understand**
6:8,19 7:6,
12,15,18,23
21:12 22:20
23:1,21
25:20 32:12,
25 93:12,17,
18 108:25
116:11
117:18
121:15
125:20
141:18
153:19
166:17
173:15
177:19
186:15
192:16
197:20
201:17

**understanding**
13:8 25:17
73:10,12
166:2 176:18
189:22
243:12

**understood**
83:19 140:12
186:15
196:20
198:11
223:11

**undertake**
40:16,21
41:4 43:23
165:3

**undertook**
159:6

**underwear**
230:11

**unique**
232:9

**United**
4:11 109:16
112:7,10,16
113:25
114:6,14,25
115:7 116:3
117:3 118:21
121:11,18
128:2,22
129:6,10
193:15
196:2,10,14
197:16,23

**unlawful**
18:5 38:19
50:14 72:13,
14 158:1

**unlawfully**
38:14 40:18,
22 41:5
125:10 185:4

**unlicensed**
52:22 53:5

**unlike**
39:17

**unrealistic**
147:24

**unrelated**
245:11

**unsold**
165:12

**untrue**
92:25 93:8

**unwilling**
127:19

**update**
165:10

**upstairs**
213:8

**uptick**
76:5

---

**V**

**variance**
196:24
199:1,17
200:15,25
201:14 202:6
204:8,14,19

**various**
78:2

**verbal**
6:24

**verbally**
179:5

**verbose**
191:2

**versus**
118:22
146:11
174:13

**video**
4:5

**video-recorded**
4:8

**video/teleconference**
15:10

**videographer**
4:3,18 50:7,
11 98:4,8
139:9,13
175:16,20
210:25 211:4
246:20 247:2

**view**
24:15 134:8
190:23
196:1,4

**violation**
14:8

**vision**
25:13 26:4
74:21,23
75:2 87:16
89:7 144:17

**visit**
53:8 66:1
79:6 86:23
100:9 169:9
242:9

**visited**
38:5 65:19,
23 100:5
137:13
156:12 181:9
242:5

**visiting**
123:21
182:11,23

**visits**
155:1

**visual**
151:12

**volume**
75:21 76:1,
12,13,21
77:1,5,11
215:21

---

**W**

**Waco**
19:25

wait
  177:20
waived
  116:13,16
waiver
  103:21
waives
  103:12
wake
  224:1
wake-up
  242:15
walk
  43:7 213:2,
  9,11
walked
  138:3 191:5,
  10
wall
  157:3 213:23
  214:3,13
  216:9,11
wander
  75:9
want
  25:3 33:23
  34:12 36:24
  45:13 46:20
  50:22 58:3,
  9,22 65:18
  95:13 96:17
  98:1 125:20
  134:24
  138:21
  141:18 157:9
  166:21
  175:10
  184:17
  186:14 198:7
  199:23
  200:19 202:6
  228:3 229:7
  232:2
wanted
  21:10 58:6
  64:17 71:5
  72:20

104:23,25
144:6 151:8
171:13 188:7
200:15 223:5
243:14
wanting
  243:8
War
  150:3
warn
  231:9,22
warned
  87:5 169:4
warning
  53:6 54:3
  100:7 101:3
  156:19,23
  157:1
watch
  77:22 162:7
way
  22:23 43:14
  45:18 61:21
  64:10 71:24
  75:7 76:14,
  23 94:10
  98:20 108:18
  121:3 125:16
  128:16
  135:23 146:7
  162:9 165:8,
  19 166:5
  167:1 175:8
  200:14
  202:13
ways
  182:8
weapon
  231:14,17,21
wear
  216:17
wearing
  79:9
weasel
  162:20
week
  17:4,9 34:15

73:8 168:22
208:19,24
231:25
235:20,22
236:2
weekend
  136:4 231:18
weekends
  35:22
weeks
  231:24 235:6
Weinstein
  10:24
weird
  51:7 74:6
  131:11,13
  141:14
  162:25
  184:19
went
  26:16 28:3
  36:1,17,23
  57:10 118:8
  127:24
  145:2,16
  180:13
  188:23
  189:6,12
  190:5 214:22
  220:17
  221:2,7
  223:12
  227:21
  235:14 236:2
  237:3 241:22
Wesson
  68:5,6
Westland
  5:21,24
When's
  175:2 206:13
whispering
  4:7 215:23
  237:20
White
  146:12

wife
  9:12,14,17
  16:15 17:17
  26:1 42:17
  171:5 176:10
  183:18
  224:22 230:8
wife's
  240:1
willful
  14:7
win
  172:12
witness
  5:2 6:8,10
  16:10,11
  130:5 138:24
  161:23
  166:6,7
  225:25 226:3
  228:9 246:6,
  23,25 248:2
witnessed
  141:4 147:12
woman
  176:14
word
  33:11,15
  41:1 56:2
  86:18,22
  96:3,5
  145:10
  163:23
  172:10
  183:19 191:3
wording
  76:23
words
  43:12 46:3
  71:4 74:4
  87:4,11
  94:24 102:13
  154:13 161:9
  168:16
  185:23
  230:18
work
  21:11 22:7

Lane Koroly Vol 1
April 13, 2026                                                    56

| | | | |
|---|---|---|---|
| 175:14 | written | 145:16 | 67:16,20 |
| 198:19 | 37:8 | 158:23 | 68:2 84:11, |
| 210:23 225:9 | **wrong** | 164:3,20,21 | 14,16,18,21 |
| **worked** | 86:14,15 | 167:9,20 | 87:4,12 |
| 10:22 27:22 | 87:8 189:14 | 169:1,2,8, | 88:14 94:10, |
| 112:6 133:4, | **wrote** | 23,24 170:25 | 25 95:5 |
| 9,13 150:19 | 94:11 162:25 | 173:2 174:8 | 126:6 144:14 |
| 182:9 | | 175:13 | 160:23 161:8 |
| **working** | | 178:6,21 | 163:17 172:2 |
| 73:15 166:2 | **Y** | 179:1 183:9 | 173:3 174:10 |
| 220:18 | | 184:8 185:5, | 175:5 198:22 |
| **workings** | **y'all** | 12 194:8 | 206:6 211:15 |
| 129:14 | 14:15 97:19 | 204:4 212:23 | 226:13,16 |
| **works** | 99:13 | 213:18 | **yes-or-no** |
| 47:17 88:11, | 138:10,16 | 214:16 | 31:16 110:24 |
| 16 98:2 | 162:3 175:10 | 216:14 | 246:4 |
| 138:15 | **yeah** | 217:1,7,12 | **yesterday** |
| 171:21 | 26:25 44:23 | 218:15 | 226:11 |
| 186:15 | 45:13 50:6 | 219:22 | **Yost** |
| 191:22 | 51:6,12 | 220:15,25 | 54:19 55:6, |
| 199:14 | 54:20,24 | 222:20,22 | 8,9 56:1,2 |
| 200:9,14 | 55:7,21 | 225:3 227:2, | 79:10 153:1, |
| 230:16,19 | 56:24 59:3 | 11 229:2,9 | 3 164:15 |
| 234:15 | 62:25 63:4, | 230:15 | **young** |
| **world** | 10,14,18 | 231:11,18 | 28:11 |
| 150:3 171:21 | 64:15 67:14 | 233:1,13 | **yous** |
| **worried** | 69:8 70:15 | 234:22 | 183:17 |
| 57:1 86:14 | 76:2,17 | 237:13,23 | **Youth** |
| 87:7 130:11, | 78:14 79:5 | 240:10 | 157:11 |
| 17 | 80:13 86:3 | 242:10,15 | |
| **worse** | 87:3 89:14, | 243:4 | |
| 162:16 | 23 90:9 | 244:10,22 | **Z** |
| **worth** | 92:16,22 | 245:3 | |
| 5:21 8:25 | 96:24 97:24 | **year** | **Zoom** |
| 9:1,3 10:23, | 98:3,16 | 9:9,15,18 | 15:8 |
| 24 44:17 | 99:2,16 | 10:25 11:4, | |
| 95:22 96:11 | 101:24 102:6 | 6,9,25 19:23 | |
| 179:25 180:3 | 105:19 | 30:14,25 | |
| 198:8 206:5 | 106:5,23 | 31:3 65:4 | |
| **worthwhile** | 108:17 | 92:7 102:7 | |
| 95:23 | 112:24 | 161:7 172:18 | |
| **Wow** | 122:23 | 185:16 | |
| 174:11 | 123:25 | **years** | |
| **write** | 124:11 126:8 | 9:2,4 10:19 | |
| 120:9,11 | 127:23 | 11:19 20:12 | |
| 129:15,16 | 138:9,14,25 | 29:18 39:3 | |
| 203:25 | 140:23 | 42:18 61:19 | |
| | 141:23 142:3 | 63:6 65:3 | |
| | 144:20 | | |