# EXHIBIT F

Lane Koroly – Deposition Transcript (Selected Portions)

(Filed Under Seal)

the statement for remote proceedings into the record and swear in the witness.

MR. LAMAR:  Chadwick Lamar on behalf of Thomas Roy Harris.

MR. HORNSBY:  Jason Hornsby on behalf of Lane Koroly.

MR. GAFFNEY:  Danny Gaffney on behalf of the ATF.

MS. AYERS:  Ashley Ayers on behalf of ATF.

LANE KOROLY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LAMAR:

Q.    Good morning, Mr. Koroly.  My name is Chadwick Lamar, and I represent Tom Harris doing business as Sporting Arms Company in a civil case called Harris v. Carlson pending in the Eastern District of Texas.

Could you please state your full name, place of residence and place of employment for the record?

A.    Lane Alan Koroly, Fort Worth, Texas, Westland Hospitality Group.

Q.    Could you repeat the place of employment?

A.    Westland Hospitality Group.

Q.    Have you ever provided testimony in a

record at 3:05 p.m.

(A recess was taken from

3:05 p.m. to 3:23 p.m.)

THE VIDEOGRAPHER:  We are back on the
record at 3:23 p.m.

EXAMINATION

BY MR. GAFFNEY:

Q.   Good afternoon, sir.  Can you hear me okay?

A.   Yes.

Q.   All right.  Are you nervous at all today?

A.   Like, it's pretty stressful, like, dragging it
all back up.

Q.   Does that stress impact your memory at all?

A.   I don't think so.  It's just, like, it
happened, you know, five years ago, so I guess that's
what impacts my memory.

Q.   Do you know Tom Harris?

A.   Yes.

Q.   When did you first meet him?

A.   The, like, spring of 2021.

Q.   And -- and how do you know him?

A.   How do I know him?

Q.   Yes.

A.   Through John and Chris.

Q.   Okay.  And -- and approximately when is the

first time you met him and spoke to him face to face?

A.   Like, May or June of 2021.  Whenever the first time I bought two guns is the first time I met him.

Q.   Bought two guns.

Where was that at?

A.   At his FFL, his house.

Q.   At his house.  Okay.

And is there another location for that FFL?

A.   No.

Q.   Okay.  So --

A.   Not that I know of.

Q.   Okay.  To your knowledge, the only location is at Mr. Harris' home?

A.   Yes.

Q.   Okay.  And you've been inside there?

A.   Yes.

Q.   How many times?

A.   Like, a lot.

Q.   Ballpark?

A.   Maybe 50 times.

Q.   50 times?

A.   Probably, yeah.

Q.   Okay.  And can you describe the layout of the business location?

A.    Yes.

Q.    So you walk in the door.  What do you see?

A.    It's, like, stairs on the left, and his office is, like, in a front office room, I guess.

Q.    Uh-huh.

A.    And then it's, like, the living room straight. I think it's, like, the kitchen over here (indicating). I don't know what's, like, upstairs or anything, though.

Q.    Are there firearms when you walk in?

            MR. LAMAR:  Object to form.

A.    Not, like -- sorry.  When you walk into the house or the office?

Q.    (By Mr. Gaffney)  The house.

A.    I don't think so, really.  It's, like -- because it's in that room, I guess.

Q.    Okay.  And -- and by "that room," you mean office?

A.    Yeah.  Sorry.  Yeah.

Q.    Okay.  And when you go into the office, what do you see?

A.    It's, like -- I mean, it could have changed, but last I remember, it was, like, the door.  There was, like, a table on the wall next to the entry door that had, like, ammo.  And there was, like, racks, like, catty-corner to it with guns.  And then I think there

might have been, like, another shelf kind of, like,

L-shaped.  And then his desk that's also kind of, like,

L-shaped and, like, the things on the wall and, like,

the -- there's, like, a thing on the side, like a

bookshelf, maybe, or, like, another kind of desk thing.

Q.   And that room that you just testified to, that's where the business took place?

A.   Yes.

Q.   Okay.  And -- and how big was that room?

A.   Not super big.  Like maybe half -- like from the half table over, probably.  Like -- sorry -- from, like, your left, where the table thing is, to here (indicating), like, the wall.

Q.   So would it be fair to say approximately 15 feet by 15 feet?

A.   I suppose, yeah.

Q.   Okay.

A.   I'm sorry.  I'm not good at, like --

Q.   That's okay.

A.   -- space.

Q.   That's okay.

And when you went in there, were there ever occasions where anyone else would accompany you?

A.   Yes.

Q.   Who?

A.    Chris; John; Sam, I think, once or twice.  I think, like, Chris' brother was there once.

Q.    So on some occasions, it would be you with other people?

A.    Yes.

Q.    Okay.  Was Mr. Harris always in the room with you while you were there?

A.    I don't think he really, like, left.  He was usually, like, there.  Maybe, like, to go to the bathroom or something, but I don't remember a time, like, we're alone --

Q.    Uh-huh.

A.    -- without anyone there.  Does that make sense?

Q.    Right.

So in that confined setting, did you have conversations with other individuals about what you were going to do with the firearms?

A.    Yes.  Like, we would, like, talk and, like, take pictures of items.

Q.    Did you talk quietly, or did you talk like in a normal conversational volume?

A.    I mean, like, relatively close, so it was not, like, hollering, but, like, not whispering either.  Like, I guess, kind of, like, normal, like you would talk to someone, I guess.

Q.    Sure.

And when you had those conversations about what you were going to do with the firearms, where was Mr. Harris?

A.    Like, at his desk.

Q.    How far away?

A.    Like, less than 15, like -- because it's like you were saying, like, 15 feet was like -- it was, like, wall to wall.  But then you have the table, so that's, like, a couple feet.  And then his desk is away from the wall.  Like, the client desk is kind of, like, in the middle of the room.

Q.    Within earshot?

A.    Yeah.  It's, like, kind of a confined area, I guess.

Q.    Did he have headphones on?

A.    I don't think I've ever really seen him wear headphones.

Q.    Was he talking on the telephone?

A.    I think he's talked on the phone before, but it's not, like, sitting on the phone the whole time everyone is there, if that makes sense.

Q.    Do you think he could have heard the conversations that you had with other individuals while you were speaking about those matters within his office?

A.    I would have reason to believe, yeah, that people would, like, hear being in proximity like that.

Q.    Was there loud music playing in the room while you're there?

A.    No.

Q.    Relatively quiet?

A.    Yeah.  It's, like, in a residential neighborhood, so there's not, like, excess noise or, like -- I don't think the TV was, like, ever on.  It was, like, just a normal house.

Q.    Normal office space?

A.    Yeah.  I guess, yeah.

Q.    So on numerous occasions, you purchased firearms from Mr. Harris; is that correct?

A.    Yes.

Q.    Okay.  And that occurred in 2021, correct?

A.    Yes.

Q.    And more specifically, it occurred in the summer of 2021, correct?

A.    Yes.

Q.    And that would have been May 2021 to about August 2021, correct?

A.    Yes.

Q.    Okay.  And when you purchased them, you did not have an FFL, correct?

A.   No.

Q.   And did you tell Mr. Harris that you did not have an FFL?

A.   I don't think I outright stated we don't have an FFL, but it's, like, I never tried to say I had one.

Q.   Did he ever ask?

A.   No.

Q.   Okay.  So, to be clear, you never told him you had an FFL, correct?

A.   I never said we had an FFL, but, like, he would have known after all that that, like, we applied for one.

Q.   And when you purchased those firearms from Mr. Harris, you spoke to him face to face?

A.   Yeah.  It was always in person.

Q.   And you spoke to him about firearms?

A.   Yes.

Q.   And did you speak with him about what you were going to do with those firearms?

A.   It wasn't, like, sitting there, like -- I guess, could you explain, like --

Q.   Sure.

So you buy the guns, right?  And then the next step is:  What are you going to do with them?  Are you going to go shoot them?  Are you going to go sell

them?  Are you going to do something else?

MR. LAMAR:  Object to form.

A.   I guess he never asked what we were going to do with them, but, like, it wasn't, like, talking about what to do with them either, if that makes sense.

Q.   (By Mr. Lamar)  Got it.

At one point in time in the summer of 2021, Mr. Harris asked you how much money you made on reselling the firearms that you purchased from him; is that correct?

A.   Yes.

Q.   And from what you can remember, what did you tell him?

A.   The 50 to 80.

Q.   He never told you not to resell them, did he?

A.   No, he never, like, talked about not reselling.

Q.   And in the summer of 2021, you were purchasing Glocks, right?

A.   The majority, yes.

Q.   And there were some -- on direct, we were talking about a nickname, "Glizzy Boy"; is that right?

A.   Yeah, but it wasn't, like, a nickname.

Q.   Who called you "Glizzy Boy"?

A.   I think, like, Chris might have, like, said it. But it -- it wasn't, like, calling me a nickname.  It

was just, like, kind of, like, a joke name because, like, we were, like, selling a lot of Glocks.

Q.   What does "Glizzy Boy" mean?

A.   I mean, "glizzy" is just, like -- like, a rapper term for, like, Glocks.  So it's, like -- like, making light of selling guns.  But it wasn't like:  Hey, Glizzy Boy, come over here.  It was not used as, like, a nickname.

Q.   Did Mr. Harris ever call you "Glizzy Boy"?

A.   I don't think so.

Q.   You don't think?  Okay.

And after that conversation about price with Mr. Harris, you continued to purchase firearms from him, correct?

A.   Yeah.  I think, like, it ramped up, like, toward the end, kind of, like, a -- because it started out, like, slower.  And then as time went on, it was, like, more, because it -- like, well, it's working, so, like, do more, like, you know, if that makes sense.

Q.   And during the summer of 2021, you purchased Glocks from him, correct?

A.   Yes.

Q.   And as you were purchasing Glocks, did -- did you see more Glocks piling up in his office?

A.   Yeah.  There was, like, a -- not a lot and not,

like, super, like -- like, there was, like, less when I was first there.  And as time went on, it was, like, dominating more shelf space.

Q.    And that's what you were primarily purchasing; is that right?

A.    Yes.

Q.    When you went there in May of 2021, were there a substantial number of Glocks there?

A.    I don't remember how many.

Q.    Was there a difference in the number of Glocks in Mr. Harris' office between May 2021 and, say, August 2021?

A.    Yes.

Q.    When were there more?

A.    In August.

Q.    Okay.  And you were the one purchasing Glocks, correct?

A.    Yes.

Q.    Was there a spreadsheet that was used for accounting for the sales of firearms that you were made aware of?

A.    My spreadsheet?

Q.    With either Mr. Harris or Mr. Remley.

A.    I'm not sure.  Like, I know they kept track of, like, ammo.  I don't know if they kept track of --

because I was the one buying all the guns, so it was, like, they wouldn't have really had much, like, involvement, I guess, in the inventory control, I guess.

Q.   Uh-huh.

A.   But I know they kept track of ammo and stuff.

Q.   And do you know if they did it in, like, an Excel spreadsheet?

A.   I'm not sure.

Q.   Did you ever see it?

A.   I don't think so.  I would -- I mean, I've seen, like, the receipts that lists ammo and the price, but I don't -- like, I never had access to, like, a spreadsheet, I guess, if that's what you're saying.

Q.   Okay.  So I'd like to talk to you about Mr. Corey Staub.

Do you know him?

A.   Yes.

Q.   I think you testified about him on direct; is that right?

A.   Yes.  Yeah, the letter from him.

Q.   Did you describe him as a loudmouth?

A.   Yeah.  It's, like -- like, that kind of, like, guy, I guess.

Q.   Based upon your interactions with Mr. Staub, is he the type of individual that exaggerates?

MS. AYERS:  Object to form.

A.   I think so, because, like, he was talking about, like, making, like, M16s, like to be, like, impressive, I guess.  It's just, like, that kind of guy, like, kind of, like, wanted to be cool, I guess, if that makes sense, or just, like -- like, trying to, like, name-drop, but, like, not names, but, like, doing stuff. And I don't know.  It's, like, a very specific, like, I guess, like, genre of guy, I guess.  I don't know how to, like, describe it.

Q.   (By Mr. Gaffney)  Understood.

You went to gun shows with Mr. Remley, right?

A.   Yes.

Q.   Did you ever see him under the influence of illegal drugs there?

A.   No.

Q.   And you had known Remley since seventh grade; is that right?

A.   Yes.

Q.   Did you ever notice him under the influence of drugs before a gun show --

A.   No.

Q.   -- while you were going there?

A.   Because they would, like, start early.  So it

was, like, wake up and, like, go.

Q.   Have you ever observed or heard Mr. Staub lie, if you can remember?

A.   The M16 thing didn't, like, seem true, but I don't know if it was or not, because it's, like, not really -- he didn't, like -- I guess, like, I don't know why people, like, talk about that.  Like, to seem cool, I guess.  So I don't know if that was, like, true or not, but it seemed kind of, like -- I just kind of, like, ignored him saying stuff like that.  Like, I didn't really put stock in it.

Q.   Thank you.

Do you know Mr. Staub's relationship with Mr. Harris?

A.   Not really, because I met Corey at, like, Canton, so that was, like, later on.  So I don't know how they all knew each other.

Q.   Do you know Mr. Slade Turner's relationship with Mr. Harris?

A.   I know they both had FFLs.  And I remember, like -- I think it was, like, Chris talking like he was hooking up with someone his wife knew.

Q.   What do you mean by -- who is "he"?

A.   Oh, sorry.  Slade.  So, like, maybe a friendship, I guess.

Q.   So, to be clear, you'd describe Mr. Slade -- or Slade Turner and Mr. Harris as friends?

A.   Yeah, I would say, probably.

Q.   Did they have a business partnership that you're aware of, or were they just friends?

A.   I mean, like, they've done business.  I don't know if they're, like, a -- you know, like if it's, like, an official thing, you know, if it's, like, a, like, mutually beneficial, so, like, they work together or whatever.

Q.   In your opinion, do you think Mr. Remley is the type of person that would take advantage of anyone to try to get ahead?

A.   I don't think so.

Q.   And you've known him since seventh grade?

A.   Yes.

MR. GAFFNEY:  Retrieving Mr. Harris' Exhibit 6 from the court reporter.

THE REPORTER:  It looks like this (indicating)?

MR. GAFFNEY:  Yes.

Oh, can I see that, ma'am?

(Complies.)

MR. GAFFNEY:  Thank you.

Handing Exhibit 6 to the witness.







Q.    Thank you, sir.

MR. GAFFNEY:  Retrieving the exhibit from the witness.

Thank you, sir.

Handing the exhibit back to the court reporter.

Thank you, ma'am.

Q.    (By Mr. Gaffney)  Sir, you made a proffer to the government in October 2022; is that correct?

A.    Yes.

Q.    And that proffer would have been closer in time to the -- the sale -- the purchase of -- purchases from -- from Mr. Harris, correct?

A.    Yes.

Q.    Sir, was your memory of those events better in October 2022, or is it better in April 2026?

MR. LAMAR:  Object to form.

A.    October 2022.

Q.    (By Mr. Gaffney)  Because it was closer in

time?

A.   Yeah.  And it's, like, I was thinking of all that stuff then, and, like, I haven't thought about this since, I guess, sentencing.  So it's, like, I -- not put it out of my mind, but it's, like, I just don't like to, like, think about it, if that makes sense.

Q.   Is it fair to say, you want -- you've tried to push those memories out of your head?

A.   Yeah.  Like moved on, basically.

Q.   It's a negative experience, correct?

A.   Yes.

Q.   People generally don't like to think about negative things; is that right?

                MR. LAMAR:  Object to form.

A.   No.

Q.   (By Mr. Gaffney)  You don't like to think about negative things; is that right?

A.   Correct.  I do not like to think about negative things.

Q.   You testified on direct examination about a Glock T-shirt, right?

A.   Yes.

Q.   Who gave you that T-shirt?

A.   Tom gave me, like, two Glock shirts.

Q.   Why?

A.    I guess because he knew I liked Glocks, and he, like, got stuff from distributors, I guess.

Q.    Was it in advance of the meeting that you had with ATF?

A.    It was, like, before the meeting, but I don't think he gave it to me for the meeting, if that makes -- because, like, he gave me that shirt and, like, a really big shirt, like a sleeping shirt for my wife.  And I don't remember why, but it was, like, on the couch, like, by the door.  So when I answered, I was just, like, in my underwear, and so, like:  Okay.  Well, like, hold on.

And, like, I saw it, and I said:  This would be a good idea.  So I put it on to be like:  Oh, yeah, he's, like, a fan.

Q.    Sir, do you know how ATF tracing works?

A.    I guess kind of but, like, not super good.

Q.    In your own words, can -- in general terms, can you just tell us how it works?

A.    So they, like, get a gun and then look up, like, the serial number and, like, follow the transfers to whoever, like, most recently had it.

Q.    Okay.  I'm going to ask you a very specific question:  When did you learn of ATF's interest in the SCCY you purchased from Mr. Harris?

A.   The first time they came to the house.

Q.   Did you learn about it from ATF or through Mr. Harris?

A.   I think it was -- I think it was the ATF because they were saying it was, like, a casino.  I remember him, like, saying, like, they pulled, like, paperwork and, like, traces.  But I don't know if it that was specifically that gun or not.

Q.   Did Mr. Harris warn you the ATF was going to contact you regarding the SCCY?

A.   Yeah.  He said they were going to definitely, like, come.  I don't know if he said specifically, like, the SCCY or not.

Q.   And did you purchase that weapon in August 2021?

A.   Yes.

Q.   And did you sell that weapon?

A.   Yeah.  I sold it at the -- like, that weekend, I guess, because I remember they said it was, like, 7 days or something, and then they had it, so --

Q.   How long after you sold that weapon did Mr. Harris warn you about the ATF contacting you?

MR. LAMAR:  Object to form.

A.   Maybe, like, two weeks.  It was, like -- like, a week or two before they actually came, he was saying,

like, they pulled it.  Like, they're definitely going to want to know about what's going on.

Q.   (By Mr. Gaffney)  Did he tell you why they were going to come?

A.   I don't think he said, like, why.

Q.   Okay.  Who told you the firearm was recovered in a gambling den?

A.   I think it was the agents, because I remember, like, thinking that was, like, kind of -- not unique, necessarily, but kind of -- like, I've never heard of, like, an underground gambling den before, so it, like, stuck in my head.

Q.   Did Mr. Harris instruct you or coach you regarding what you should say to ATF when they called you about the SCCY?

MR. LAMAR:  Object to form.

A.   He was just, like:  To say you only trade them or collect them, not to, like, admit to selling them.

Q.   (By Mr. Gaffney)  Why would he tell you that?

MR. LAMAR:  Object to form.

A.   I -- well, I guess, so, like, they wouldn't have my own statement to, like, start going deeper into what was happening, if that makes sense.

Q.   (By Mr. Gaffney)  But he did tell you not to tell the ATF that you sold them, correct?

A.    Yeah.  Only say, like, you traded for, like, silver or other guns or whatever or, like, crypto.

Q.    And it was after being approached by the ATF that you refrained from purchasing firearms with the intent to resell, correct?

A.    I think I was going to stop, like, before they came because I was figured it was getting, like -- like, it was already kind of getting too big.  But then, like, obviously, when they came, I definitely, like -- like, that was, like, a bigger deal than this thing.  Like, hey, like --

Q.    Did it seal your decision?

A.    Yeah.

Q.    Are you aware, however, that Mr. Remley continued to buy firearms from Mr. Harris with the intent to resell those firearms?

A.    Yes.

Q.    Do you know how many firearms Mr. Remley purchased?

A.    I'm not, like, totally sure.  It was less than me, though.

Q.    Okay.  Before you stopped, do you recall how many firearms you purchased from Mr. Harris?

A.    Maybe, like, over half.

Q.    What do you mean?  Half of what?

A.   Of the 118.

Q.   Okay.

A.   So -- but I don't know exactly, like, how many, no.

Q.   Can you give an approximate number?

A.   Oh.

MR. LAMAR:  Object to form.

Q.   (By Mr. Gaffney)  Can you give an approximate number of firearms that you purchased from Mr. Harris in the summer of 2021?

A.   Maybe, like, 70, give or take, because a bulk of those was, like, the lowers.

Q.   Thank you, sir.

Do you know how an ATF multiple sales report works?

A.   Like, I do now because, like, they send, like, the record in with -- I guess it's like the 4473 they, like, send.

Q.   You testified on direct that you discussed with Mr. Harris that Mr. Harris was required to record multiple sales of pistol handguns; is that correct?

A.   Yeah.  I think it's, like, everybody, though.

Q.   Who educated you about reports of multiple sales?  How did you learn that?

MR. LAMAR:  Object to form.

Q.    (By Mr. Gaffney)  How did you learn about multiple sales reports?

A.    I think it was, like, when the agents had, like, a list of everything.  But I thought that was because they pulled all the paperwork, like, a couple of weeks before they actually came.  So I don't -- I don't remember when I learned, like, specifically what they were.  It was, like, after all the buying stuff.

Q.    Thank you, sir.

MR. GAFFNEY:  One moment, ma'am.

(Conference between Mr. Gaffney and Ms. Ayers.)

Q.    (By Mr. Gaffney)  Sir, just to put a finer point on it, in the summer of 2021, you went to Mr. Harris' office and purchased firearms, correct?

A.    Yes.

Q.    Okay.  And approximately how many occasions did you go there?

MR. LAMAR:  Object to form.

A.    It was at least, like, once a week, because, like, the shows and then maybe, like, more than once a week because I was selling to, like, other people outside the shows, too.  Like, for -- like, for, like, J.J., I would go separate because, like, it wasn't show prep days, if that makes sense.

Q.   (By Mr. Gaffney)  Okay.  So in August of 2021, you went there approximately once per week.

When you did that, how often were you accompanied by another individual?

A.   Probably most of the time.  Like, I'd go with, like, Chris or John.  I didn't go, like, alone super often because it -- like, they knew him better than me.

Q.   Okay.

A.   And it was, like, we were, like, friends, and we would, like, hang out.  So it was, like --

Q.   And would you go -- would Chris or John go into the office with you?

A.   Yes.

Q.   And when you said:  We were all friends, did those individuals have a comfortable relationship with Mr. Harris?

A.   I would say they had a more comfortable relationship than me because they'd known him longer.

Q.   Okay.  And did you observe them talking to Mr. Harris?

A.   Yes.

Q.   And would Mr. Harris come up and talk to you guys and just talk about a number of topics?

A.   It was mostly, like, guns and ammo-related or, like, the news, maybe, stuff like that.  But he was

usually, like, at his desk, though.  He wasn't, like, getting up.

Q.    But to be clear, when you went into that office with either John or Chris, you would have conversations with them about selling those guns, correct?

A.    Yes, like -- because we would talk about, like, the shows and what's, like, going on.

Q.    And what was going on at the shows was the sale of firearms, correct?

A.    Yes.

Q.    And Mr. Harris was there -- was nearby while you had those conversations, correct?

A.    Yeah, because, like, we weren't, like -- it was, like, we were, like, talking to each other and stuff, because it wasn't, like, trying to be, like, secretive about everything, because I figured, like, it was, like -- so everyone was, like, talking about what show was next and, like, what's going to happen when and stuff like that.  So it's, like, it wasn't, like, whispering and stuff.  It was, like, talking like normal, I guess.

Q.    Normal conversational tone?

A.    Yeah.

Q.    To your knowledge, Mr. Harris does not have an impairment with his hearing, does he?

A.   I don't think so.

Q.   Has he ever told you that he has an impairment with his hearing?

A.   I don't think so.

MR. GAFFNEY:  Thank you.

No further questions.

MR. LAMAR:  I have roughly 10 redirect questions.

FURTHER EXAMINATION

BY MR. LAMAR:

Q.   Mr. Koroly, do you recall during cross-examination agreeing that you bought firearms from Mr. Harris, quote, between May 2021 and August of 2021?

A.   Yes.

Q.   Isn't it true that you purchased your first firearm from Mr. Harris in June 2021?

A.   It could have been June, but it was, like, the summer, is how I'm, like, thinking of it.  So if it's, like if it was, like, June 1st, like a day from May, so it's, like, maybe I'm off on, like, a day or something. But it's, like, it was the beginning of summer.  So when I think of that, I'm thinking of, like, not really April, but, like, May/June is, like, the beginning of summer, because I don't know the exact date we met either about.  So it's, like -- just kind of seems like